Anthony J. Staltari
**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**
51 Madison Avenue
New York, New York 10010
(212) 849-7000

OF COUNSEL:
Rollo C. Baker*      Ellison Ward Merkel*
Edgar O. Aliferov*      Sophia Y. Hill*
**Quinn Emanuel Urquhart
& SULLIVAN, LLP**
51 MADISON AVENUE
NEW YORK, NEW YORK 10010
(212) 849-7000

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **STANISLAV ROYZENSHTEYN and ROMAN GERASHENKO,**<br><br>       Plaintiffs,<br><br>**v.**<br><br>**ONYX ENTERPRISES CANADA INC., PRASHANT PATHAK, CAREY KURTIN, J. WILLIAM KURTIN, KAILAS AGRAWAL, IN COLOUR CAPITAL INC., CANACCORD GENUITY GROUP INC., and LEGACY ACQUISITION SPONSOR I LLC.**<br><br>       Defendants. | Civil Action No. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**(Filed Electronically)** |

---

* *Pro hac vice* applications to be submitted.

## **TABLE OF CONTENTS**

**Page**

NATURE OF THE ACTION ................................................................1

PARTIES ..........................................................................................7

    A.    Plaintiffs ............................................................................7

    B.    Defendants .........................................................................8

    C.    Relevant Non-Parties ........................................................11

JURISDICTION ...............................................................................13

BACKGROUND ...............................................................................17

    A.    The Founders Create And Build A Tremendously Successful
            Company. ...........................................................................17

    B.    Defendants Get A Controlling Interest In Onyx At An Absurdly
            Depressed Value With A Cash-Out Option. .......................20

    C.    Pathak, And C. Kurtin Consolidate Control Over Onyx In Order
            To Facilitate An Eventual Cash-Out Transaction. .............24

    D.    Controller Defendants Hunt For A Transaction That Would
            Trigger Their Liquidation Preference. ...............................26

    E.    Defendants Set Their Sights On A SPAC Merger. .............39

    F.    Defendants Ram Through A Self-Interested Merger With
            Legacy. ..............................................................................45

    G.    The Merger Was Fundamentally Flawed And Unfair. ........69

    H.    The Merger Gravely Injured The Founders. .......................81

COUNTS ..........................................................................................88

PRAYER FOR RELIEF .....................................................................100

JURY DEMAND ...............................................................................101

Plaintiffs Stanislav Royzenshteyn ("Steven") and Roman Gerashenko ("Roman") (together, "Plaintiffs" or "Founders"), by and through their undersigned counsel, for their complaint against Defendants Prashant Pathak, Carey Kurtin and Kailas Agrawal, each a former director (the "Director Defendants") of Onyx Enterprises Int'l Corp. ("Onyx" or the "Company"), the Company's controlling stockholder, Onyx Enterprises Canada, Inc. ("OEC," and collectively with Director Defendants, the "Controller Defendants"), J. William Kurtin and In Colour Capital, Inc. ("ICC"), affiliates and controllers of OEC, Canaccord Genuity Group Inc. ("CGG"), and Legacy Acquisition Sponsor I LLC (the "Sponsor"), allege as follows:

## **NATURE OF THE ACTION**

1.     Plaintiffs bring this action seeking recovery against the Defendants for the egregiously unfair and economically nonsensical SPAC merger transaction through which Defendants conspired to dilute Plaintiffs' interests in the Company while securing themselves a windfall at Plaintiffs' expense.  Having wrongfully wrested a controlling stake in the Company from Plaintiffs just a few years before (the subject of an entirely separate lawsuit), the Controller Defendants doubled down on their misconduct by agreeing to an unfair and grossly underpriced merger that was designed to allow them to cash out their stake in the Company while giving away a massive portion of Plaintiffs' stake in exchange for essentially no

consideration, thereby causing a special injury to Plaintiffs as minority common stockholders.

2.      On September 18, 2020, the Controller Defendants and the Sponsor agreed to a merger whereby Onyx would combine with a special purpose acquisition company ("SPAC") called Legacy Acquisition Company, LLC ("Legacy"). SPACs, also known as "blank check" companies, go public without having any business or operations of their own, and raise money from investors in the public markets by selling shares (and warrants) for $10 each. They put the proceeds from those sales into a trust account, and then use that money to acquire a stake in a private company that the SPAC merges with, taking the target company public. The private company gets the cash in the SPAC's trust account and an efficient process for going public, while in exchange, the SPAC's shareholders get to own a share of the target company that is proportional to their cash contribution. However, shareholders who purchase stock in the SPAC before the target company is selected retain the right to redeem their shares for a return of their $10 purchase price before the merger closes, making the amount of money available to purchase a stake in the target company uncertain.

3.      To address this uncertainty, target companies typically negotiate protections—such as minimum cash requirements or outside investments—that will ensure they are fairly compensated for selling an interest in their company. No company acting rationally would forego these protections, which are necessary to be

certain that the target company receives some benefit from the deal.  Indeed, as the Company's financial advisor, CGG, explained it during an August 28, 2020 Onyx Board Meeting ██████████████████████████████████████████████

██████████████████████████

4.      Yet that is exactly the deal that Defendants made.  Onyx was a thriving e-commerce company that the Founders built from the ground-up into a Company that Defendant CGG had valued between $400 and $600 million.  While Legacy ostensibly had up to $64 million in cash proceeds available to compensate Onyx's stockholders for the stake of this valuable and growing Company that Legacy and the Sponsor were to receive in the deal, in reality less than $45 million of that cash was actually available to be paid, and all of it was susceptible to redemption.  But the Defendants, acting for themselves and for the benefit of the Controller Defendants, were myopically focused on the $20 million cash-out liquidation preference payment that OEC expected to receive in a qualifying liquidation event.  And Legacy and its Sponsor were themselves laser-focused on an impending deadline for Legacy to complete a merger or else return all the cash in their trust fund and lose their entire investment in the SPAC. ███████████████████████

████████████████████████████████████ Mutually focused on getting a deal done at all costs, Defendants agreed to a merger that wildly underpriced Plaintiffs' shares in Onyx and, unlike for the Controller Defendants, provided no

cash consideration to Plaintiffs.   The merger also poised the value of the "consideration" that Plaintiffs did receive (i.e., shares in the combined business entity) to plummet by ignoring Plaintiffs' warnings that Defendants would be forcing the Company public at an inopportune moment, and ***provided no cash protections at all to the Company***.   Essentially, Legacy (and by extension its Sponsor) received a sizable stake in the Company in exchange for no consideration at all besides a payoff to the Controller Defendants.

5.     Onyx's Director Defendants could have insisted on a public investment in private equity ("PIPE") backstop to secure the promised proceeds, like Virgin Orbit had received after 82.3% of the shares related to their SPAC transaction were redeemed.  They could have also secured an investment via convertible notes, like Buzzfeed had done after 94.4% of the shares related to their SPAC transaction were redeemed.  They could have made the merger contingent upon contribution of a minimum amount of funds, or pushed for a higher valuation on the deal so that Legacy would have received a smaller percentage of the Company.  They did none of these things, because they were focused on securing their 4X cash liquidation preference.

6.     As a result, when the deal was announced and Legacy faced an incredible 84%+ redemption rate, Onyx was left with only $9 million out of a promised $65 million—100% of which was paid to OEC to cash out the $5 million

injected in the Company—by the time the merger closed on November 20, 2020 (the "Merger"). To make matters worse, the post-Merger entity was saddled with millions of dollars' worth of expenses resulting from the transaction. Yet Legacy, and by extension the Sponsor, were still awarded their 9.68% stake, and CGG was awarded its success fee—leaving Plaintiffs holding the bag, with no cash consideration in a deal that grossly undervalued the Company. Plaintiffs were left with a massively reduced ownership stake following a value-destroying and unfair transaction in the Company that they had built from the ground up.

7.     The Director Defendants knew full well that they were conflicted given their interest in receiving a unique cash-out payment from the deal; they also knew that the SPAC was motivated to get a deal done immediately and at any costs. Yet despite being well aware of these conflicts, the Director Defendants did not: (a) explore the value to all stockholders of not proceeding with the Merger, (b) negotiate a price or transaction structure that ensured some value for the common stockholders, or (c) determine the fairness of the Merger to the common stockholders. Nor did the Director Defendants set up a special committee to address the inherent conflicts they faced in the transaction. Thus, the Director Defendants approved the Merger without instituting any of the safeguards or due diligence demanded of them under the circumstances.

8.     Worse still, the Plaintiffs knew from the outset that this was a sham transaction, a terrible deal for the Company's shareholders without any rational justification beyond Defendants' own self-interest, that was highly likely to destroy the Company's value by taking it public before it was ready.  When they voiced their concerns numerous times, the Director Defendants and OEC purported to invoke contractual provisions that would have permitted them to "drag along" the Plaintiffs and act as their proxies in approving the transaction.  But the transaction did not come close to meeting the price threshold that was required for the Controller Defendants to invoke this drag-along provision.  Nor did the transaction qualify to trigger the cash-out liquidation preference.  Desperate to extract a non-ratable benefit, the Controller Defendants simply ignored the plain terms of the contracts, just as they disregarded their fiduciary duties.

9.     At bottom, as a result of the Controller Defendants' breaches of fiduciary duty and contract, and the other Defendants aiding and abetting those fiduciary duty breaches, the Controller Defendants forced through a transaction that undervalued Onyx by no less than hundreds of millions of dollars, and assigned imaginary value to Legacy's stock—which in fact had no value independent from the value of the Company with which it was merging.  Legacy contributed **no** cash to the balance sheet of the surviving entity, paying all of the scant cash it had to the Controller Defendants.  As the Controller Defendants' own financial advisor

6

expressly advised, this defeated the entire purpose of the transaction, because

████████████████████████████████████████████████████████████

The Controller Defendants went through with the Merger anyway, at Plaintiffs' expense and causing Plaintiffs a special injury.

10.     As a result of Defendants' misconduct, Plaintiffs suffered damages well in excess of $100 million dollars.

## PARTIES

**A.     Plaintiffs**

11.     Plaintiff Stanislav Royzenshteyn is one of the co-founders of Onyx and was its President from 2008 until 2018 and its Chief Executive Officer ("CEO") from December 2018 to July 2020.  Steven was also a director of Onyx from 2008 until the transaction closed in November 2020 and at all relevant times was a minority shareholder of the Company.  He is a resident of Monmouth County, New Jersey.  Immediately prior to the Merger, Steven held 24% of the common stock of Onyx.  Following the transaction, Steven held approximately 18.42% of the common stock of PARTS iD.

12.     Plaintiff Roman Gerashenko is the other co-founder of Onyx and was its CEO from 2008 to December 2018.  Roman was also a director of Onyx from 2008 until the transaction closed in November 2020 and at all relevant times was a minority shareholder of the Company.  He is a resident of Monmouth County, New

Jersey.  Immediately prior to the Merger, Roman held 24% of the common stock of Onyx.  Following the transaction, Roman held approximately 18.42% of the common stock of PARTS iD.

## B.   Defendants

13.   Defendant Prashant Pathak ("Pathak") was a Director of Onyx and remains on PARTS iD's post-Merger board as Chairman of the Board.  Pathak was at all relevant times a principal of Onyx Enterprise Canada ("OEC"), which received Onyx shares in the 2015 Transaction (defined below) and became the controlling stockholder; Chief Executive Officer of Ekagrata Inc. ("Ekagrata"), which facilitated the 2015 Transaction; and one of two principals of In Colour Capital, Inc. ("ICC"), which loaned the funds to OEC to effectuate the 2015 Transaction.  Pathak is a resident of the province of Ontario, Canada.

14.   Defendant Carey Kurtin ("C. Kurtin") was a Director of Onyx until the Merger.  Like Pathak, C. Kurtin was at all relevant times a principal of OEC and a principal of ICC.  C. Kurtin is a resident of the province of Ontario, Canada.

15.   Defendant J. William Kurtin ("W. Kurtin") is the father of C. Kurtin and a resident of the province of Ontario, Canada.  W. Kurtin provided ICC $5 million to get control of Onyx through OEC.  Upon information and belief, W. Kurtin has been directly advising his agents, namely C. Kurtin and Pathak, to take the actions complained of in this Action.  W. Kurtin has on information and belief

derived some pecuniary benefit from ICC as a result of the Merger and/or was compensated as a result of the Merger.

16.     Defendant OEC is an Ontario corporation, which held 1,000,000 Preferred Shares in Onyx and 217 Warrant Shares in Onyx, totaling 52% of the Company, until the date of the Merger. *See* Series A Stock Purchase Agreement dated July 7, 2015, at § 1.2.  As the controlling stockholder, OEC had a purported veto power over certain Onyx transactions under the Company's Bylaws (the "Bylaws") and Amended and Restated Certificate of Incorporation (the "COI").  For example, OEC's consent was required for any substantial capital expenditure, entry into a transaction with any director or officer, increase in the size of the board of directors, or approval of any executive compensation package or the annual budget. Additionally, as the controlling stockholder, OEC had the power to effect any substantial change to Onyx's COI or Bylaws. *See* Onyx's Bylaws, § 5.1 and Onyx's COI, Art. VI (B).

17.     Pathak, C. Kurtin, and W. Kurtin are directors, officers, employees, independent contractors and/or agents of OEC, and/or derive some pecuniary benefit from their association with OEC, and/or were compensated by OEC for acting as directors of Onyx.  As of September 30, 2022, Pathak either directly and/or in his corporate capacity through OEC holds 14,305,445 shares in PARTS iD Common Stock, equating to approximately 42% of the outstanding common stock.

18.    Defendant In Colour Capital Inc. ("ICC"), is an investment fund and was incorporated in Ontario in or around April 2015.   ICC is owned 50% by Ekagrata Inc. (whose principal is Pathak) and 50% by 2427014 Ontario Inc. (whose principal is C. Kurtin).   Preferred shares in ICC are owned by 2425470 Ontario Inc. (whose principal is W. Kurtin).

19.    Defendant Kailas Agrawal is Pathak's family friend, who was brought into Onyx as a consultant on or about October 1, 2015.  From 2016 to 2017 Agrawal served as Chief Financial Officer ("CFO") of ICC and remained on ICC's payroll until January 2018.  Concurrently, Agrawal served as Onyx's *de facto* CFO from approximately December 2015 through January 2018.  Agrawal became Onyx's official CFO from January 1, 2018 to March 26, 2020 (when he abruptly resigned), and he returned as CFO from August 6, 2020 until the date of the Merger.  Agrawal served as Onyx's provisional director from July 13, 2018 until the date of the Merger and is the current CFO of PARTS iD.  Agrawal is a resident of Ontario, Canada.

20.    Defendant Legacy Acquisition Sponsor I LLC (the "Sponsor") is a Delaware Limited Liability Company that was formed for the sole purpose of creating a SPAC that would effectuate a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses. The Sponsor's managing member is Edwin J. Rigaud.

Mr. Rigaud held sole voting and dispositive power of the Sponsor's voting shares in Legacy Acquisition Corp.

21.     Defendant Canaccord Genuity Group Inc. ("CGG") is an investment bank primarily based in Canada, but with offices around the world, including the United States.  On April 15, 2019, Onyx retained CGG as a financial advisor to assist in Onyx's review of its "strategic and financial alternatives, including one or several possible business combinations."

22.     Defendants OEC, Pathak, C. Kurtin, and Agrawal are referred to herein as the "**Controller Defendants**."

23.     Defendants Pathak, C. Kurtin, and Agrawal are referred to herein as the "**Director Defendants**."

## C.     Relevant Non-Parties

24.     Onyx Enterprises Int'l Corp. ("Onyx"), which was based in Cranbury, New Jersey, was co-founded by Roman Gerashenko and Steven Royzenshteyn in 2008.  Onyx was one of the world's largest e-commerce retailers of automotive parts and accessories, with an emphasis on specialty automotive products.

25.     As of the 2015 Transaction, Onyx offered 3.5 million unique products across 11 core departments, selling over 800 brands categorized into the following segments:  interior and exterior accessories, performance parts, automotive lighting, wheels and tires, audio and electronics, auto repair parts, tools and garage, RV

accessories, and outdoor and recreation.  The Company had more than 500 suppliers for more than 150 product lines.

26.     As of December 31, 2014, the Company had over 9 million visitors and over 40 million page views per month, and 1.7 million customers of the Company's online retailer of auto spare parts, CARiD.com.

27.     Legacy Acquisition Corp. ("Legacy") was incorporated in Delaware on March 15, 2016.  Legacy was formed for the purpose of raising capital in the public markets in order to effectuate a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more private companies.  The corporation had no operations and did not generate any operating revenues.  On November 20, 2017, Legacy completed its initial public offering through the sale of 30,000,000 public units at $10.00 per unit, yielding a total of $300,000,000 in profits that were placed in a trust account.  Simultaneously with the Legacy IPO, the Sponsor had purchased an aggregate of 17,500,000 private placement warrants at a price of $0.50 per warrant, for an aggregate purchase price of $8,750,000.  Each member of the Sponsor was an officer and/or director of Legacy.

The following chart depicts the relationship between certain relevant parties and non-parties:

**William (Bill) Kurtin**
Provided **$5M** through ICC to Onyx Canada
Introduced to Plaintiffs by Carey Kurtin (son) and
Prashant Pathak

**Ekagrata Inc.,**
Private equity firm, Canada corp.
Prashant Pathak, CEO
Provided term sheet for 2015 transaction

**In Colour Capital
formed 2015**
Formed by Prashant Pathak and Carey Kurtin to facilitate capital investments
Prashant Pathak, 1 of 2 Principals (since April 2015)
Carey Kurtin, 2 of 2 Principals (since April 2015)
Kailas Agrawal, CFO (from 2016 to 2017)
William Kurtin, Shareholder, & Primary funder of funding (**$5M** for 2015 Transaction)

**Legacy Acquisition Sponsor I LLC**
**incorp DE**
Ed Rigaud, Member
Darryl McCall, Member
Richard White, Member

**2008 Onyx Enterprises Int'l Corp.**
**incorp May 2008, NJ**
Roman Gerashenko, Director & CEO
Stanislav Royzenshteyn, Director & President

**Onyx Enterprises Canada Inc.,**
**incorp April 2015, Canada**
Provided $5M to ONYX
Prashant Pathak, President & Director
Carey Kurtin, Director

**Legacy Acquisition Corp.**
**incorp March 2016, DE**
Ed Rigaud, Chairman & CEO
Darryl McCall, COO
Richard White, Board Member

**2015 Onyx Enterprises Int'l Corp.**
Kailas Agrawal, CFO (from January 2018 to March 2020, and from August 2020 to November 2020),
Provisional Director (from July 2018 to November 2020)
Prashant Pathak, Chairman of the Board (Director from 2015 onward)
Carey Kurtin, Director (from 2015 to November 2020)
Roman Gerashenko, Director (from 2015 to November 2020), CEO (from 2015 to December 2018)
Stanislav Royzenshteyn, Director (from 2015 to November 2020), President (from 2015 to 2018),
CEO (from December 2018 to July 2020)

**PARTS iD, Inc.**
**Principal stockholders:** Onyx Enterprises Canada, Roman Gerashenko, Stanislav
Royzenshteyn, Legacy Acquisition Sponsor I LLC
**Officers:** Antonino Ciappina, Kailas Agrawal, Ajay Roy, Mark Atwater
**Directors:** Prashant Pathak, Aditya Jha, Lev Peker, Rahul Petkar, Edwin J. Rigaud,
Darryl T.F. McCall, Richard White

## **JURISDICTION**

28.     This Court has subject matter jurisdiction over this action pursuant to

28 U.S.C. § 1332(a)(1), insofar as the matter in controversy exceeds the sum or value

of $75,000, exclusive of interest and costs, and there is complete diversity of

citizenship between Plaintiffs and Defendants.

29.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C.

§ 1391(b)(2) and/or (b)(3) in that a substantial part of the events or omissions giving

rise to the claims occurred in this district, and Defendants are subject to personal jurisdiction in this district.  Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(c)(3) because Pathak, C. Kurtin, W. Kurtin, and Agrawal reside in Canada, and OEC and ICC are incorporated and, upon information and belief, headquartered in Canada; thus, these parties may be sued in any judicial district.

30.     The Court has personal jurisdiction over OEC pursuant to New Jersey's long-arm rule, New Jersey Rule of Civil Procedure 4:4-4, and the United States Constitution.  Personal jurisdiction over OEC is appropriate because it has availed itself of the laws of New Jersey when it:  acquired a majority stake in Onyx (a New Jersey corporation), engaged in continuous business and repeated contact with Plaintiffs (New Jersey citizens), engaged in wrongful conduct in connection with the Merger (including through its agents Pathak and C. Kurtin), and received significant benefits at the expense of Plaintiffs.

31.     The Court has personal jurisdiction over Pathak, C. Kurtin, and Agrawal pursuant to New Jersey's long-arm rule, New Jersey Rule of Civil Procedure 4:4-4, and the United States Constitution.  Personal jurisdiction over Pathak, C. Kurtin, and Agrawal is appropriate because they have availed themselves of the laws of New Jersey by acting as directors of Onyx (a New Jersey corporation), by engaging in continuous business and repeated contact with Plaintiffs (New Jersey citizens), by engaging in wrongful conduct in connection with the Merger, and by

14

receiving significant personal benefit at the Plaintiffs' expense.  Pathak, C. Kurtin, and Agrawal traveled to New Jersey for Onyx Board meetings on multiple occasions.

32.    The Court has personal jurisdiction over W. Kurtin pursuant to New Jersey's long-arm rule, New Jersey Rule of Civil Procedure 4:4-4, and the United States Constitution.  Personal jurisdiction over W. Kurtin is appropriate because he has availed himself of the laws of New Jersey as a principal funder of OEC as it purchased Onyx, a New Jersey corporation.  Additionally, upon information and belief, W. Kurtin was involved in the wrongful conduct that resulted in the Merger—including by directing and/or advising his agents to engage in wrongful conduct—and received a pecuniary benefit and/or compensation from the wrongful Merger at the expense of Plaintiffs.  W. Kurtin traveled to New Jersey on multiple occasions to meet with Plaintiffs for Onyx business matters.

33.    The Court has personal jurisdiction over ICC pursuant to New Jersey's long-arm rule, New Jersey Rule of Civil Procedure 4:4-4, and the United States Constitution.  Personal jurisdiction over ICC is appropriate because it has availed itself of the laws of New Jersey as a principal funder of OEC as it purchased Onyx, a New Jersey corporation.  ICC knew that New Jersey was Onyx's principal place of business, and it aimed its tortious conduct at New Jersey in inducing OEC to

breach its contractual obligations to Onyx. Upon information and belief, ICC received a pecuniary benefit from the Merger.

34. The Court has personal jurisdiction over the Sponsor pursuant to New Jersey's long-arm rule, New Jersey Rule of Civil Procedure 4:4-4, and the United States Constitution. Personal jurisdiction over the Sponsor is appropriate because it has availed itself of the laws of New Jersey by being responsible for pushing the transaction at issue here and directly benefiting from it, the same transaction which resulted in the merger of Onyx, a New Jersey corporation. The Sponsor knew that New Jersey was Onyx's principal place of business, had repeated contact with Onyx, and aimed its tortious conduct at New Jersey in inducing OEC to breach its obligations and duties to Onyx.

35. The Court has personal jurisdiction over CGG pursuant to New Jersey's long-arm rule, New Jersey Rule of Civil Procedure 4:4-4, and the United States Constitution. Personal jurisdiction over CGG is appropriate because it has availed itself of the law of New Jersey by engaging in continuous business and repeated contact with Onyx, by engaging in wrongful conduct in connection with the Merger (including aiding and abetting OEC's breaches of fiduciary duty) and by receiving significant benefit at the expense of Plaintiffs. CGG's agents and/or representatives traveled to New Jersey for meetings with Onyx and Plaintiffs on multiple occasions.

16

## BACKGROUND

**A.    The Founders Create And Build A Tremendously Successful Company.**

36.    In 2008, Steven and Roman founded Onyx, an e-commerce retailer engaged in the business of marketing and distributing various automotive parts and accessories around the world through its online stores, with an emphasis on specialty automotive products.

37.    From 2008 to mid-2015, Onyx remained a private corporation operated by Steven and Roman as sole owners and as President and CEO, respectively. Through the Founders' efforts, what originated as a small start-up business developed into one of the largest and most sophisticated specialty automotive aftermarket sales and technology platforms in the United States.

38.    Onyx's substantial growth and development was unusual compared to most startups in that it never took any outside capital or investments. The Company never carried significant debt. Instead, the Founders built Onyx through a strict commitment to re-investing the lion's share of cash flow and profits back into the Company for its continuous development and growth. Between 2010 and 2014, the Founders grew the revenue from $29 million to $154 million—reflecting a 5X increase in revenues. During that time period, the Founders never once went to the market to obtain capital or financing. In a February 2015 valuation assessing the fair market value of Onyx as of December 31, 2014, Silicon Valley Bank Analytics

valued Onyx at $258 million.  The Company was primed to continue expansion into an auto parts market, which was recording 17% year-over-year growth.

39.    As an e-commerce business, Onyx's success was driven in large part by its skillful optimization of advertising search engine results.  In late 2013, as a result of changes by Google, Inc. to its advertising and search platforms, Onyx had to expend substantial additional sums to protect its online presence and market share.

40.    Ultimately, in 2014, the Founders decided to explore the possibility of a cash infusion from an outside investor in order to invest in necessary changes, grow the business, and strengthen the Company's balance sheet.

41.    While searching for outside capital, the Founders were introduced to several potential partners, including Defendant Pathak, by way of his private equity firm based in Canada, Ekagrata Inc. ("Ekagrata").  Pathak then introduced the Founders to C. Kurtin, and later to W. Kurtin, his personal acquaintance, business partner, and C. Kurtin's father.

42.    The Founders and Pathak began discussions about a potential deal. During those discussions, Pathak represented that if Plaintiffs gave up a majority of Onyx's shares, he would utilize his deep relationships with Canadian Tire Corporation ("CTC"), Canada's largest retail empire, to conclude a lucrative partnership between Onyx and CTC pursuant to which CTC would become a

minority stockholder in Onyx.  In addition, Pathak and CTC would provide a nominal $5 million to Onyx to facilitate the partnership.

43.    The Founders knew that a relationship between Onyx and CTC could, among other things, increase Onyx's brand recognition, allow an upgrade in back-office infrastructure, provide capital for increased marketing and buying power, improve vendor discounts, permit creation of a series of private label products, introduce Onyx to new, larger vendors, and maximize marketing to drive even more web traffic to Onyx.  Although neither of the Founders had experience in raising capital nor an established network for borrowing the necessary funds, they reasonably believed that a partnership with CTC would be a compelling strategic fit and take Onyx from a valuable but niche e-commerce company to a major retailer.

44.    Believing that a truly transformational partnership with CTC was around the corner at a valuation premium, the Founders agreed to move forward with the deal.[1]

---

[1]    As explained below, though not the subject of this Action, on March 22, 2018, the Founders filed a complaint in the Superior Court of New Jersey, Chancery Division, Monmouth County, against Pathak, C. Kurtin, Ekagrata, Inc., OEC., Onyx Enterprises Int'l, Corp., ICC and W. Kurtin for fraud in connection with the 2015 Transaction, with the caption *Stanislav Royzenshteyn and Roman Gerashenko v. Prashant Pathak, et al*., Docket No. MON-C-45-18, which is pending trial (the "Fraud Litigation"). On November 6, 2020, the defendants in the Fraud Litigation moved for summary judgment. The motion as to the direct claims against the defendants was denied on August 31, 2021.  To the extent that transactions in connection with the Fraud Litigation are alleged herein, they are solely for background.

**B.     Defendants Get A Controlling Interest In Onyx At An Absurdly Depressed Value With A Cash-Out Option.**

45.     On July 17, 2015, trusting that Pathak and C. Kurtin would fulfill their promise to complete the CTC partnership, the Founders proceeded with the transaction (the "2015 Transaction").

46.     In order to facilitate the 2015 Transaction, Pathak and C. Kurtin formed OEC, and W. Kurtin provided it $5 million, through ICC, to be used for purposes of the transaction.  W. Kurtin's holding company, 2425470 Ontario Inc., sent the funds by direct wire to Onyx.

47.     The 2015 Transaction was memorialized in several agreements between the Founders, Onyx, and OEC.  Relevant here, the Parties executed the Stockholders Agreement and Series A Preferred Stock and Warrant Purchase Agreement (the "Stock Purchase Agreement") and amended the Company's Certificate of Incorporation and Bylaws (together, the "2015 Transaction Documents").[2]   Certain terms of the 2015 Transaction Documents relevant to this Action are laid out below.[3]

---

[2]  The Stockholders Agreement, Stock Purchase Agreement, Amended and Restated Certificate of Incorporation and Amended Bylaws are attached as Exhibits A, B, C and D hereto.

[3]   The Stockholders Agreement and Stock Purchase Agreement are subject to Delaware law.  *See* Exh. A, § 7.4 and Exh. B, § 6.2.

48.   *First*, OEC paid $5 million and received 1,000,000 Preferred Shares of Onyx and a warrant to purchase 52% of the common shares of Onyx. *See* Exh. B, § 1.2.  OEC exercised the warrant in late 2015, though whether OEC ever paid the nominal purchase price for the common shares of Onyx is under dispute in the Fraud Litigation.

49.   *Second*, OEC obtained the right to select two of the four members of the Onyx Board of Directors.  Acting for OEC, Pathak and C. Kurtin immediately appointed themselves to Onyx's Board.  Steven and Roman continued as the other two members of the Board.

50.   *Third*, Section 4.5 of the Stockholders Agreement contained a "Drag-Along Clause," which states in part:

> In the event that [OEC] determine to accept an offer for a Sale of the Company for a **purchase price of *at least* $45,000,000**, then [OEC] shall give written Notice to the Company and to each of the [Founders] in accordance with Section 4.2 (a "***Drag Notice***") and may obtain from such offeror a bona fide offer addressed to each [Founder] to purchase all (but not less than all) of the [Founders'] Stock on the same terms and conditions as forth in the Drag Notice.  Upon receipt of such Drag Notice, the [Founders] will be required to sell all of the [Founders'] Stock on the same terms and conditions as set forth therein. The [Founders'] acceptance of the offer will be made in writing and delivered to [OEC] within fifteen (15) days of receipt of the Drag Notice.

51.   *Fourth*, in connection with other sections of the Stockholders Agreement, Section 5.1 appointed OEC as the "irrevocable proxy" of the Founders

21

to "vote the Voting Shares in accordance with [the Stockholders Agreement] and to execute all appropriate instruments consistent with the provisions of this Agreement on behalf of such Stockholder."

52.     *Fifth*, Onyx's Amended Certificate of Incorporation specified a payout to OEC under certain, particularly defined circumstances.  Specifically, under the Amended Certificate of Incorporation, any "Acquisition or Asset Transfer" would be a "Deemed Liquidation" entitling OEC, as the preferred stockholder, to "an amount per share of Series A Preferred equal to the sum of (i) four (4) times the Original Issue Price plus (ii) any accrued but unpaid Accruing Dividends ...." *See*  Exh. C, Art. IV (B) (3)(a), 4(a).

53.     "Acquisition" is defined as "any consolidation, stock exchange or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, **other than any such ... merger** or reorganization **in which the stockholders of the Company immediately prior to such ... merger** or reorganization, **continue to hold a majority of the voting power of the surviving entity in substantially the same proportions ... immediately after such ... merger or organization** ...." Exh. C, Art. IV (B) (4)(b).[4]

---

[4]   "Asset Transfer" is defined as "a sale, lease or other disposition of all or substantially all of the assets or intellectual property of the Company or the granting

54.     Thus, under the Amended Certificate of Incorporation, in the event of a merger involving Onyx in which its stockholders did not continue to hold a "majority of the voting power in substantially the same proportions" as held prior to the merger, OEC would be entitled to $20 million—4X the $5 million it provided— plus any accrued but unpaid Accruing Dividends (hereafter, the "Liquidation Preference").   After full payment of that Liquidation Preference in a qualifying Acquisition, the "consideration received in such transaction" "shall be distributed ratably to the holders of the Common Stock."  Exh. C, Art. IV (B)(3)(a–b).

55.     However, OEC would not be entitled to the Liquidation Preference in the event that post-merger the stockholders of Onyx continued to hold a "majority of the voting power in substantially the same proportions" as held prior to the merger.   Under those circumstances, all consideration received in the transaction would be distributed ratably to the common stockholders.

56.     Pathak and C. Kurtin, through their ownership of ICC, and W. Kurtin, who had provided the initial $5 million to ICC, stood to benefit directly from any Liquidation Preference paid to OEC.

---

of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of the Company."  Exh. C, Art. IV (B) (4)(b).

**C.    Pathak, And C. Kurtin Consolidate Control Over Onyx In Order To Facilitate An Eventual Cash-Out Transaction.**

57.    Unbeknownst to the Founders, around the time of the 2015 Transaction, Pathak and C. Kurtin torpedoed the promised partnership with CTC—finding pretextual bases to discourage and ultimately end CTC's interest—and with it, the foundation for Plaintiffs' decision to give up 52% of the Company and accept OEC's $5 million.

58.    Rather than pursue an intelligent growth strategy—like a partnership with CTC—the Controller Defendants began engaging in irresponsible and scattershot discussions with investors in which they made apparent that they lacked any real understanding of Onyx's business fundamentals.  Notwithstanding that the Founders had grown Onyx from nothing to an e-commerce juggernaut completely on their own, Pathak and C. Kurtin seemed determined to interfere with and stymie the Founders' management of the Company.  With two voting directors from each faction, Pathak and C. Kurtin would frequently deadlock the Board's vote or renege on important commitments.  As a result, the Board was unable to act on important matters concerning the management of Onyx's affairs.

59.    Pathak and C. Kurtin quickly installed an ally in senior management. Kailas Agrawal, Pathak's long-time family friend and neighbor, who was an employee of Defendant ICC and became ICC's CFO in 2016.  Agrawal was hired as a consultant for Onyx on October 1, 2015.  At this time, Agrawal was still on ICC's

24

payroll, though his salary was funded by Onyx.  Agrawal remained on ICC's payroll until January 2018, when he became Onyx's official CFO.  Agrawal then served as Onyx's CFO from January 2018 until March 2020.[5]

60.    Dysfunctional conduct continued over nearly two years.  Pathak and C. Kurtin repeatedly went to the market with poorly executed proposals evidencing that they had little business acumen for running the Company.

61.    On March 22, 2018, the Founders filed a complaint against OEC, Pathak, C. Kurtin, W. Kurtin, ICC, and their affiliates, in Superior Court of New Jersey, Monmouth County, Chancery Division alleging, among other things, that in connection with the 2015 Transaction, Pathak, C. Kurtin, W. Kurtin and OEC had made fraudulent and material misrepresentations, breached their fiduciary duties, oppressed the minority stockholders, and tortiously interfered with the Founders' prospective economic relations (the "Fraud Litigation").[6]  That lawsuit was filed

---

[5]   On multiple occasions in or around 2017, W. Kurtin met with the Founders to pursue a plan to replace Pathak as an Onyx Director.  In the course of these meetings and during the onboarding process, W. Kurtin confirmed his influence and control over Pathak and C. Kurtin.  W. Kurtin eventually decided not to replace Pathak on the Board, but upon information and belief, continued to direct Pathak and C. Kurtin's actions.  He also met with Agrawal on at least one occasion in or around 2017, to discuss Onyx business matters and management disputes.

[6]   On July 1, 2019, the Founders filed a Verified Second Amended Complaint.  On November 6, 2020, the defendants in that case filed a motion for summary judgment, which was denied in predominant part on August 31, 2021.  On February 18, 2022, the defendants filed a second motion for summary judgment relating to the availability of certain categories of damages, which the Special Master on June 1,

years before the Merger challenged here; the Fraud Litigation is entirely separate from this lawsuit, which focuses only on the Merger.

62.     Due to the frequent deadlocks caused by a 2-2 board as mentioned above, and with their employment agreements expiring on July 17, 2018, the Founders, Pathak, C. Kurtin, and other defendants in the Fraud Litigation cross-moved for the appointment of a provisional fifth director to the board.  On July 13, 2018, relying on assurances by Agrawal—who was then acting as Onyx's CFO—that he would not be controlled by or beholden to Pathak despite being Pathak's friend, longtime employee and associate, the Founders proposed him as one of the nominees.  Unbeknownst to the Founders, Agrawal had colluded with Pathak and C. Kurtin against the Founders for years prior to his appointment and intended to remain their staunch ally once appointed to the Board.

**D.     Controller Defendants Hunt For A Transaction That Would Trigger Their Liquidation Preference.**

63.     Having consolidated their control and sidelined the Founders, the Controller Defendants shifted their sights to finding a transaction—any transaction—that would trigger a 4X return on the $5 million they initially provided, as soon as possible.

---

2022 recommended be partially granted and is now pending a final decision and order of the Court.  The Fraud Litigation is awaiting a trial date.

1. **Controller Defendants mislead the Founders into believing a banker would assist in fundraising while instead focusing on a sale at all costs.**

64.     On August 30, 2018, the Founders presented a three-year strategic roadmap of the Company, which consisted of three parts: (1) dedicate 70-80% of company efforts toward the core business model; (2) raise $5 million to purchase a new domain name and prepare for a larger fundraise for growth and other capital expenditures; and (3) migrate the Company's operations under a single brand,[7] pursue global marketing, and expand the Company's international operations as well as its warehouse distribution/private label.

65.     During the continuation of the August 30, 2018 Board meeting on September 20, 2018, the Board discussed details on how to appoint an investment banker for the fundraising process that the Founders had outlined.  Specifically, the Board resolved to "appoint [an] Investment Banker whose objective will be to discuss and deliver strategic options for the company which includes [a] minimum of $25M to 30M capital to fund immediate requirement[s] of the company."

---

[7]     The Company does business under a number of brands, including: CARiD (automotive parts & accessories), MOTORCYCLEiD (motorcycle parts & accessories), POWERSPORTSiD (powersports parts & accessories), TRUCKiD (semi-truck parts & accessories), BOATiD (boat parts & accessories), CAMPERiD (RV parts & accessories), RECREATIONiD (outdoor sports & camping gear), and TOOLSiD (tools & garage equipment). *See* https://www.carid.com/about-us.html. The Founders' goal was to achieve increased market strength by unifying its multiple automotive brands under one universal name.

66.     During the Board's December 22, 2018 meeting, the Board discussed various approaches to the fundraising, and eventually agreed that the fundraise should be for a minimum of $25 million.  The Board unanimously agreed that, prior to signing an engagement letter with a bank, the Company should inform the bank of the Fraud Litigation and seek its input as to any adjustments to the process it would need to make to account for the dispute.  The Board further resolved that all Board members would attend each of the banker's presentations; that to the extent feasible, all Board members would participate on calls regarding the fundraise; that there would be unanimity as to the process of fundraising; and, critically, that there would be "[n]o withholding communication and/or information with [the] board as it relates to [the fundraising] process."

67.     At no time during these three Board meetings was there a discussion of simply putting Onyx up for sale, let alone a sale regardless of the merits of the transaction or that in any such sale the Board would accept whatever price was offered by the potential buyer.[8]

---

[8]   After engaging in these seemingly productive discussions at the December 22, 2018 Board meeting, C. Kurtin, Pathak and Agrawal voted against renewing Roman's employment agreement and to terminate him from his 10-year position as CEO of Onyx.  During the board meeting, C. Kurtin and Pathak held no more than ten minutes of discussion on the topic, and had no plan for how to replace Roman or locate another CEO with his experience, skill set, or vast knowledge of the industry.

68.     In early 2019, the Board had pursued seven investment banks (four of which were recommended by Pathak and C. Kurtin and three which were recommended by the Founders).  After several meetings with the Onyx Board and receipt of financials and other information concerning Onyx, the Board heard presentations from only two investment banks:  Greenhill & Co. ("Greenhill") and Canaccord Genuity Group Inc. ("CGG").  Pathak and C. Kurtin had recommended both Greenhill and CGG.  CGG, in particular, had a very close relationship with W. Kurtin, and on information and belief had represented him in prior significant transactions.

69.     In February 2019, CGG provided the Onyx Board with a 50-page presentation that found Onyx to be a "compelling, differentiated opportunity for investors due" to many factors:

## / Executive Summary

*We are excited to present our thoughts and credentials to Onyx (the "Company") regarding a possible sale or recapitalization*

- We have meaningful relevant experience selling tech-enabled companies in the e-commerce sector (D2C and B2B) and have a track record of obtaining premium valuations for our clients
  - This will be relevant as we position and present the Onyx growth story to strategic and financial buyers in order to orient them towards a premium valuation
- Onyx is a compelling, differentiated opportunity for investors due to its:
  - Cutting edge platform technology in the e-commerce ecosystem, including the Company's industry-leading big data fitment algorithm
  - Highly respected category leadership in the automotive parts aftermarket
  - 10 million unique SKU's, 5,000+ brands and over 600 invaluable vendor relationships
  - Geo-focused virtual warehouse supply chain integration, with flexibility of marketplaces and online-to-offline integration
  - Unique user experience path that drives purchase intelligence and content development
  - Extremely cost efficient and effective development and operations
- We anticipate Onyx appealing to both strategic and financial buyers who can leverage the Company's proprietary fitment algorithm, penetrate new verticals and optimize the long-term opportunity across several markets
  - We recommend conducting an initial focused process, reaching out to a select group of strategic and financial buyers before opting to commence a broader outreach

*Today's discussion will address critical process considerations and underscore Canaccord's firm-wide commitment and belief that we are the optimal investment banking partner for Onyx and its stakeholders*

cg/         Page 1         Driven by your success.

70.    The presentation explained that CGG's "initial assumption, based on discussions with stakeholders, is that the current primary objective is to sell the Company" and that CGG "would seek to engage a selected subset of potential strategic and equity partners with a proven ability to help companies execute their growth strategies."   The presentation noted, however, that if Onyx "desires to explore a growth capital raise, we would be excited to assist the Company, given our platform's core growth capital raising capabilities."  The Founders were not involved in those initial discussions and so were surprised not only that such discussions had

occurred without them, but also that during those discussions CGG was given the impression that the "assumption" was a sale of the Company.

71.   CGG analyzed Onyx across numerous "Key Operational Metrics," including 3-Year Revenue CAGR and Gross Margin, comparing them to peer benchmarks.   Based on CGG's diligence on Onyx and its peers in the market, including public comps and precedent transactions, the presentation included a "Summary Valuation Overview," which presented a valuation range of between $400 and $600 million:



31

72.     Following CGG's presentation, Defendant Pathak moved to appoint CGG as Onyx's investment banker.  On March 13, 2019, Pathak, C. Kurtin and Agrawal approved the appointment by e-mail.  The Founders wrote to their fellow Board members that they were concerned about the objective of engaging CGG when the February 2019 presentation explicitly stated, contrary to the Board's prior discussions, that "[o]ur initial assumption, based on discussions with stakeholders, is that the current primary objective is to sell the Company."  Pathak responded, essentially, that the vote (by e-mail) of a majority of the Board was final.  The Board never issued a formal written consent or resolution approving CGG's retention.

73.     Under the Controller Defendants' direction, Onyx retained CGG on April 15, 2019.  Per the terms of the engagement letter, CGG was retained as the "exclusive financial advisor in connection with the Company's review of its strategic and financial alternatives, including one or several possible business combinations, through purchase, sale, merger, joint venture or otherwise … or by means of a merger, consolidation, reorganization, recapitalization, spin-off, joint venture, partnership, … strategic alliance, or any other transaction of a like nature …."  Any such transaction was defined as a "Transaction."

74.     As Onyx's exclusive financial advisor, CGG was also to assess the possibility of a "Financing Transaction," whereby Onyx issues "new equity and/or debt securities … for cash."

75. 

76.

77.     It quickly became clear that CGG—under the direction of the Controller Defendants—was focused solely on a "Transaction" whereby Onyx would be acquired by a third party.  When dealing with potential investors, rather than present Onyx as an optimal candidate for short term growth funding, CGG effectively auctioned off the Company, and set "bid deadlines" for investors.

78.     The Founders, who had built the Company from scratch through sweat and tears, were primarily focused on building the Company through organic long-

term growth.  They encouraged sequential and short-term fundraises to support the various expansion efforts described above, including Onyx's universal domain acquisition, global marketing, and international expansion.  Additionally, from a strategic perspective, the Founders understood that an investment opportunity framed as a short term fundraise for growth purposes would entice investors and lead to a higher valuation, even if the ultimate goal was the sale of the Company.  Indeed, the Founders were amenable to consider an outright sale of the Company, if it was at an appropriate valuation.  But they opposed an undervalued wholesale acquisition of Onyx, which the Controller Defendants' fire sale strategy seemed to invite.

79.    The Founders made their views known to the Controller Defendants and CGG, and questioned CGG's marketing tactics.  In an email to CGG dated October 11, 2019, the Founders expressed concern that Onyx would be perceived as wearing a "For Sale" sign because CGG was focusing on a "full acquisition" of Onyx and was not sufficiently exploring growth funding.  They also worried that "the valuation would be greatly impacted as we are the ones that look desperate . . . Last thing [we] want to do is damage our reputation on the market and in front of our competitors as being desperate."

80.    Unfortunately, the Founders' worries came to fruition.  Strategic acquirers easily read the Controller Defendants' and CGG's signs of desperation, and took advantage by pricing the transaction well below the valuation levels.  Thus,

by March 2020, CGG had received only two firm offers to purchase Onyx, at bids far below those CGG had presented in February 2019.

81.    The Founders continued to express their view to the Controller Defendants that they did not support a sale of Onyx at any cost, and that Onyx was well positioned to grow without an outright sale of the Company—and would certainly do better by messaging as such to potential acquirers.

82.    The Founders also expressed continued concern with Pathak's, C. Kurtin's, and Agrawal's business judgment, especially given that none of them had any experience running an e-commerce company like Onyx (or any major operating company, for that matter), and that all of them seemed to have tunnel-vision towards finding an exit, regardless of whether such exit was in the best interests of Onyx and its common stockholders or likely to maximize the Company's long-term value.

### 2.    The Controller Defendants force out the Founders while making increasingly desperate maneuvers to achieve a payout.

83.    With the ongoing Fraud Litigation in which Founders were seeking to retake control of the Company and following a failed marketing process, the Controller Defendants became increasingly unhinged in their efforts to extract value to the detriment of the Founders.

84.    Notably, private equity firms generally run on five-year timelines, looking to partner with a company, and then exit with a profit, by the five-year mark.

The five-year window for ICC—of which Pathak and C. Kurtin are both principals, and which had created and funded OEC in order to partner with Onyx using $5 million received from W. Kurtin—was closing in 2020.

85.    Evidencing their panic, in February 2020, CGG recommended that Onyx accept an offer of approximately $55 to $65 million from Wheel Pros, LLC/Clearlake ("Clearlake") for 100% of Onyx.  The Controller Defendants were willing to accept the deal (apparently because they were focused on realizing the Liquidation Preference) but the Founders believed it significantly undervalued Onyx, even by CGG's own analysis.  The Founders voted against the Clearlake proposal.

86.    With clearly divergent views on a "sale at any cost," the relationship between the Founders and the Controller Defendants grew increasingly acrimonious.

87.    Pathak and C. Kurtin then planned a raid of the Company by calling a default as a purported secured creditor of Onyx, further demonstrating their singular interest in cashing out and abandoning the Company.

88.    With knowledge of this scheme, on March 26, 2020, Agrawal resigned from his position as CFO.  In an email sent minutes after his resignation, Agrawal stated that "with too many conflicts and continuous fights, I don't see a future here …. I resign as CFO asap."  Nevertheless, Agrawal continued as a provisional Board member after having stepped down as CFO.

89.    A few hours after Agrawal's abrupt resignation, C. Kurtin issued a Redemption Notice as a "secured creditor" of Onyx and owner of Class A Preferred Shares on behalf of the Controller Defendants.  The Redemption Notice claimed that Onyx was in default on the redemption of Series A Preferred provision contained in Onyx's Certificate of Incorporation for: (i) failure to pay accruing dividends, and (ii) ceasing to be "solvent" as defined in the Restated Certificate of Incorporation. *See* Exh. C, Art. IV (B)(5)(b-c).  On the same day, on the basis of this purported notice, OEC unlawfully sought to take possession of approximately $15 million from Onyx's bank accounts under certain Deposit Account Control Agreements and a Blocked Account Control Agreement.  The day after, the Founders sought to restrain the Controller Defendants from accessing Onyx's bank accounts by motion in the Fraud Litigation.  The Court granted the temporary restraining order on April 14, 2020 and ordered that that any exceptional expenditures outside the normal and ordinary course of business be subject to Board approval.   The Controller Defendants would have to find some other avenue to extricate cash from the Company.

90.    The Controller Defendants then turned towards other retaliatory measures.  For example, on April 25, 2020, the Controller Defendants issued "Resolutions For Consideration By The Board Of Directors" which threatened an

investigation and pursuit of "a claim for damages" against the Founders for having voted against the Clearlake deal.

91.    In another act of retribution, at the July 10, 2020 Board meeting, Pathak executed the Controller Defendants' plan to terminate Steven by proposing that the Board "accept" Steven's "resignation" as the CEO of the Company.    Steven responded by stressing that he had not resigned from the Company, and that the decision whether to resign was to remain in his sole discretion through July 19, 2020, by virtue of the express language of his employment agreement.   The Director Defendants ignored these statements and voted to accept the fictional resignation.

92.    After having improperly removed Steven, the Director Defendants named Antonino Ciappina to serve as Onyx's Interim General Manager ("GM"). The Director Defendants seemingly took this action without having spoken to Mr. Ciappina about the position prior to the appointment or evaluating his suitability.

93.    Mr. Ciappina had joined Onyx just five months earlier, in January 2020, as Chief Marketing Officer.  Mr. Ciappina had no prior experience as a CEO, no prior experience in the automotive industry, and no prior experience managing hundreds of overseas contractors – a key aspect of Onyx's business.[9]  Before joining Onyx, Mr. Ciappina held marketing roles in companies selling children's products

---

[9]    Many of Onyx's independent contractors were located abroad, including in Ukraine, Belarus, the Philippines, and Costa Rica.

and clothing, such as Toys R US, Kenneth Cole, Gilt Groupe, The Children's Place, and Foot Locker.[10]

94.    Mr. O'Hern, the Company's counsel, noted that the action was drastic and put the Company at risk, and explained to Pathak that, "you said you have to protect the company. You're basically saying nobody's running the company right now.  That's a problem."  Pathak snapped back at Mr. O'Hern, "[d]on't make this more difficult than it is" and that he would have "more direction" on Mr. Ciappina, "by the end of day."

95.    Thus, by the middle of 2020, the Controller Defendants—who were affiliated with and/or controlled by ICC and W. Kurtin—were desperate to find some other exit to trigger the Liquidation Preference.

96.    As set forth below, the Controller Defendants found their perfect match in a so-called blank check company, where that company's sponsor was equally desperate to close on a transaction for its own self-interested financial reasons.

## E.    Defendants Set Their Sights On A SPAC Merger.

97.    On July 8, 2020, Mark Young and Chris Blackwell of CGG initiated contact with Legacy, a special purpose acquisition company ("SPAC").  Upon information and belief, CGG had provided banking services for Legacy.

---

[10]    *See*, https://www.linkedin.com/in/ninociappina (last accessed December 22, 2022).

Mr. Blackwell also knew Legacy's Director, Richard White, from their prior work at Canadian Imperial Bank of Commerce.  Mr. White had shared with Mr. Blackwell that Legacy's then-pending deal with a seller based in China had "become complicated," and that Legacy would soon be searching for another target company to acquire.

### 1.   SPACS generally.

98.    SPACs are "blank-check" companies that go public with no operations of their own.  Instead, the purpose of a SPAC is to raise money in the public markets and then to identify a privately-held company with existing operations and take that company public by merger.

99.    SPACs go public via an initial public offering before they have identified a target to merge with, selling their shares to the public at a price of $10 per share.  The money raised through the IPO is then placed in a trust account, which is then used to cover the SPAC's expenses and as consideration for the acquisition of a target company.

100.   Individual SPACs are created and underwritten by a sponsor, typically an investment firm with an established track record that allows investors to trust that the SPAC will comport with its fiduciary obligations, conduct thorough diligence, and exercise sensible business judgment in identifying a target company that will benefit from the SPAC's financial resources and access to the public markets.

101.   Once public, the SPAC's governing documents typically provide the sponsor a period of two years in which to find a target company and complete a merger.  Typically, once a target is identified, the sponsor will conduct due diligence, and negotiate with the target company the way any merger or acquisition would be negotiated.  Depending on how much money the SPAC has in its trust account, it will typically negotiate with the target company to acquire a commensurate amount of that company's stock.  For example, in a simplified example, if a SPAC has sold 100,000 shares at $10 per share, and therefore has $1,000,000 in its trust account, it would typically be able to acquire approximately a 10% share in a company worth $10 million.  That 10% interest will then be distributed between the sponsor, which earns a premium on its investment in the form of shares in the merged company, and public shareholders.  In turn, in exchange for diluting its existing shareholders, the target company will have received $1,000,000 that it can use to fund its business and operations.

102.   Once a merger is agreed upon, its terms and details will be memorialized in a proxy statement issued by the SPAC.  Based on that proxy statement, investors in the SPAC can choose (1) whether to vote their shares in favor of the merger and (2) whether to stay invested in the SPAC, and thereby the merged company, or to redeem their shares and receive back the $10 stock purchase price.

103.   Because the shareholders' redemption right creates uncertainty as to the amount of cash that will actually be exchanged for the interest in the target company that the SPAC is acquiring, the parties typically take at least two actions in order to protect the target company from the downside risk of a high redemption rate.  First, they negotiate a "minimum cash" closing condition, which provides that the merger will not close if a certain minimum level of cash is not paid to the target company through the transaction.   Second, they solicit tag-along investments known as "private investment in public equity" or PIPE investments, which can provide additional cash to make the deal worthwhile to target companies.

104.   If the sponsor is unsuccessful in completing a merger within the two-year time frame (and does not obtain extensions to that time frame), the money in the trust is returned to its investors, and the sponsor will lose its entire investment, its sunk costs in the form of time and effort attempting to find a target company, and the opportunity to realize a return from the success of a target company.

105.   Correctly executed, SPACs can create value for stockholders through successful acquisitions of privately held target companies and subsequent increases in the value of those companies, and for the target companies by providing an infusion of cash and access to the public markets in a more streamlined process than an IPO.  But the conflicts inherent in their structure, including, among other things, pressure on the sponsor to do any available deal before the SPAC's deadline in order

to salvage a profit and avoid losing their investment, may incentivize a sponsor to act in its own self-interest.

### 2.   Legacy.

106.   Legacy was formed and taken public by its sponsor, Legacy Acquisition Sponsor I LLC (the "Sponsor"), which (1) selected the SPAC's directors, (2) dominated the SPAC's management, (3) made an investment in SPAC shares and warrants to cover the SPAC's underwriting fees and working capital, and (4) received a 20% equity stake in the SPAC for only a nominal investment. *See* Legacy Schedule 14A at pg. 30.   The Sponsor held 7,500,000 founder shares (purchased for $25,000) and 17,500,000 private placement warrants (purchased for $8.75 million) in Legacy.

107.   Upon its formation, the Sponsor took Legacy public in 2017 through an IPO that sold 30,000,000 units at $10.00 per unit, including the underwriters' exercise of their overallotment option—which brought the proceeds of the IPO to $300,000,000.   Consistent with SPAC practice, the proceeds of the IPO were placed in trust for the benefit of the public stockholders.   Those funds could be used to pay for redeemed shares, to contribute to a merger (including the payment of certain expenses in that transaction), or to return the public stockholders' investment in a liquidation.

108.   As described in Legacy's Form S-1 registration statement, Legacy initially had a 24-month window, until November 21, 2019, to consummate a merger.  If Legacy failed to complete a deal during that window and was unable to obtain an extension by vote of its stockholders, Legacy would be required to liquidate and return its public stockholders' funds, with interest, which would have rendered the Sponsor's investment and its 20% stake worthless. The Sponsor, therefore, had a significant incentive to find and execute a merger.

109.   By the middle of 2020, the Sponsor had been unable to find a target company within the allotted window despite having received several deadline extensions.  During the then-latest deadline extension, from March 2020 to June 2020, Legacy's investors had redeemed shares equal to $242 million (79.0% of Legacy's restricted cash).  Legacy's trust account, which had held $300 million in 2017, held only $64.5 million by June 2020.

110.   But not all hope was lost for the Sponsor.  If the Sponsor found a target before November 20, 2020, the final deadline extension, the Sponsor would earn an immediate return on its investment, receive benefits from post-SPAC positions as directors/officers, and had the potential to earn millions more depending on SPAC performance and other factors.  Alternatively, if the Sponsor remained unable to find a target by November 20, 2020, Legacy would have been forced to return the

remainder of the funds in trust (about $63 million before the Merger was announced) and cease to exist and the Sponsor's warrants would expire, worthless.

## F.  Defendants Ram Through A Self-Interested Merger With Legacy.

111.  As described above, in early July 2020, CGG had indicated that Legacy's pending deal with a target company had "become complicated."  On July 21, 2020, the deal between Legacy and that target company fell through—just as Mr. White had suggested would happen to CGG's Blackwell.  Legacy was now in a race to find a new target and consummate a transaction before November 20, 2020 in order to avoid a liquidation.  Time was of the essence.

### 1.  The Controller Defendants and Legacy negotiate a merger at record speed.

112.  On July 22, 2020, Onyx's outside counsel Dan O'Hern wrote to the Board that he "was contacted yesterday by Mark Young of CG[G] to inform me that CG[G] would be sending over to me a new NDA regarding a potential interested party" and that "this was the first [O'Hern] had heard of this potential opportunity."

113.  On July 27, 2020, Onyx—under the direction of the Controller Defendants—and Legacy executed a non-disclosure agreement.  Throughout the relevant period, the Controller Defendants refused to involve and timely share information with the Founders concerning the potential transaction with Legacy even though the Founders remained members of the Onyx Board and had the right, under New Jersey law and the parties' prior agreements, to stay involved and receive

all such information on a timely basis.  From July 2020 through the consummation of the transaction, the Founders repeatedly requested information relating to the potential transaction and were repeatedly and improperly stonewalled and given incomplete and belated information.

114.   On July 27, 2020, the Controller Defendants received Legacy's prospectus from CGG.

115.   On July 28, 2020, Legacy, the Controller Defendants, and representatives of CGG rushed to conduct an introductory meeting.  Present at the meeting were Legacy's Chairman & CEO Ed Rigaud, Chief Operating Officer ("COO") Darryl McCall and Board Member Richard White, and other Legacy management; Onyx's Pathak, Interim GM Mr. Ciappina, and COO Ajay Roy; and representatives of CGG.  The Founders first learned about this meeting only after it had occurred.

116.   On July 29, 2020, CGG sent Onyx's audited financial statements to Legacy.  That same day, Legacy met with CGG to discuss a possible transaction, public company comparisons, and other financial metrics.

117.   On July 30, 2020, Legacy provided a draft letter of intent (the "July LOI") to CGG, which was immediately shared with the Controller Defendants.

Founders did not receive this document until the end of August 2020, nearly a month after CGG and the Controller Defendants had received it.[11]

118.   The July LOI makes clear that during the July 28, 2020 meeting (from which the Founders were excluded) Pathak and CGG focused on the Liquidation Preference as being the top priority.  The second paragraph on the very first page of the July LOI highlighted that ███████████████████████████████████

████████████████████████████████  In other words, the Sponsor understood that the Controller Defendants were laser focused on getting the Liquidation Preference—4X their $5 million plus unpaid Accruing Dividends—and the Sponsor wanted to make it crystal-clear to the Controller Defendants that the Sponsor had heard their concern and was willing to "play ball" to ensure that cash would be made available to pay off the Controller Defendants.[12]

119.   The July LOI valued Onyx at an enterprise value of ███████████████

██████████████████████████████████████████████████████

██████████████████████████  The  July  LOI  proposed  that  the ████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[11]   The July LOI is attached hereto as Exhibit E.

[12]   ████████████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ [13]

120.   Thus, from the very first LOI, the deal was structured so that the overwhelming majority of the consideration in the deal would be in Legacy equity, with the cash consideration entirely going to the Controller Defendants to pay the Liquidation Preference.  The Founders would merely receive stock in the surviving entity—stock which had no value separate and apart from the value of Onyx, the Company they already owned.  Even further, the Controller Defendants were perfectly happy to saddle Onyx with significant transaction expenses; they were prepared to do whatever necessary, no matter how unfair to the Founders, to close the deal so they could trigger the Liquidation Preference.  And to the extent the Controller Defendants would earn any return on their common stock in the future, they viewed it as a lottery ticket.  The Controller Defendants would have already achieved their economic objective through the Liquidation Preference.

121.   On August 1, 2020, Legacy prepared a revised LOI and implemented changes to the July LOI based on Onyx's input (the "August LOI").[14]  The Controller Defendants unilaterally provided whatever input they gave without any attempt to

---

[13]   Reflecting the rushed nature of the transaction, the July LOI contained numerous typos.
[14]   The August LOI is attached hereto as Exhibit F.

include the Founders in these negotiations.  The Founders, despite having held roles as Onyx Directors, had no insight into the specific input Onyx provided.

122.   Recognizing that something was afoot and that the Founders were being sidelined, on August 4, 2020, Steven sent Onyx's Interim GM Mr. Ciappina a demand for copies of and access to the books and records of the Company. As set forth in the demand, Steven was a shareholder and Board member of Onyx, and as a Board member of the Company he had an "absolute unqualified right to inspect the corporate books and records" of the Company.  Among other records, Steven sought "records sufficient to establish the steps you are taking or intending to take for the Company, including, without limitation, your objectives and timelines."

123.   Steven never received any response to his demand.

124.   On August 4, 2020, Onyx—under the control of the Controller Defendants—executed the August LOI on behalf of Onyx.  The August LOI, like the July LOI, ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

125.   In other words, the Controller Defendants and Legacy agreed, at least as of the August LOI, █████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████   This is consistent with how most SPAC mergers are structured; as a blank check company with no operations of its own, the SPAC's stock has no value independent from the Company it is acquiring.  Thus, the chief consideration that the target company is receiving is the cash from the trust account. As it turned out, the Controller Defendants took no steps to ensure that a minimum amount of "remaining Legacy cash" would be available as a condition to proceeding with the deal.

126.   The August LOI stated that ████████████████████████

▪████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████

127.   Again, the shares being offered were valueless on their own—they simply reflected the share of the merged company that Onyx's shareholders were entitled to after accounting for the percentage of the Company that the SPAC purportedly purchased through its cash contribution.

128.   The August LOI further specified that Legacy and Onyx would ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

129.   Thus, under the terms of the August LOI, ██████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

130.   On August 5, 2020, after Onyx—under the direction of the Controller Defendants—had already signed the August LOI, Pathak forwarded the executed LOI to the Board, including the Founders:



131.   Pathak's cover email reflected his true focus, highlighting that the August LOI had ████████████████████████████████ Rather than attempt to negotiate a fair price for Onyx or literally any benefit that would run to the Founders, Pathak was laser focused on getting a payout for the preferred shareholders (Controller Defendants).  As with the rest of the negotiations, the Founders, despite being Board Members, were kept in the dark and not involved in any of these discussions with Legacy.

2.      **The Controller Defendants brush off the Founders' serious concerns and objections.**

132.    The Founders, as Board members and stockholders, reviewed the August LOI and immediately realized that the transaction made little financial sense and appeared to be motivated by the Controller Defendants' desire to trigger the Liquidation Preference.   Steven emailed the Controller Defendants "[c]ould you please explain what exactly will the common shareholders receive from this Legacy Transaction?  Value, Benefits etc…?"

133.    Pathak—a Board Member with fiduciary duties to Onyx and the Founders as minority stockholders—had no good answer.  Instead, he wrote back that the LOI ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

134.    Making clear that he had abdicated his fiduciary duties (or that the concept of fiduciary duties was entirely foreign to him), Pathak stated that **"[o]ther aspects in regards [sic] Perspective on value benefits etc I suggest any/all common shareholders can seek their own Individual advice**."  Pathak did not identify—and could not identify—a single legitimate reason why the proposed transaction with Legacy benefited Founders as minority common stockholders.

135.   Thus, Steven wrote again to Pathak asking for an explanation:



136.   Three days later, on August 10, 2020, Steven followed up yet again for an explanation; he never received a response.  Steven wrote to Onyx's corporate counsel Dan O'Hern directly that "I don't understand the details and the process of the behind the scenes on what [i]s going on" and included ten specific questions.

137.   On August 11, 2020, the Founders learned from Mr. O'Hern that without a Board meeting or vote, the Controller Defendants had retained Faegre Drinker Biddle & Reath, LLP ("Faegre Drinker") as counsel for the Merger and paid a $1 million retainer. This was in stark contrast to prior engagements of outside advisors; when the Company retained Mr. O'Hern as corporate counsel, the Company did so through formal Board approval.  Additionally, O'Hern shared that

he "[had] not prepare[d] the LOI, nor did [he] review it" but that Faegre Drinker "reviewed the LOI for the Company."

138. Adding to the Founders' concerns, Mr. O'Hern informed the Founders that DLA Piper, the firm that had been representing the defendants in the Fraud Litigation for over two years, was representing Legacy.  Mr. O'Hern relayed that according to Faegre Drinker, this "was a complete coincidence" and they had "spoken with the DLA SPAC attorneys" and that they were "very comfortable that there was no conflict."[15]

### 3. The Director Defendants are reminded of, and disregard, their fiduciary duties in approving the merger.

139. On August 17, 2020, Onyx provided the first draft of the Business Combination Agreement ("BCA"), which adopted the unnegotiated deal price offered by Legacy and the terms that had been described in the August LOI and discussed between the Defendants behind closed doors.  The Founders, despite being Board members of Onyx, were not provided a copy of the draft before it was sent to Legacy.

---

[15] When the Founders' prior counsel in the Fraud Litigation emailed John Pendleton of DLA Piper about the conflict, Mr. Pendleton responded outright that "DLA is not representing Legacy in this transaction."  This was incorrect.  Legacy's publicly filed schedules with the SEC indicate that DLA Piper had represented Legacy since June 2019.  After the Merger was complete, Mr. Pendleton became the EVP, Legal & Corporate Affairs and Corporate Secretary of PARTS iD, and according to the Insider Trading Report Form 4 filed by Faegre Drinker Biddle, owns 20,000 shares of PARTS iD common stock as of May 17, 2022.

140.   A Board meeting was held on Friday, August 28, 2020, with the sole agenda item being for the Company's advisors, CGG and Onyx's outside counsel at Faegre Drinker, to take the time to update the Board on the potential transaction with Legacy.   Presentations from both groups of advisors were delivered along with a very limited Q&A afterwards.   At that time, the Founders had only been provided with the August LOI; they had not been given a copy of the draft BCA (which the Controller Defendants had sent to Legacy 11 days earlier) or the July LOI.

141.   CGG's presentation noted, among other things, that CGG had "initiated contact with Legacy on July 9th"; that Legacy "demonstrated strong motivation to close an acquisition in the near term"; and that Legacy "[was] obviously strongly motivated to close an acquisition in the near term," given that it "must close a qualifying acquisition before its expiration in November"; and had "identified a compelling strategic fit in Onyx."

142.   CGG did not, however, explain how Legacy was a "compelling strategic fit" for Onyx.   Nor could it—because Legacy was not a "strategic fit" at all.   Legacy's management was comprised of former Procter & Gamble executives, with no experience operating an e-commerce auto-parts company.   Indeed, Legacy's own SEC filings highlighted that the "**lack of experience of Legacy's officers with investing in or managing companies in the technology industry**" was a **material risk**.

143.   CGG explained that, under the proposed transaction, Onyx's ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████

144.   Faegre Drinker also highlighted the key deal terms, including that while

OEC ████████████████████████████████████████████████████████

████████████████████████████████████████████████████[16]

145.   During the Board meeting, CGG also stated that it had met with Legacy's institutional stockholders in a series of "test-the-water" meetings to ensure that they would be supportive of the transaction and become ongoing shareholders in the Company.

146.   This was important because, as CGG explained during the meeting, if Legacy's stockholders redeemed their shares, there would be no cash left in Legacy's trust account to add to the balance sheet of the surviving entity.   CGG explained: ████████████████████████████████████████████████

██████

---

[16]   The presentation further stated ████████████████████████████████

████████████████████████████████████ It is unclear what was contemplated here, but it is hard to fathom what representations, warranties, or covenants would be meaningful given that Legacy was a blank check company with no operations or cash flow.

147.   Of course, as described below, that is exactly what ultimately occurred. CGG's "test-the-water" process was either flawed or pre-textual or both, as most of Legacy's stockholders ended up redeeming their shares, and ultimately there would be no cash left in the trust account for anything but to pay out the Controller Defendants' desired Liquidation Preference.

148.   Faegre Drinker's presentation to the Onyx Board—including the Controller Defendants—emphasized that each of the Board members had a "Duty of Loyalty," requiring them to "act in good faith in what directors honestly believe to be the best interests of the corporation, **not personal interests**."

149.   



150.   Each of the Controller Defendants were therefore made aware of their fiduciary duties in real-time and that under the deal structure OEC would receive cash but the Founders as common stockholders would only receive stock in the surviving entity.

151.   During the meeting, CGG admitted that Legacy provided the $250 million valuation and that ***the Controller Defendants and CGG never attempted to negotiate that deal price***.   When discussing the deal price, CGG stated that the valuation was what Legacy thought its stockholders would support.   In response to Steven's questions regarding Legacy's $250 million valuation, CGG responded,

████████████████   There was no negotiation of the deal price because the Controller Defendants just wanted to get a deal done that would allow them to assert that they were entitled to the Liquidation Preference.

152.   CGG told the Founders that if they tried to push back on the deal price it would lead to no deal and would be a ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

153.   According to CGG and Faegre Drinker, Onyx stockholders would continue to hold a majority of the voting stock post transaction.  Prior to the transaction, Onyx's stockholders held 100% of the voting stock of the Company. Post transaction, Onyx's stockholders would hold 79.2% of the voting stock in the surviving entity.  Because Onyx's stockholders continued to "hold a majority of the voting power of the surviving entity in substantially the same proportions" as they held prior to the transaction, the transaction did not qualify as an "Acquisition" triggering the Liquidation Preference.

154.   Nevertheless, the Controller Defendants acted on the brazen assertion that the transaction did in fact trigger the Liquidation Preference.  Onyx's advisors—

beholden to the Controller Defendants for their lucrative fees—likewise proceeded from the assumption that the preferred stockholder (OEC) would be paid the Liquidation Preference.

155.    Ultimately, as a result, the Controller Defendants awarded themselves $20 million in consideration as the putative Liquidation Preference in breach of the Amended Certificate of Incorporation.   This $20 million in consideration should have been paid ratably to the common stockholders.

156.    CGG acknowledged that,



By the time Roman and Steven were permitted to ask questions during the call, which was their very first opportunity to ask questions regarding the transaction, there was very little time left, and Pathak ended the meeting.

### 4.    The Director Defendants agree to wildly unfair deal terms that undervalue Onyx and provide no benefit to Founders.

157.    On September 1, 2020, at 9:14 PM, the Founders finally received—after repeated requests—the draft BCA that the Controller Defendants had sent to Legacy two weeks before, on August 17, 2020.

158.    The very next day, on September 2, 2020, at 2:30 PM, the Onyx Board held a meeting to discuss the draft BCA.  Having just received the 90-page draft the

previous evening, the Founders attended the meeting without having had the opportunity to fully read, digest, and understand the document.

159.   The key terms of the draft BCA were as follows:

- Onyx's shareholders would, in effect, be transferring all of Onyx's assets, liabilities and equity (and Onyx shareholders' 100% interest in the foregoing) in exchange for shares of PARTS iD.  In exchange, the Legacy shareholders were to provide (i) cash to pay (a) OEC $20 million for the Preferred Shares based on a "Liquidation Preference," and (b) add an uncertain amount of cash to Newco's balance sheet; and (ii) provide a public shell;

- the draft contemplated that Legacy would contribute $64 million in cash to PARTS iD (the surviving entity), but noted the actual contribution could change due to redemptions by Legacy's stockholders; nevertheless, the draft BCA did not include any protective provisions for Onyx in the event that the available cash ended up being less as a result of Legacy's stockholder redemptions;

- the BCA specified in the "WRITTEN CONSENT OF STOCKHOLDERS" that OEC would receive the $20 million Liquidation Preference, saying "the shares of preferred stock, no par value per share, of the Seller (other than Dissenting Shares and Cancelled Shares) shall be automatically converted into the right to receive an amount in cash equal to $20,000,000[.]"

160.   In the limited time the Founders had to review the draft BCA, they raised various concerns to the Controller Defendants and the advisers, including that the "only number that was solid [in the BCA] is the $20 million preferred."

161.   During the September 2, 2020 Board meeting, the Founders once again asked about the deal price for Onyx, questioning whether anyone had bothered to conduct an independent valuation to ███████████████████████████

████████████████████ and if this was ████████████ CGG once again admitted that there had been no such valuation, but asserted tautologically that "fairness" of the deal price was assured by the fact that Legacy had offered the price and the Controller Defendants were willing to accept that price:



162.   A subsequent Board meeting was then scheduled for Friday, September 4, 2020 from 2:30 – 4 pm ET.  All Board members attended along with CGG, Faegre Drinker, and Mr. Ciappina.   When the Founders once again emphasized their concern that they did not ████████████████████████████████████ ████████████████████████████████████ Faegre Drinker made ██ ████████████████████████████████████ ████████





163.   CGG's statement glossed over the fact that no negotiation had occurred, and that the Controller Defendants' interests were far from identical to the Founders—nor did it give consideration to whether **_no_** transaction would have been better for the minority common stockholders than moving forward with this one.

164.   Meanwhile, throughout this rushed and opaque process, the Founders continued to try to obtain information regarding the transaction—including the price and process.   On September 6, 2020, the Founders emailed "[i]f based on pure metrics, Onyx should be valued higher than PRTS [its peer and competitor], then we do not understand why we are accepting such a discount.  Please help us understand that."

165.   Indeed, at the time, the privately held and self-funded Onyx was outperforming the publicly traded PRTS (CarParts.com) in many aspects and unit economics, including both revenue and EBITDA.  Moreover, Onyx had a larger

quantity of unique SKUs (over 17X as many as CarParts.com), a higher average order value, and its own proprietary technology and data, whereas CarParts.com was just an e-commerce company (the former generally associated with higher valuations).  As an enterprise, Onyx was outperforming CarParts.com in all relevant metrics, and should have commanded a strong valuation multiplier.  Despite Onyx's superiority as a bigger, faster and more advanced company, when Legacy compared Onyx to other publicly traded digital e-commerce companies and in particular, CarParts.com, for the purposes of a valuation, Legacy used an unexplained discounted multiplier.  Without the unexplained discount, Onyx's value exceeded $400 million.

166.   However, after raising numerous concerns about the valuation, the Founders received no legitimate explanation for the highly discounted $260 million deal price.

**5.    The Controller Defendants abuse their contractual rights to force the Merger to close.**

167.   On September 18, 2020, Mr. Edwin Rigaud—the Chairman and CEO of Legacy—approved and signed the BCA on behalf of Legacy.

168.   On September 18, 2020, Onyx's Board held a special meeting (without the required three-day notice per Onyx's Bylaws, which rendered the meeting

defective[17]). In attendance were the Founders (who objected to the improperly scheduled meeting), Pathak, C. Kurtin, Agrawal, Faegre Drinker, and CGG representatives (Mark Young, David Kassie and Chris Blackwell) (the "Special Board Meeting").

169. The Special Board Meeting lasted 30 minutes. At the conclusion, the Onyx Board approved the BCA by a 3-2 vote. Pathak, C. Kurtin, and Agrawal voted for the Merger; Steven and Roman voted against it.

170. On the night of September 18, 2020, hours after the Board majority of Pathak, Kurtin, and Agrawal had voted to approve the Business Combination Agreement, OEC, claiming to be relying on the Drag-Along Provision, issued the Drag Notice.

171. OEC represented to the Founders in the Drag Notice that it had decided to accept "an offer for a transfer" of all of the "Investor Stock" and all of the "Key Holder Stock" "as part of a Sale of the Company, structured as a merger . . . for a purchase price of approximately $260,000,000 to Legacy Acquisition Corp." OEC claimed that the Stockholders Agreement required the Founders to, among other

---

[17] *See* Bylaws, § 3.6 ("Special Meetings: Special meetings of the Board may be called by the president, the chief executive officer or any two (2) members of the Board on three (3) days' notice to each director, either personally or by mail (including electronic mail), telegram, telephone or facsimile transmission.").

things, sell all their shares of Onyx in the Merger, vote all their shares in favor of the Merger, and execute all documents required to support the Merger.

172.   Under the BCA, Onyx had "agreed to deliver, no later than one business day following the Agreement Date, a copy of the executed ***written consent*** of the requisite stockholders of Onyx approving the Business Combination Agreement."

173.   On September 18, 2020, OEC issued the "Written Consent," purporting to ratify the BCA and secure through the Drag-Along Provision, without notice or a stockholder meeting, the stockholder approval required for the Merger under N.J.S.A. § 14A:10-3.

174.   The Written Consent further stated that Onyx's shareholders had determined that it was "advisable and in the best interests of the Company" to enter into the Business Combination Agreement and consummate the Merger.   The Founders did not agree with, nor sign onto, the Written Consent.

175.   A copy of the Written Consent was provided to each Onyx shareholder, including the Founders, via email the evening of September 18, 2020.  Pathak, the president of OEC, had signed the Written Consent on behalf of OEC, and provided an executed copy to the Founders the morning of September 19, 2020.  Without giving the Founders any time to review or contest the Written Consent, C. Kurtin had executed it on their behalf as their claimed proxy purportedly pursuant to the

Drag-Along Clause in the Stockholder Agreement.   But, as discussed below, the Drag-Along Clause was not triggered by the BCA.

176.   On September 18, 2020, Onyx entered into an Agreement and Plan of Merger.

177.   On October 13, 2020, OEC called a Special Shareholder Meeting of Onyx to "Ratify and Approve" the BCA.  According to the notice, Onyx's Board had "determined that the business combination is fair and in the best interests of Onyx shareholders and recommended a vote 'FOR' the proposal to ratify and approve the business combination agreement and the mergers."

178.   On November 20, 2020, the Merger was completed.  Pursuant to the BCA, Excel Merger Sub I, Inc. merged with and into Onyx, with Onyx surviving as a direct wholly-owned subsidiary of Excel Merger Sub II, LLC ("Merger Sub 2"). Immediately after, Onyx merged with and into Merger Sub 2, with Merger Sub 2 surviving as a wholly owned subsidiary of Legacy.  Merger Sub 2 changed its name to PARTS iD, LLC ("**PARTS iD, LLC**").  Upon the consummation of the Second Merger, Merger Sub 2 was the surviving company and Onyx ceased to exist, and Merger Sub 2 became a direct, wholly owned subsidiary of the Company (collectively with the other transactions described in the Business Combination Agreement, the "**Business Combination**").   On the Closing Date, (i) Legacy changed its name from Legacy Acquisition Corp. to PARTS iD, Inc. and listed its

shares of Class A common stock, par value $0.0001 per share (the "Class A Common Stock") on the NYSE under the symbol "ID" and (ii) Merger Sub 2 changed its name to PARTS iD, LLC.

## G. The Merger Was Fundamentally Flawed And Unfair.

179.   As the timeline above makes clear, the process by which the Defendants agreed to and then rammed through the Merger at a record pace was fundamentally flawed, self-interested, and unfair.  As laid out below, the Director Defendants were conflicted and in no position to independently evaluate or approve the Merger, and yet made no effort to employ a process that would cleanse or cure that self-interest. Unsurprisingly, then, the result was a merger whose pricing and terms were fundamentally flawed and unfair to the minority common stockholders—Steven and Roman.

### 1.   The Director Defendants were conflicted and not independent.

180.   Because three of Onyx's five directors were interested in the Merger, the Merger was not approved by a majority of disinterested and independent directors.[18]  As described in detail above, the Merger materially benefitted the OEC

---

[18]   The Merger was therefore approved in contravention of Onyx's Bylaws, which contemplated the proper procedure for transactions involving interested directors. *See* Bylaws, § 3.10 ("No contract or transaction between this Company and any other corporation, firm, association or other legal entity shall be invalidated by reason of the fact that any one (1) or more of the directors has a direct ***or indirect interest***, pecuniary or otherwise, in such corporation, firm, association, or legal entity . . .

principals with whom two of the Director Defendants (Pathak and C. Kurtin) were affiliated:  ICC and W. Kurtin.  As discussed above, ICC's investment in OEC was reaching its five-year mark at the end of 2020.  Pathak, C. Kurtin, and W. Kurtin were eager to trigger a liquidation event to see a 300% return on their $5 million.

181.   Agrawal was also conflicted and not independent.  Agrawal is Pathak's close family friend, and Onyx's fifth board member.  Pathak and Agrawal lived close to each other, often held joint family gatherings, and were in constant communication. Upon information and belief, Pathak even helped Agrawal's son gain admission into a school that he otherwise would not have been accepted into, and attain job offers.  Further, Agrawal had been financially dependent on Pathak and the Kurtins—and their affiliated entities—for years.  Agrawal had been on ICC's payroll since January 1, 2016 and had a job at Onyx thanks to his connections with Pathak.  Agrawal was at all relevant times beholden to the Defendants for his gainful employment by Onyx and in prior ventures.  His primary role on the Board was to ensure that Pathak's directives were carried out.  He was not capable of exercising, and did not exercise, judgment independent of what the Controller Defendants wanted.  He also had a material financial interest in voting in favor of the transaction given his financial dependence on the Controller Defendants.

_____

*provided that* . . . *a disinterested majority of the Board shall have nonetheless ratified and approved such contract or transaction*.")(emphasis added).

70

182.   Agrawal joined Onyx's Board as a provisional director by court appointment in the Fraud Litigation due to frequent deadlocks between Pathak and C. Kurtin and the Founders.  Although Agrawal was appointed to act in the best interests of Onyx and its common stockholders, in reality he was in Pathak's and Kurtin's pocket and, without fail, supported their votes without question.

183.   Agrawal served as provisional director and CFO until March 26, 2020. On March 26, 2020, Agrawal strategically resigned as CFO in anticipation of Pathak and C. Kurtin's attempt to issue a default.  On March 30, 2020, Agrawal wrote a letter to the judge in the Fraud Litigation recommending that the Court appoint a receiver over Onyx and in that letter, he complained about not receiving a pay raise or receiving "orally agreed" upon bonuses.[19]  Despite resigning as CFO, Agrawal remained a provisional director.

184.   On or about August 5, 2020, without any advanced notice or explanation to the Founders or the Board, Agrawal was re-hired by Interim GM Mr. Ciappina as Onyx's CFO.[20]  The terms of his new employment agreement, which

---

[19]   Not by coincidence, Onyx's Certificate of Incorporation provides that "any holder of Series A preferred [shares] may require the Company, to the to the extent it may lawfully do no, to redeem all of the then-outstanding shares of Series A Preferred held by such holder" upon "a proceeding under . . . receivership law or statute filed against the Company," if certain conditions are met. *See* Exh. C, Art. IV (B)(5)(b).

[20]   Agrawal's re-appointment by Ciappina violated Onyx's Bylaws, which state that "***The Board*** shall have the authority to appoint a president, chief executive officer,

were revealed only after the Merger was concluded, reflected a significant increase in base salary, a $100,000 signing bonus, goal-based bonuses, and other long-term incentives.

185.   The day Agrawal rejoined Onyx is the same day Legacy and Onyx signed the Letter of Intent.  He was hired by Interim GM Mr. Ciappina, under the direction of the Controller Defendants, at materially improved compensation and with other material incentives, because he was beholden to the Controller Defendants and would agree to support and facilitate the transaction in his capacity as a provisional Board member and CFO.

186.   Agrawal immediately began to carry out his marching orders and made sure that he too would materially benefit from the Merger.  During the September 2, 2020 Board meeting, ███████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████   Agrawal was a fundamental player in negotiations while the Founders remained in the dark and sidelined.

187. Certain versions of the BCA and Legacy's Schedule 14C filed November 20, 2020, stated that under the "BCA, "Onyx and Legacy made certain

---

vice president(s), a treasurer, a secretary, and ***such other officers as it deems advisable.***" Bylaws, § 4.1 (emphasis added).

covenants," which included Legacy having agreed to "take all necessary action" as of the Closing so that "Antonino Ciappina will be the chief executive officer of Legacy and Kailas Agrawal will be the Chief Financial Officer of Legacy immediately after the Closing."

188.   According to Legacy's Schedule 14C filed October 30, 2020, on October 1, 2020, "[p]ursuant to the terms of the Business Combination Agreement," Legacy had approved and authorized an Equity Incentive Plan (the "2020 Plan") and an Employee Stock Purchase Plan (the "ESPP") to provide "grant of stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares and units and other cash-based or stock-based awards" in order to "attract, retain and motivate employees, including officers, consultants and directors." As a SPAC, Legacy has no employees and had no incentive to issue the 2020 Plan and ESPP except in connection with the BCA and Merger.

189.   Upon closing Legacy did handsomely reward Agrawal, Mr. Ciappina and Mr. Roy for their allegiance to the Controller Defendants.  A Compensation Committee made up of former Legacy officers (Richard White, Aditya Jha and Rahul Petkar) granted Agrawal, Mr. Ciappina, and Mr. Roy massive equity incentive plan rewards on April 16, 2021.

| Name | Grant Date | Stock Awards | | | |
|---|---|---|---|---|---|
| | | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock that Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Antonio Ciappina | 4/16/2021 | 86,667 | 211,467 | | |
| | 4/16/2021 | | | 130,000 | 317,200 |
| Kailas Agrawal | 4/16/2021 | 83,334 | 203,335 | | |
| | 4/16/2021 | | | 125,000 | 305,000 |
| Ajay Roy | 4/16/2021 | 83,334 | 203,335 | | |
| | 4/16/2021 | | | 125,000 | 305,000 |

190.    In addition to stock awards and restricted stock units, the Compensation Committee awarded the Controller Defendants' loyalists substantial increases in salary and bonuses.   Indeed, according to PARTS iD's Schedule 14A dated December 31, 2021, after the Merger, Agrawal, Mr. Ciappina and Mr. Roy each saw an average 600% increase in their total compensation pursuant to the PARTS iD 2020 Equity Incentive Plan and 2020 Employee Stock Purchase Plan.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Antonio Ciappina | 2021 | 409,241 | - | 2,085,200 | 136,151 | - | 2,630,592 |
| | 2020 | 295,082 | 88,525 | - | | - | 383,607 |
| Kailas Agrawal | 2021 | 300,000 | - | 2,005,000 | 67,208 | - | 2,372,208 |
| | 2020 | 180,657 | 136,247 | - | | 9,758 | 326,662 |
| Ajay Roy | 2021 | 300,000 | - | 2,005,000 | 67,478 | - | 2,372,478 |
| | 2020 | 300,000 | 90,000 | - | | - | 390,000 |

191.    These interested directors owed fiduciary duties to the Company and its shareholders and were not free to place the interests of OEC and ICC ahead of the common stockholders.   However, these three directors ignored their fiduciary duties to the common stockholders in favor of their own financial interest and the desires of OEC and ICC and their principals.

192.  Knowing that a majority of the board was not disinterested or independent, the Director Defendants did nothing to ensure the process of considering the Merger was fair to the common stockholders.   At no time did the

Director Defendants request or receive (a) any formal valuation of Onyx or its assets or (b) any fairness opinion or similar independent assessment of the proposed Merger.  At no time did the Director Defendants establish a committee or any other means of evaluating the transaction to ensure that Onyx's minority common stockholders were being treated fairly.  Essentially the Board undertook no real process at all.

### 2. The price and terms of the Merger undervalued Onyx and were deeply unfair to the Founders.

193.   The Controller Defendants were fully aware that all cash consideration in the transaction would go to their affiliated entity (OEC) as the putative Liquidation Preference, and that no cash consideration would go to the Founders as minority common stockholders.  And the Controller Defendants knew that, absent a fair deal price and appropriate protections in the BCA, there were no assurances that there would be any cash in Legacy's trust account to strengthen the balance sheet of the surviving entity, the Founders would be getting a terrible and unfair deal.  Yet, the Controller Defendants still pushed through the transaction to trigger the putative Liquidation Preference—and took no steps to ensure that the transaction was fair to the common stockholders.

194.   Had the Controller Defendants been interested in considering the best interests of the common stockholders, the Controller Defendants would have (a) explored the value of the Company as an independent company and considered

the possibility of maximizing long term value without an immediate merger, or (b) otherwise attempted to negotiate a price that would have achieved some value for Onyx's common stockholders, including a minimum cash protection to ensure that some value was received in exchange for granting the SPAC significant ownership in the Company and diluting its existing shareholders.  The Controller Defendants did neither.

195.  *First*, the Controller Defendants gave no consideration to simply not selling.  There was no need to sell Onyx in September 2020, and certainly no need to sell Onyx in the hasty manner in which the Merger was negotiated.  At that time the Company was beating its revenue projections and was experiencing one of the best years on record.  It faced no imminent financial crisis.  Rather, with proper management and talent, it was primed for success through, among other things, ongoing unified branding, and plans to expand into new geographic areas by leveraging its virtual warehouse and scaling vertically.  The Director Defendants were fiduciaries charged with a duty to act with loyalty and in good faith and in the best interests of all the stockholders, regardless of the desires of OEC to realize a Liquidation Preference.

196.  *Second*, the Controller Defendants failed to negotiate a fair price for Onyx.  CGG conceded to the Onyx Board that the Controller Defendants and CGG accepted the deal price because it was what Legacy had stated was necessary to

obtain Legacy's stockholder support for the deal.  Neither the Controller Defendants nor CGG pushed back on the price offered by Legacy or attempted to negotiate a higher price.  And when asked by the Founders what the justification was for the deal price, neither the Controller Defendants nor CGG could justify the price from a valuation standpoint.  They simply accepted the deal price because it was designed to get the Controller Defendants their Liquidation Preference and CGG its Success Fee.  Moreover, the suggestion that this price was necessary to obtain Legacy stockholder support was wrong, since the vast majority of Legacy's stockholders redeemed their shares and exited the deal.

197.  During the August 28, 2020 Board meeting, Faegre Drinker stated,

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████  Subsequently, according to Legacy's August 2020 LOI and sworn statements of the Defendants in the Fraud Litigation, Legacy valued Onyx's common shares at $260 million.

198.  This valuation of Onyx was discounted by hundreds of millions of dollars, even though its performance metrics outpaced those of its competitors at the time of the Merger.  For example, in one of the "test-the-waters" presentations dated August 28, 2020, Legacy valued Onyx by comparing it to other peer companies, including CarParts.com.  The presentation showed that Onyx had higher adjusted

EBITDA in 2019 than CarParts.com, higher revenue in 2020, higher estimated revenue in 2021, and higher revenue growth from 2019 to 2020. It also showed the various key metrics in which Onyx surpassed CarParts, including: lower fulfillment costs, broader product offerings, and more unique SKUs. However, when calculating Onyx's value, Legacy used a discounted multiplier, and had no legitimate explanation for why a discount of at least 35% was reasonable or justified.

199. Further, the $260 million valuation was approximately 33% lower than CGG's lowest valuation according to its March 2019 investor presentation. Despite this large disparity, no independent appraisal, valuation, or fairness opinion was conducted to determine Onyx's true value or to assess whether the $260 million reflected fair value. If the Controller Defendants had done appropriate diligence and acted consistent with their fiduciary duties, it should have been apparent to them that $260 million was a woefully deficient valuation.

200. Moreover, the sole benefit that Legacy was ostensibly contributing to the transaction—its cash contribution—was illusory and unprotected. On July 23, 2020, according to an e-mail from Onyx's counsel Daniel O'Hern to the Onyx Board, CGG claimed Legacy had $65 million in cash available for an acquisition. According to Legacy's unaudited pro forma financial statement, the trust account held $63,804,000 as of September 30, 2020.

201.   But in Legacy's publicly released Investor Statements on September 21, 2020, and October 6, 2020, Legacy then reported a cash balance of $55.5 Million "to fund future growth and potential accretive strategic acquisitions."  By October 15, 2020, Legacy filed a Schedule 14C that stated that depending on redemption of its investors, the surviving entity would instead have *negative* $2.7 million in cash upon the Merger's close.  *See* Legacy Schedule 14C at 74.

202.   The Founders had raised their concerns regarding the potential for a significant number of redemptions, by email with the Controller Defendants, CGG and Onyx's merger counsel on November 19, 2020.  They never received a response.

203.   That same day, on November 19, 2020, the window for Legacy shareholders to redeem their shares closed and Legacy announced that "84.175% of the outstanding [5,153,781] Public Shares" will be redeemed, for a total consideration of $54,135,315.62, which would be paid out of Legacy's cash account. Thus, upon the completion of the Merger, Legacy's trust account held approximately $9.3 million.

204.   Despite this shortfall, the Defendants had not negotiated any protections that would ensure that the terms for common shareholders were improved or the Merger cancelled, such as a minimum required cash contribution. Nor had they negotiated for any private capital contributions.  As described above, SPACs and targets frequently seek to address the risk of significant redemptions like

these by soliciting PIPE investments that take place alongside the SPAC merger and help to ensure at least a minimum amount of cash will be contributed to the target company through the PIPE.  No PIPE was arranged in this case.

205.   On September 2, 2020, Onyx held a Board meeting and reviewed slide decks presented by CGG and Faegre Drinker regarding the transaction.   At this Board meeting, CGG represented ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

206.   On September 8, 2020, ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

To Plaintiffs' knowledge, neither the Controller Defendants nor CGG insisted upon a PIPE investment, and no PIPE investments were made, either before or after the deal's announcement.

207.   Thus, when the Merger closed, Legacy paid OEC the $20 million Liquidation Preference, using $9 million in cash from Legacy's trust account (which held only $9.3 million at the time) and $11 million in the form of Class A common stock in PARTS iD.  As a result of the redemption and liquidation payments, and the

Defendants' failure to arrange PIPE funding, $0 of the originally promised $65 million cash went towards PARTS iD's balance sheet (let alone to the Founders).

208.   Legacy's failure to accurately state, and the Controller Defendants' failure to conduct due diligence on the balance in Legacy's cash account not only resulted in an economically nonsensical transaction in which common stockholders received less than nothing, but also ensured that the transaction was worth far less than $45 million, as would have been required for OEC to validly exercise its proxy and drag-along rights.   Because the Drag-Along Clause had not been lawfully triggered by the Merger, OEC did not have the right to exercise proxy rights under Section 5.1 of the Stockholders Agreement and OEC's execution of the Written Consent and Stockholder Support Agreements on behalf of the Founders was improper.

## H.   The Merger Gravely Injured The Founders.

209.   As detailed above, the Sponsor saw Onyx as an easy target for Legacy and the Director Defendants were hopelessly conflicted.  This Merger benefitted the Defendants, but it was woefully unfair to the Founders as minority common stockholders.

210.   Based on the Business Combination Agreement's base consideration for Onyx of $260 million nominal value of PARTS iD stock, the Founders were each diluted from 24% to 18.2% ownership of the combined company.   After

redemptions, Legacy brought only $9.282 million dollars to the table for that dilution and in return Onyx suffered a total dilution of 20.8%, implying a valuation below $45 million. After the Liquidation Preference ($9 million), repurchase of warrants ($5.6 million), and compensation to underwriters ($6 million), the surviving entity was left with less cash than Onyx brought to the table.[21]  Even ignoring all of the additional costs borne by the surviving company, that implied valuation of less than $45 million failed to meet the threshold for exercising the drag along provision. After those costs, the value of the transaction was completely non-existent.

211.  For the Founders, the outcome of the Merger was as follows: (i) they lost their 48% equity interest in Onyx; (ii) received $0.00 in cash; (iii) received approximately 36% of restricted stock in PARTS iD (around 75% of their initial equity stake); and (iv) lost their director seats on the board.

212.  Following the Merger, the Founders were diluted to less than 37% combined shareholders as shown below:

---

[21]  Onyx held $36.9 million in cash and cash equivalents as of September 30, 2020; but as of December 31, 2020, the combined company (PARTS iD) held only $22.2 million.

| Principal Stockholders | Onyx Enterprises Int'l Corp. Class A Common Stock | PARTS iD Class A Common Stock[22] | |
|---|---|---|---|
| | % of Outstanding | # of Shares | % of Outstanding |
| Onyx Enterprises Canada Inc. / Prashant Pathak | 52% | 14,084,072 | 42.8% |
| Roman Gerashenko | 24% | 5,983,443 | 18.2% |
| Stanislav Royzenshteyn | 24% | 5,983,443 | 18.2% |
| Edwin J. Rigaud | | 1,068,370 | 3.2% |
| Richard White | | 1,048,485 | 3.2% |
| Darryl T.F. McCall | | 1,044,188 | 3.2% |

### Pre-Transaction Ownership



### Post-Transaction Ownership



---

[22]  *See* PARTS iD Schedule 14A at p. 27.

213. Additionally, following the Merger, the Founders owned a smaller stake in a Company that was in *worse shape* than it had been before the transaction. First off, it drained the Company's assets: whereas prior to the transaction Onyx had $47.3 million in current assets, after all the expenses incurred as a result of the transaction, the combined company had only $35.1 million. The Merger also caused an apparent drop in revenue. PARTS iD's 2022 3rd Quarter results show that revenue has steadily declined from $123.2 million in Q3 2020 (right before the Merger) to $79.9 million in Q3 2022.

214. Further, since the Merger, the value of shares in PARTS iD has plummeted. According to PARTS iD's Form 8937 filed on January 8, 2021, the "reasonable estimate of the fair market value of [Legacy's] common stock at the effective time of the merger [was] $6.92 per share." As of December 21, 2022, shares in PARTS iD were trading at just $1.00 per share.[23]

215. PARTS iD now has a market cap of less than $34.2 million, a far cry from the $200+ million estimated before Pathak came on board or the $400+ million promised by CGG. During the same time period, other companies in the same industry, like Carparts.com, increased their value over 400% and experienced consecutive year-over-year sales growth, due to proper management and increased online ordering during the pandemic.

---

[23] *See*, https://finance.yahoo.com/quote/id (last accessed December 21, 2022).

216.   Unfortunately, the value-destroying nature of the transaction was exactly what the Founders had warned of prior to the transaction being consummated.   For example, during the Special Board Meeting, the Founders explained that ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████

217.   Indeed, in November 2020, after both Roman and Steven were removed from their positions as CEO, the Company was still operating under the leadership of Interim GM Mr. Ciappina.  Mr. Ciappina was underprepared, having had no prior experience in the automotive industry, no prior experience as a CEO, no prior experience managing hundreds of overseas contractors, and certainly no experience leading a publicly-traded company.   Onyx's COO Ajay Roy, who joined the Company just a year earlier, was similarly unprepared, having never served as an executive officer of a public company.

218.   PARTS iD publicly reported after the Merger:

> **Management has limited experience in operating a public company. Our executive officers have limited experience in the management of a publicly traded company**. Our management team may not successfully or effectively manage our transition to a public company that will be subject to significant regulatory oversight and reporting obligations under federal securities laws. **Their limited experience in dealing with the increasingly complex laws pertaining to public companies** could be a significant disadvantage in that it is likely that an

> increasing amount of their time may be devoted to these activities which will result in less time being devoted to the management and growth of the Company. **We may not have adequate personnel with the appropriate level of knowledge, experience, and training in the accounting policies, practices or internal controls** over financial reporting required of public companies in the United States. The development and implementation of the standards and controls necessary for the Company to achieve the level of accounting standards required of a public company in the United States may require costs greater than expected. It is possible that we will be required to expand our employee base and hire additional employees to support our operations as a public company which will increase our operating costs in future periods.

These disclosures were in addition to the disclosures, described above, regarding the directors' lack of necessary experience or minimum required qualifications.

219.    Moreover, around the time of the Merger in November 2020, the Company was still in the process of finalizing its unified branding, restoring relationships with its Ukrainian-based contract workers,[24] and ameliorating a downturn in growth initiatives and innovation, which began with Roman's removal as CEO.   But instead of resolving these outstanding issues and preparing the Company to go public in a timely manner, the Controller Defendants pushed through

---

[24]    PARTS iD publicly reported after the Merger that it had not resolved "impairments to its relationship with contractors, including the lead contractor of the Company's Ukraine operations, as well as service providers controlled by that lead contractor."

a rushed transaction that hindered the Company's path to growth, only because it was their last resort for a quick payoff.

220.  Legacy's Proxy Statement disclosed the "requirement that Legacy complete a business combination by November 20, 2020, and [its] lack of prior experience in evaluating or managing companies in the technology industry, may have decreased [their] ability to conduct due diligence on Onyx." *See* Legacy's Schedule 14C at 33.  This was a terrible signal to the market and predictably led to a negative reaction.

221.  When the Merger closed on November 20, 2020, it was clear that all the Founders' fears had come true:  the only "consideration" Legacy truly provided to the Founders as minority common stockholders was Legacy's worthless stock.

222.  The Defendants' actions and omissions guaranteed their manufactured result, and they knew, or should have known, that the Merger would be a losing proposition for Onyx and its common stockholders.  Following a process dominated by the Controller Defendants, and others poised to profit from a bad deal, the Director Defendants approved the Merger at an inopportune time rather than tasking CGG to find a better deal, obtaining an independent appraisal or evaluation of the transaction's fairness, simply electing not to do a transaction, or demanding investor protections or a PIPE investment.   As a result, Onyx's minority common stockholders—the Founders—got less than nothing.

223.   Legacy merged with Onyx for unfair consideration to the detriment of the Founders as minority common stockholders.  Collectively, Defendants ignored proper corporate governance in blindly seeking their own enrichment, which caused significant damage to the Founders.  Founders suffered special and direct injuries as a result of the fiduciary and contractual breaches.

## COUNT I

### Breach of Contract – Stockholders Agreement
### (OEC)

224.   Plaintiffs repeat and reallege the allegations in each of the paragraphs set forth above.

225.   The Stockholders Agreement is an enforceable agreement that imposes upon OEC certain contractual obligations, including the requirement than any exercise of the Drag-Along be done in connection with a sale for a purchase price of at least $45,000,000.

226.   Plaintiffs have complied with all terms of the Stockholders Agreement.

227.   OEC materially breached the Stockholders Agreement when OEC purported to exercise the Drag-Along Clause for a merger that did not meet the $45 million threshold.

228.   As a direct, proximate, and foreseeable result of OEC's breach of the Stockholder Agreement, Plaintiffs have been harmed by an amount to be proven at trial, but in any event an amount greatly exceeding $75,000.

## COUNT II

### Breach of Contract – Amended Certificate of Incorporation
### (Director Defendants & OEC)

229.   Plaintiffs repeat and reallege the allegations in each of the paragraphs set forth above.

230.   The Amended Certificate of Incorporation is an enforceable agreement that imposes upon the Director Defendant, and OEC certain contractual obligations, including the requirement that the Liquidation Preference be paid only upon a transaction meeting the definition of a Liquidation Event.

231.   Plaintiffs have complied with all terms of the Amended Certificate of Incorporation.

232.   Pathak, C. Kurtin, Agrawal, and OEC materially breached the Amended Certificate of Incorporation when they exercised the Liquidation Preference for a transaction that did not meet the definition of "Acquisition" as set forth in Section 4(b) of the Amended Certificate of Incorporation.

233.   As a direct, proximate and foreseeable result of Defendants' breaches of the Amended Certificate of Incorporation, Plaintiffs have been harmed in an amount to be proven at trial, but in any event in an amount greatly exceeding $75,000.

## COUNT III

**Breach of Implied Covenant of Good Faith and Fair Dealing – Stockholder Agreement**
**(OEC)**

234.   Plaintiffs repeat and reallege the allegations in each of the paragraphs set forth above.

235.   The Stockholders Agreement is an enforceable agreement.

236.   Plaintiffs have complied with all of their obligations under the Stockholder Agreement.

237.   Under New Jersey and Delaware law, a covenant of good faith and fair dealing is implied by law in every contract (including the Stockholder Agreement), to prevent a party from acting in bad faith and to protect the reasonable expectations of the parties and to protect them against their counterparty's evasion of the spirit and purpose of the agreement.

238.   OEC breached the implied covenant of good faith and fair dealing under the Stockholder Agreement by triggering the Drag-Along Clause in a transaction that did not meet the $45 million purchase price threshold and did not provide anywhere close to that amount of value to the Company or its shareholders.

239.   As a direct, proximate and foreseeable result of OEC's breach of the implied covenant of good faith and fair dealing under the Stockholder Agreement,

Plaintiffs have been harmed by an amount to be proven at trial, but in any event an amount greatly exceeding $75,000.

## COUNT IV

### Direct Claim for Tortious Interference - Stockholder Agreement
### (Director Defendants, ICC, Sponsor)

240.   Plaintiffs repeat and reallege the allegations in each of the paragraphs set forth above.

241.   The Stockholders Agreement is an enforceable agreement that imposes upon Plaintiffs and OEC certain contractual obligations, including that the Drag-Along Clause could not be exercised absent a transaction exceeding a $45 million purchase price.

242.   At all relevant times, the Director Defendants, ICC, and the Sponsor were fully aware of the Stockholders Agreement and the obligations of OEC under that agreement.

243.   The Director Defendants, ICC, and the Sponsor intentionally and wrongfully caused OEC to breach its obligations under the Stockholders Agreement.

244.    Plaintiffs suffered damages as a result of Defendants' misconduct and breaches of the Stockholders Agreement by OEC, in an amount to be proven at trial but in any event in an amount greatly exceeding $75,000.

## COUNT V

### Direct Claim for Tortious Interference – Certificate of Incorporation
### (ICC & Sponsor)

245.   Plaintiffs repeat and reallege the allegations in each of the paragraphs set forth above.

246.   The Amended Certificate of Incorporation is an enforceable agreement that imposes upon Plaintiffs, Director Defendants, and OEC certain obligations.

247.   At all relevant times, ICC and the Sponsor were fully aware of the Amended Certificate of Incorporation and the obligations of Director Defendants and OEC under that agreement.

248.   ICC and the Sponsor intentionally and wrongfully caused the Director Defendants and OEC to breach their obligations under the Amended Certificate of Incorporation.

249.   Plaintiffs suffered damages as a result of Defendants' misconduct and breaches of the Amended Certificate of Incorporation, in an amount to be proven at trial but in any event in an amount greatly exceeding $75,000.

## COUNT VI

### Direct Claim for Breach of Fiduciary Duty
### (Pathak, C. Kurtin, Agrawal)

250.   Plaintiffs repeat and reallege the allegations in each of the paragraphs set forth above.

92

251.   The Director Defendants, as Onyx's directors, owed the common stockholders, including Plaintiffs, the fiduciary duties of due care, loyalty, good faith, and disclosure.  These duties required them to place the interests of Onyx common stockholders above their personal interests and the interests of the Controller Defendants.

252.   Because each of the Director Defendants failed to ensure the adoption of procedural safeguards to protect the interests of the minority common stockholders of Onyx, it is the Director Defendants' burden to establish the entire fairness of the Merger.  They cannot do so.

253.   The Director Defendants and their affiliates' initiation, negotiation, structure, timing, and Board approval of the Merger constituted an unfair process to the common stockholders of Onyx.  The economic terms of the deal grossly undervalued Onyx and grossly overvalued the consideration received from Legacy.

254.   The Director Defendants breached their fiduciary duties by approving the Merger.

255.   As a result of the Director Defendants' breaches of fiduciary duty, Plaintiffs suffered distinct injuries in their capacity as minority common shareholders and have been harmed in amount to be proven at trial, but in any event in an amount greatly exceeding $75,000.

256.   In addition, the Director Defendants must be disgorged of all benefits received in connection with the Merger.

## COUNT VII

### Direct Claim for Breach of Fiduciary Duty
### (OEC)

257.   Plaintiffs repeat and reallege the allegations in each of the paragraphs set forth above.

258.   OEC was the controlling stockholder of Onyx.

259.   As the controlling stockholder, OEC owed Onyx's common stockholders, including Plaintiffs, fiduciary duties of due care, loyalty, good faith, and disclosure.   These duties required OEC to place the interests of Onyx stockholders above OEC's self-interest.

260.   OEC breached its fiduciary duties by causing Onyx to enter the Merger.

261.   As a result of OEC's breaches of fiduciary duty, Plaintiffs have suffered distinct injuries in their capacity as minority common shareholders and have been harmed in an amount to be proven at trial, but in any event in an amount far exceeding $75,000.

262.   In addition, OEC must be disgorged of all benefits received in connection with the Merger.

## COUNT VIII

### Aiding and Abetting Breach of Fiduciary Duty
### (CGG)

263.   Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

264.   The Controller Defendants owed the utmost fiduciary duties of care and loyalty, which comprise an obligation to act in good faith, with candor, and to make accurate material disclosures to Onyx's stockholders.

265.   The Controller Defendants breached their fiduciary duties by approving of, and causing Onyx to engage in, the Merger.

266.   CGG knew that (i) the Director Defendants owed Plaintiffs fiduciary duties of loyalty, care and disclosure; and (ii) OEC, as the controlling stockholder, owed Plaintiffs fiduciary duties of loyalty, care and disclosure.

267.   By the acts alleged herein, CGG knowingly participated in, and provided substantial assistance to, the Director Defendants and OEC's breaches of fiduciary duty by communicating to the Sponsor, among other things, that the Liquidation Preference was of central importance to the Controller Defendants and working exclusively to ensure the successful consummation of a deal, rather than maximizing deal consideration and protective provisions in the Business Combination Agreement.

268.   CGG knowingly and substantially assisted and participated in the Director Defendants' and OEC's use of unrealistic valuations of Onyx in order to support the transaction.

269.   CGG knowingly and substantially assisted and participated in the Director Defendants' and OEC's breaches of fiduciary duty by negotiating with the Sponsor in a way that encouraged the Sponsor to offer an artificially low deal price for Onyx, which did not reflect the fair value of Onyx but instead was designed to facilitate the consummation of a "Transaction" such that OEC could receive the Liquidation Preference and CGG could realize a "Success Fee" under the engagement letter.

270.   As a result of this conduct by CGG, Plaintiffs have been harmed.

## COUNT IX

### Aiding and Abetting Breach of Fiduciary Duty
### (Sponsor)

271.   Plaintiffs repeat and reallege the allegations in each of the paragraphs set forth above.

272.   The Sponsor was aware of the Controller Defendants' fiduciary duties of care and loyalty owed to Plaintiffs.

273.   The Controller Defendants breached their fiduciary duties by approving of, and causing Onyx to engage in, the Merger.

274.   The Sponsor knowingly participated in the Controller Defendants' breaches of their duties (and any exculpated care breaches by Director Defendants), when the Sponsor made the Business Combination Agreement contingent on the Controller Defendants exercising the Drag Along clause, ensuring the Controller Defendants would no longer exercise independent business judgment with respect to the Merger.  The Sponsor made sure to focus its offer on the liquidation payment that it knew was a priority for the Controller Defendants, in order to entice the Controller Defendants into disregarding their fiduciary duties in order to obtain a quick liquidation and exit.

275.   The Sponsor knew that the Business Combination Agreement was contingent on the Controller Defendants exercising the Drag Along clause, and that they, and the Controller Defendants, stood to profit immensely from the consummation of the Merger——even if the Merger was unfair to Onyx's minority shareholders.

276.   The Sponsor knowingly and substantially assisted and participated in the Director Defendants' breaches of fiduciary duty by knowingly offering an artificially low deal price for Onyx, including a cash-out payment to the Controller Defendants, which did not reflect the fair value of Onyx, but instead was designed to facilitate the consummation of a "Transaction" such that OEC could receive the

Liquidation Preference and CGG could realize the Success Fee under the engagement letter.

277.    As a result of this conduct by the Sponsor, Plaintiffs have been harmed.

## COUNT X

### Unjust Enrichment
### (Sponsor)

278.    Plaintiffs repeat and reallege the allegations in each of the paragraphs set forth above.

279.    The Sponsor negotiated a SPAC transaction with Controller Defendants that resulted in no cash going to the Company, and yet through that transaction the Sponsor collected significant fees along with a major stake in Onyx.  The Sponsor was thus unjustly enriched in the form of their SPAC fees and the share of the merged company.

280.    The Sponsor's enrichment came at the direct expense of Plaintiffs, whose ownership interest in the Company was diluted through the Merger, although neither Plaintiffs nor the Company received any benefit or consideration in exchange.

281.    Retention of those benefits would be inequitable because, among other actions, the Sponsor forced through a transaction knowing the damage it would cause to both their own shareholders and the shareholders of the target company.

282.   Accordingly, Defendants seek disgorgement of fees, profits, and the stake in the merged Company that the Sponsor received through the inequitable SPAC transaction.

## COUNT XI

### Unjust Enrichment
### (W. Kurtin)

283.   Plaintiffs repeat and reallege the allegations in each of the paragraphs set forth above.

284.   W. Kurtin provided $5 million to OEC and/or ICC by direct wire transfer to Onyx to fund the 2015 Transaction.

285.   Following the improper payment of the Liquidation Preference to OEC in connection with the Merger, on information and belief, among other benefits, the cash consideration was ultimately, in part or in whole, distributed to W. Kurtin.

286.   Because the Merger did not trigger the Liquidation Preference under the plain language of the Amended Certificate of Incorporation, W. Kurtin was unjustly enriched by the receipt of such proceeds, which should have instead been paid to the Company for the benefit of its shareholders.  Retention of such proceeds would therefore be inequitable.

287.   Accordingly, Plaintiffs seek disgorgement of any such proceeds received by W. Kurtin.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that the Court grant the following relief:

A.      Declaring that OEC breached the Stockholders Agreement;

B.      Declaring that OEC and the Director Defendants breached the Amended Certificate of Incorporation;

C.      Declaring that OEC breached the implied covenant of good faith and fair dealing under the Stockholders Agreement;

D.      Declaring that ICC and the Sponsor intentionally and wrongfully caused the Director Defendants and OEC to breach its obligations under the Amended Certificate of Incorporation;

E.      Declaring that Director Defendants, ICC, and the Sponsor intentionally and wrongfully caused the Director Defendants and OEC to breach its obligations under the Stockholders Agreement;

F.      Declaring that the Director Defendants breached their fiduciary duties to Onyx's common stockholders in connection with the Merger;

G.      Declaring that OEC breached its fiduciary duties to Onyx's common stockholders in connection with the Merger;

H.      Declaring that CGG aided and abetted the Controller Defendants to wrongfully enrich themselves by knowingly participating in the Controller

Defendants' breach of their fiduciary duties, and that CGG's knowing participation in this breach caused Onyx's common stockholders damage;

I.      Declaring that the Sponsor aided and abetted the Controller Defendants to wrongfully enrich themselves by knowingly offering an artificially low price for Onyx, and by facilitating a transaction where OEC would receive the Liquidation Preference and CGG could realize the Success Fee with full knowledge that this was breach of the fiduciary duties owed by the Controller Defendants to Plaintiffs and that this breach caused Onyx's common stockholders damage;

J.      Declaring that the Sponsor and W. Kurtin were unjustly enriched;

K.      Declaring Defendants jointly and severally liable for all damages and relief awarded to Plaintiffs;

L.      Award Plaintiffs such monetary and equitable relief against Defendants, as the Court deems just and equitable, including disgorgement where applicable;

M.      Awarding Plaintiffs their reasonable attorneys' fees, costs and expenses in incurred in connection with this action; and

N.      Awarding Plaintiffs such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedures, Plaintiffs hereby demand a trial by jury.

DATED:  December 27, 2022        /s/ Anthony J. Staltari

QUINN EMANUEL URQUHART
 & SULLIVAN, LLP

*Attorneys for Plaintiffs*
Ellison Ward Merkel*     Rollo C. Baker*
Edgar O. Aliferov*        Anthony J. Staltari
Sophia Y. Hill*

**pro hac vice* forthcoming
51 Madison Avenue
New York, New York 10010
(212) 849-7000