<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| STANISLAV ROYZENSHTEYN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ONYX ENTERPRISES CANADA, INC., et al.,<br><br>Defendants. | Civil Action No. 22-07514 (GC) (JBD)<br><br>**OPINION<br>FILED UNDER TEMPORARY SEAL** |

<u>**CASTNER, District Judge**</u>

     This matter comes before the Court upon five fully briefed motions filed by all Defendants

to dismiss Plaintiffs Stanislav Royzenshteyn and Roman Gerashenko's Complaint.[1]  (ECF Nos.

---

[1]     The relevant docket entries are as follows:

- Complaint (ECF Nos. 1 (redacted but searchable version), 33 (unredacted but flat version)).

- Defendant Kailas Agrawal's motion (ECF No. 82), Plaintiffs' opposition (ECF No. 83), and Agrawal's reply (ECF No. 84).

- Defendant J. William Kurtin's motion (ECF No. 85-1), Plaintiffs' opposition (ECF No. 86), and J.W. Kurtin's reply (ECF No. 85-3).

- Defendant Canaccord Genuity Group Inc.'s (Canaccord Inc.) motion (ECF Nos. 87, 89), Plaintiffs' opposition (ECF No. 90), and Canaccord Inc.'s reply (ECF Nos. 91, 93).

- Defendants Onyx Enterprises Canada Inc. (OEC), Prashant Pathak, and Carey Kurtin's (collectively, OEC Defendants) motion (ECF No. 88), Plaintiffs' opposition (ECF No. 96), and OEC Defendants' reply (ECF No. 94).

- Defendant In Colour Capital Inc.'s (ICC) motion (ECF No. 92), Plaintiffs' opposition (ECF Nos. 97, 98), and ICC's reply (ECF No. 95).

82, 85, 87, 88, 92.)  The Court has carefully considered the parties' submissions and decides the motions without oral argument pursuant to Federal Rule of Civil Procedure (Rule) 78(b) and Local Civil Rule 78.1(b).  For the reasons set forth below, and other good cause shown, Defendants' motions are **GRANTED** in part and **DENIED** in part.

## I.    <u>BACKGROUND</u>

### A.    **Factual Allegations**

In 2008, Plaintiffs founded Onyx Enterprises Int'l Corp. (Onyx or the Company), a New Jersey-based e-commerce retailer of specialty automotive products.  For years, Plaintiffs were Onyx's sole owners and directors.  In 2014, Plaintiffs began searching for outside investors. (Compl. ¶¶ 4, 24, 36-40.)

Their search led them to Prashant Pathak, the owner of the Canadian private equity firm Ekagrata, Inc., who then introduced Plaintiffs to Carey Kurtin and his father, J. William Kurtin. Impressed with Pathak's promises of a venture with a large Canadian tire retailer, Plaintiffs brought Pathak and C. Kurtin into Onyx through the "2015 Transaction."[2]  (*Id.* ¶¶ 40-41, 45.)

To facilitate the 2015 Transaction, Pathak and C. Kurtin formed Onyx Enterprises Canada, Inc. (OEC), which used $5 million that it received from J.W. Kurtin through his Canadian company In Colour Capital, Inc. (ICC) to invest in Onyx.[3]  The transaction is memorialized in several contracts (the "2015 Transaction Documents"): the Stockholders Agreement, Stock Purchase

---

[2]    Plaintiffs insist that their fraud-sounding allegations describing the lead up to the 2015 Transaction are "not the subject of this Action" but "solely for background."  (Compl. ¶ 44 n.1.)

[3]    The Complaint alleges both that "[J.W.] Kurtin provided it $5 million, through ICC, to be used for purposes of the transaction," and that "[J.W.] Kurtin's holding company, 2425470 Ontario Inc., sent the funds by direct wire to Onyx."  (Compl. ¶ 46.)

Agreement, Amended and Restated Certificate of Incorporation, and Amended and Restated Bylaws. (*Id.* ¶¶ 45-55.)[4]  The Complaint focuses on five terms across those documents.

The Stock Purchase Agreement includes two key terms in exchange for the $5 million investment in Onyx: *first*, OEC received one million preferred shares of Onyx and a warrant to purchase 52% of the common shares of Onyx, which OEC exercised in late 2015, making Plaintiffs minority shareholders of Onyx; and *second*, Pathak and C. Kurtin became two of the four members of Onyx's board of directors, the other two being Plaintiffs. (*Id.* ¶¶ 46-49, 57; Stock Purchase Agreement §§ 1.2, 2.3.)

The Stockholders Agreement includes two more key terms. *First*, a "Drag-Along" clause provides that if OEC accepts an offer to sell Onyx for at least $45 million, OEC can issue a "Drag Notice" and require Plaintiffs to sell their stock. *Second*, the Stockholders Agreement appointed OEC as Plaintiffs' "irrevocable proxy" to "vote the Voting Shares in accordance with this [Stockholders Agreement] . . . and to execute all appropriate instruments consistent with the provisions of this Agreement on behalf of such Stockholder." (Compl. ¶¶ 50-51; Stockholders Agreement §§ 4.5(a), 5.1.)

Finally, the Amended Certificate of Incorporation (COI) provides that if a merger involving Onyx resulted in its stockholders' losing a "majority of the voting power in substantially the same proportions" as they held before the merger, OEC would be entitled to the "Liquidation Preference": the sum of (i) "four times the Original Issue Price"—that is, four times OEC's $5 million investment, or $20 million—plus (ii) "any accrued but unpaid Accruing Dividends."  Any

---

[4]    (*See* Compl. Ex. A (Onyx Stockholders Agreement); Compl. Ex. B (Onyx Stock Purchase Agreement); Compl. Ex. C (Onyx Amended and Restate Certificate of Incorporation); Compl. Ex. D (Onyx Amended and Restated Bylaws).)

remaining assets would "be distributed ratably to the holders of the Common Stock." (Compl. ¶¶ 52-54; COI, Art. IV, §§ 3(a)-(b), 4(b) (cleaned up).)

Over time, disputes arose between Plaintiffs and Pathak and C. Kurtin. Plaintiffs say Pathak and C. Kurtin abandoned their pre-transaction promises. And frequent deadlocks of a divided board (Plaintiffs on one side, Pathak and C. Kurtin on the other) paralyzed decision-making and strained Onyx's business. (Compl. ¶¶ 57-58, 60.)

In March 2018, Plaintiffs sued OEC, Pathak, C. Kurtin, J.W. Kurtin, ICC, and their affiliates in the Superior Court of New Jersey, Monmouth County, Chancery Division, over allegations of fraud in the 2015 Transaction. To keep Onyx functioning, the parties asked the court to appoint a provisional fifth director to the board to settle the board's deadlocks. For that position, the parties chose Kailas Agrawal, who had served as Onyx's de facto chief financial officer since December 2015 before becoming Onyx's official CFO in January 2018. Though Agrawal was Pathak's long-time friend and a high-level employee with ICC, he assured Plaintiffs—deceptively so, Plaintiffs allege—that he would not be controlled by Pathak. (*Id.* ¶¶ 19, 59, 61-62.)

Later in 2018, Plaintiffs drew up a "three-year strategic roadmap" for Onyx. The plan, which focused on growing the business, would require more funds—at least $25 million, by the board's estimation. So the board set out to find an investment bank to help with fundraising. (*Id.* ¶¶ 64-66.)

In February 2019, after pursuing several investment banks, Onyx heard a presentation from Canaccord Genuity Group Inc. (Canaccord Inc.),[5] an investment bank who was recommended by Pathak and C. Kurtin and had ties to J.W. Kurtin. In its presentation, Canaccord made clear that

---

[5]    Canaccord Inc. asserts that Onyx in fact engaged Canaccord Genuity LLC (Canaccord LLC), not Canaccord Inc. In this background section, the Court refers to the entity simply as Canaccord.

it understood, "based on discussions with stakeholders," that the "current primary objective" was to sell Onyx.  With that understanding, Canaccord presented a preliminary valuation for Onyx of between $400 and $600 million, footnoting that its valuation "assume[d] a sale on 12/31/19."  (*Id.* ¶¶ 68-73.)

Though Plaintiffs were open to selling Onyx at an appropriate valuation, they preferred to grow the company, not sell it.  And they worried that Canaccord was too focused on selling Onyx.  Despite Plaintiffs' concerns, Onyx engaged Canaccord as the "exclusive financial advisor in connection with [Onyx]'s review of its strategic and financial alternatives," including possible business combinations or a financing transaction.  (*Id.* ¶¶ 72-74, 78.)

Plaintiffs allege that from the start, Canaccord—directed by Pathak, C. Kurtin, and Agrawal[6]—sought to sell Onyx rather than secure financing.  Canaccord's fee arrangement, Plaintiffs contend, made selling Onyx more lucrative for Canaccord.  (*Id.* ¶¶ 75-79.)

By March 2020, after a year of searching, Canaccord had fielded only two "low-ball offers" to purchase Onyx, which created more dysfunction and hostility among the already divided board members.  As Plaintiffs allege, private equity firms like ICC aim to enter a company and exit with a profit within five years—and ICC's five-year window was closing in 2020.  With the deadline looming, Pathak and C. Kurtin became desperate to find their exit that would trigger the Liquidation Preference.  (*Id.* ¶¶ 80-95.)

In July 2020, Canaccord contacted Legacy Acquisition Corp. (Legacy), a special purpose acquisition company (SPAC), as a potential acquirer of Oynx.  (*Id.* ¶ 97.)

---

[6]    Plaintiffs refer to Pathak, C. Kurtin, and Agrawal as the "Director Defendants" and, together with OEC, the "Controller Defendants."

Legacy, like most SPACs, was a shell with no operations of its own; it existed to raise funds and then find a privately held operating company and take that company public by merger. The typical life of a SPAC, as Plaintiffs describe it, is this: A sponsor (typically an investment firm) creates the SPAC, the SPAC raises funds through an initial public offering (typically at $10 per share, sold to institutional investors), the IPO proceeds are placed into a trust account for expenses and consideration for a merger, and the sponsor then has a set period (typically two years) to find a target company and complete the merger. Once a sponsor finds a suitable target, the sponsor and the target negotiate the terms of a merger, reach an agreement, and file a proxy statement memorializing the deal. The SPAC's investors then decide whether to (1) vote in favor of approving the merger, and (2) stay invested in the SPAC or instead redeem their shares and receive back their $10-per-share investment. If the merger is approved, the business combination is completed (the "de-SPAC transaction"), the SPAC funds are invested in the target, and the combined company trades under a new ticker symbol. But if a merger is never completed, the SPAC funds are returned to the investors, and the sponsor loses its entire investment. (*Id.* ¶¶ 98-102, 104, 106.)

Here, Legacy was formed and taken public by its sponsor, Legacy Acquisition I LLC (the Sponsor), in 2017. By mid-2020, the Sponsor still had not found a target company, despite receiving several deadline extensions. At that point, Legacy's investors had redeemed $242 million of the $300 million originally raised, leaving Legacy with only $64.5 million in trust. If the Sponsor could not close a deal by November 20, 2020, the latest deadline, it faced losing its entire investment. (*Id.* ¶¶ 106, 109-110.)

The urgency felt by both ends led to what Plaintiffs say was a rushed, unfair merger to the detriment of Onyx's minority shareholders. Within two months, the Controller Defendants and

Legacy negotiated the material terms of the deal, with Canaccord's help, and with Plaintiffs sidelined and kept in the dark. (*See id.* ¶¶ 112, 115, 118, 120-122, 156.)

In early negotiations, Legacy and Onyx exchanged a letter of intent in July 2020 and a revised version in August 2020. (Compl. Exs. E (July LOI), F (Aug. LOI).) The August LOI valued Onyx at least at $250 million, an increase from the July LOI's low-end valuation of $175 million. (Compl. ¶¶ 119, 121.) The August LOI also contemplated the following terms:

- approximately $20 million of Legacy's cash would go to OEC for the Liquidation Preference payment;

- "the remaining Legacy cash would remain on the balance sheet of the post-business combination company to fund growth, accretive strategic acquisitions to create a more attractive public company and for transaction expenses";

- the "[p]arties [would] discuss and mutually agree upon minimum cash proceeds for the proposed business combination (and related mechanics) following the initial marketing";

- Onyx's stockholders would receive stock in Legacy, which Plaintiffs submit "has no value independent of the [c]ompany it is acquiring"; and

- Legacy and Onyx would "discuss and mutually agree on the composition of the Board of Directors of Legacy post-business combination" and "other governance rights of [Onyx] stockholders commensurate with their post-closing ownership in the combined company."

[(*Id.* ¶¶ 124-128; Aug. LOI.)]

From the first LOI, Plaintiffs allege, the deal prioritized OEC's Liquidation Preference, omitting "protections ensuring that the SPAC would have a minimal amount of cash to contribute," risking that Plaintiffs "would receive no value for their Onyx stock." (Compl. ¶ 120, 129.)

On August 4, Onyx executed the August LOI. When Pathak forwarded the executed August LOI to the board, Plaintiffs raised concerns that the proposed transaction would not benefit them as minority common stockholders. Onyx proceeded with the deal anyway. (*Id.* ¶¶ 124, 130-136.)

On August 17, Onyx sent Legacy the first draft of the business combination agreement (BCA), which adopted the deal price and terms of the August LOI, without first giving Plaintiffs a chance to review it. Even by the board's meeting on August 28, where Onyx's outside counsel and Canaccord presented updates on the potential transaction, Plaintiffs still had not received the draft BCA. (*Id.* ¶¶ 139-144, 148.)

During the August 28 board meeting, Canaccord advised that "it had met with Legacy's institutional stockholders in a series of 'test-the-water' meetings to ensure that they would [support] the transaction and become ongoing shareholders in [Onyx]." Indeed, if Legacy's stockholders redeemed their shares, Legacy's trust account would have no cash for the surviving entity—defeating the point of going public. Canaccord also stated that the Controller Defendants and Canaccord never attempted to negotiate Legacy's $250 million valuation, reasoning that Legacy was better positioned to dictate the valuation. Onyx's outside counsel advised that in considering the transaction, the board owed "the same fiduciary duties to the shareholders as [it] would . . . in performing any other duties." Counsel also advised that the board was "not really selling [the] company" but was "just essentially bringing in some new capital via a transaction." (*Id.* ¶¶ 145-146, 149-152.)

Plaintiffs allege that because after the merger Onyx's stockholders would continue to "hold a majority of the voting power of the surviving entity in substantially the same proportions" as they held before the transaction—Onyx's stockholders' collective percentage share of voting stock would go from 100% pre-transaction to 79.2% post-transaction—the transaction would not qualify as an "Acquisition" triggering the Liquidation Preference. Yet the Controller Defendants and Canaccord proceeded as if the merger triggered the Liquidation Preference. (*Id.* ¶¶ 153-155.)

On September 1, Plaintiffs finally received the draft BCA.  On September 2 and 4, the board and Onyx's advisors met to discuss the draft BCA.  During both meetings, Plaintiffs continued to question the proposed deal's fairness for Onyx.  Canaccord and outside counsel responded, in essence, that arms-length negotiations determine a deal's fairness and that all of Onyx's common stockholders' interests were aligned—even though, as Plaintiffs allege, no negotiations had occurred, and the interests of the Controller Defendants and Plaintiffs were different.  Plaintiffs also allege that Canaccord did not consider "whether *no* transaction would have been better for the minority common stockholders than moving forward with this one."  No one ever explained to Plaintiffs why Onyx would accept a price that was much lower than its "pure metrics" valuation relative to its peer competitors.  (*Id.* ¶¶ 157-166, 198.)

On September 18, Legacy approved and signed the BCA.  That same day, Onyx's board held a special meeting,[7] with Canaccord and outside counsel present.  The special board meeting lasted 30 minutes, ending with the board's approval of the BCA by a 3-2 vote—Pathak, C. Kurtin, and Agrawal voted for the merger; Plaintiffs voted against it.  (*Id.* ¶¶ 167-169.)

The BCA required Onyx to "deliver, no later than one business day following the Agreement Date, a copy of the executed *written consent* of the requisite stockholders of Onyx approving the Business Combination Agreement."  So on the evening of September 18, OEC issued a Drag Notice under the Drag-Along clause of the Stockholders Agreement.  The Drag Notice stated that OEC accepted "an offer for a transfer" of all "Investor Stock" and all "Key Holder Stock" "as part of a Sale of the Company, structured as a merger . . . for a purchase price of approximately $260,000,000 to Legacy Acquisition Corp.," and that Plaintiffs must sell their

---

[7]    Plaintiffs allege that the special meeting was defective because the board did not give the three days' notice required under the bylaws.  (Compl. ¶ 168 n.17.)

Onyx shares in the merger, vote all their shares in favor of the merger, and execute all documents required to support the merger.  Acting under the Drag-Along clause, OEC issued the written consent of Onyx's stockholders to approve the BCA, as required under the BCA and New Jersey law.  C. Kurtin, invoking the proxy power under the Drag-Along clause, executed the written consent on Plaintiffs' behalf as their proxy.  Onyx then entered into an Agreement and Plan of Merger.  (*Id.* ¶¶ 170-176.)

On October 13, OEC called a special shareholder meeting of Onyx to "ratify and approve" the BCA.  (*Id.* ¶ 177.)

On November 20, the merger was completed.  The result was that Onyx ceased to exist; Legacy changed its name to PARTS iD, Inc., and listed its shares of Class A common stock on the NYSE under the symbol "ID"; and Excel Merger Sub II, LLC (Merger Sub 2), a newly formed subsidiary that was created for the transaction and absorbed Onyx along the way, changed its name to PARTS iD, LLC.  (*Id.* ¶ 178.)

The day before the merger was the last day that Legacy shareholders could redeem their shares.  And, as Plaintiffs had feared, roughly 84% of Legacy's outstanding public shares were redeemed for a total consideration exceeding $54 million payable from Legacy's trust account, leaving a cash balance of $9.3 million.  When the merger closed, Legacy paid OEC the $20 million Liquidation Preference, depleting all $9 million in cash from Legacy's trust account, and covering the balance with $11 million in Class A common stock in PARTS iD.  After redemption and liquidation payments, Legacy had no cash to put toward PARTS iD's balance sheet.  (*Id.* ¶¶ 203, 207.)

Plaintiffs assert that the merger was fundamentally flawed and unfair because (1) the Director Defendants were conflicted and not independent, and (2) the price and terms of the merger

undervalued Onyx and were deeply unfair to Plaintiffs.  As for their injuries, Plaintiffs assert that they "were each diluted from 24% to 18.2% ownership of the combined company"; "Onyx suffered a total dilution of 20.8%"; and transaction-related costs left the surviving entity "with less cash than Onyx brought to the table."  Plaintiffs' ownership stake was diluted from 48% to less than 37%, and they received no cash, received "approximately 36% of restricted stock in PARTS iD (around 75% of their initial equity stake)," and "lost their director seats on the board."  (*Id.* ¶¶ 180-208, 210-213, 221-222.)

### B.    Procedural History

In December 2022, Plaintiffs brought this diversity-based federal action against Pathak, C. Kurtin, and Agrawal, as former directors of Onyx; OEC, as Onyx's controlling stockholder; J.W. Kurtin and ICC, as affiliates and controllers of OEC; Canaccord Inc., as the investment bank that facilitated the merger; and the Sponsor, for its involvement.  (Compl. at 3.)

In May 2023, ICC moved to dismiss the Complaint, arguing in part that the Court lacked subject-matter jurisdiction because the Sponsor's members are not completely diverse from Plaintiffs.  (ECF No. 55 at 11-13.)  Days later, Plaintiffs filed a notice of voluntary dismissal of the Sponsor under Rule 41(a)(1)(A)(i).  (ECF No. 57.)  The Court then administratively terminated ICC's motion and instructed Defendants to file pre-motion letters in accordance with the Court's preferences.  (ECF Nos. 62.)  Defendants filed their letters, and following a pre-motion conference, the Court set a schedule for the parties to brief and file motions to dismiss in bundled fashion. (ECF No. 72.)

On August 9, Plaintiffs asked the Court if, instead of opposing the motions, they could file an amended complaint without leave of court.  (ECF No. 78.)  The Court denied their request, instructing Plaintiffs to either respond to the motions or move for leave to amend.  (ECF No. 81.)

So Plaintiffs opposed the motions, and in September, the parties filed the motions papers in bundle. (ECF Nos. 82 to 102.)

### C.    The Motions

Defendants raise various grounds for dismissing the entire action.  *First*, subject-matter jurisdiction: Plaintiffs' claims, though styled as "direct," are truly derivative and, as such, could not be dismissed without court approval under Rule 23.1(c); therefore, Plaintiffs' Rule 41 dismissal of the Sponsor is null, the Sponsor is still in the case, and thus complete diversity is lacking. *Second*, regardless, the Sponsor is a necessary and indispensable party under Rule 19, whose absence requires dismissal.  *Third*, the state-court action is a parallel proceeding justifying abstention under the *Colorado River* doctrine.

Some defendants assert grounds unique to those defendants.  *First*, J.W. Kurtin, Canaccord Inc., and ICC argue that they are not subject to personal jurisdiction in New Jersey.  *Next*, Agrawal argues that he enjoys quasi-judicial immunity against claims arising from his acts as a court-appointed provisional director.  *Finally*, the Complaint fails to state a claim under Rule 12(b)(6).

The Court will address these arguments in their logical sequence.

## II.    <u>LEGAL STANDARDS</u>

### A.    Rule 12(b)(1)—Lack of Subject-Matter Jurisdiction

Rule 12(b)(1) permits a defendant to move at any time to dismiss the complaint for lack of subject-matter jurisdiction on either facial or factual grounds.  *Gould Electronics Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

A facial challenge asserts that "the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction."  *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999).  In analyzing a facial challenge, a court "must only consider the allegations of the

complaint and documents attached thereto, in the light most favorable to the plaintiff." *Gould Electronics Inc.*, 220 F.3d at 176. "A court considering a facial challenge construes the allegations in the complaint as true and determines whether subject matter jurisdiction exists." *Arosa Solar Energy Sys., Inc. v. Solar*, Civ. No. 18-1340, 2021 WL 1196405, at *2 (D.N.J. Mar. 30, 2021).

A factual challenge, on the other hand, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016). The "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" and "the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "Therefore, a 12(b)(1) factual challenge strips the plaintiff of the protections and factual deference provided under 12(b)(6) review." *Hartig Drug Co.*, 836 F.3d at 268. Regardless of the type of challenge, the plaintiff bears the "burden of proving that the court has subject matter jurisdiction." *Cottrell v. Heritages Dairy Stores, Inc.*, Civ. No. 09-1743, 2010 WL 3908567, at *2 (D.N.J. Sep. 30, 2010) (citing *Mortensen*, 549 F.2d at 891).

## B.    Rule 12(b)(2)—Lack of Personal Jurisdiction

For purposes of a motion to dismiss under Rule 12(b)(2), "the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence . . . , not mere allegations." *Patterson v. F.B.I.*, 893 F.2d 595, 604 (3d Cir. 1990) (citation omitted); *see Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (describing plaintiff's burden to prove that jurisdiction exists). When the district court does not hold an evidentiary hearing, "the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its

favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004) (citation omitted).  If the plaintiff meets this burden, "the burden shifts to the defendant to establish the presence of other considerations that would render the exercise of personal jurisdiction unreasonable." *Brainbuilders LLC v. EmblemHealth, Inc.*, Civ. No. 20-12703, 2021 WL 2025004, at *3 (D.N.J. May 21, 2021) (quoting *Display Works, LLC v. Bartley*, 182 F. Supp. 3d 166, 172 (D.N.J. 2016)).[8]

## C.    Rule 12(b)(6)—Failure to State a Claim Upon Which Relief Can Be Granted

On a motion to dismiss for failure to state a claim, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Directors of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)).  When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 903 (3d Cir. 2021)).  The defendant bringing a Rule 12(b)(6) motion bears the burden of

---

[8]     To these ends, Plaintiffs submit a sworn declaration of Royzenshteyn ("Royzenshteyn Decl.") at ECF No. 99, and the defendants submit sworn statements of Donald MacFayden ("MacFayden Decl."), the executive vice president and chief financial officer at Canaccord Inc., at ECF No. 87-4; Prashant Pathak ("Pathak Decl."), as a principal of ICC, at ECF No. 92-2; and C. Kurtin ("C. Kurtin Decl."), as a principal of ICC, at ECF No. 92-3.  *See Dudhwala v. Choice Hotels Int'l Servs. Corp.*, Civ. No. 22-873, 2022 WL 4300219, at *2, 4 (D.N.J. Sept. 19, 2022) ("When evaluating a motion to dismiss for lack of personal jurisdiction, courts may consider facts outside of the complaint," including "parties' declarations for relevant factual support" (citing *Patterson by Patterson v. F.B.I.*, 893 F.2d 595, 603-04 (3d Cir. 1990))).

"showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

### D. Rule 12(b)(7)—Failure to Join a Party

In considering a motion to dismiss under Rule 12(b)(7), a district court first looks to Rule 19(a) to determine whether there is an absent party that should be joined as a "necessary" party. *Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 312 (3d Cir. 2007). If the absent party should be joined, but joinder is infeasible, then the court determines whether the absent party is indispensable under Rule 19(b). *Id.* at 313. If the absent party is indispensable, the court must dismiss the action. *Id.*

## III.  DISCUSSION

### A.  Parallel State Court Litigation

Canaccord Inc. argues that this action should be dismissed or stayed in favor of the pending State Court Litigation. (ECF No. 89 at 45-48; ECF No. 91 at 19.[9]) The Court disagrees.

"The *Colorado River* doctrine allows a federal court to abstain, either by staying or dismissing a pending federal action, when there is a parallel ongoing state court proceeding." *Tomasi v. Twp. of Long Beach*, 364 F. Supp. 3d 376, 388 (D.N.J. 2019) (quoting *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 307 (3d Cir. 2009)). Abstention under *Colorado River* depends on a two-part inquiry: (1) "whether there is a parallel state proceeding that raises 'substantially identical claims [and] nearly identical allegations and issues'"; and (2) "if so, 'whether "extraordinary circumstances" meriting abstention are present.'" *Id.* (quoting

---

[9]      Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

*Nationwide Mut.*, 571 F.3d at 307) (alterations in *Nationwide Mut.*).  If the state and federal proceedings are parallel, the Court determines whether "extraordinary circumstances" exist under a six-factor test:

> (1) [in an in rem case,] which court first assumed jurisdiction over [the] property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether federal or state law controls; and (6) whether the state court will adequately protect the interests of the parties.
>
> [*Id.* at 388-89 (quoting *Nationwide Mut.*, 571 F.3d at 308).]

"No one factor is determinative;" a court considers both "the obligation to exercise jurisdiction and the combination of factors counseling against that exercise." *Id.* at 389 (quoting *Nationwide Mut.*, 571 F.3d at 308).

The abstention test fails at step one.  Though the state and federal cases involve overlapping parties and similarly titled counts, the cases arise from separate transactions—the State Court Litigation concerns the 2015 Transaction; this federal action concerns the 2020 Merger.[10]  The two cases therefore are not "'identical,' or at least 'effectively the same.'"  *Kelly v. Maxum Specialty Ins. Grp.*, 868 F.3d 274, 285 (3d Cir. 2017) (citation omitted).

Nor is abstention warranted by Canaccord Inc.'s prediction that if Plaintiffs prevail in rescinding the 2015 Transaction in the State Court Litigation, "they will surely argue that the Controller Defendants lacked the ability to outvote Plaintiffs in favor of (and drag them along to) the merger."  (ECF No. 91 at 19.)  Under *Colorado River*, "[t]he proceedings must involve substantially similar parties and claims at the time the federal court is deciding whether to abstain."

---

[10]    Though not dispositive, Plaintiffs contain their federal action strictly to the 2020 merger. (*See* Compl. ¶ 44 n.1 ("To the extent that transactions in connection with the [State Court] Litigation are alleged herein, they are solely for background.").)

*Kelly*, 868 F.3d at 285.  "[P]roceedings are not parallel merely because of potentiality."  *Id.* at 286.[11]

The Court therefore declines to abstain under *Colorado River*.

**B.    Subject-Matter Jurisdiction**

1.    <u>Rule 41 Dismissal</u>

The parties dispute whether Plaintiffs could voluntarily dismiss all claims against the Sponsor, a nondiverse defendant, under Rule 41(a) to cure a jurisdictional defect.

OEC Defendants invoke the "time-of-filing" rule: that "the jurisdiction of the court depends upon the state of things at the time of the action brought."  *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570, 575 (2004) (rejecting a partnership's postfiling attempt to cure a jurisdictional defect by changing its partners' citizenships) (citation omitted).  Citing *Newman-Green, Inc. v. Alfonzo-Larrain*,[12] they argue that the time-of-filing rule has only two exceptions for curing jurisdictional defects—Rule 21 and 28 U.S.C. § 1653.  So Plaintiffs could not use Rule 41(a) to cure the jurisdictional defect.  (ECF No. 88-1 at 12-14.)  The Court disagrees.

Neither *Newman-Green* nor its ancestors or progeny expressly limits the time-of-filing rule's exceptions to Rule 21 and § 1653.  *See Newman-Green*, 490 U.S. at 830 ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed.  Like most general principles, however, this one is susceptible to exceptions, and the two that are potentially applicable here are reflected in 28 U.S.C. § 1653 and Rule 21 of the Federal Rules of Civil Procedure." (internal citation omitted)); *In re Lipitor Antitrust Litig.*, 855 F.3d 126, 150 (3d

---

[11]    Because the cases are not parallel, the Court need not weigh the exceptional-circumstances factors.  *See Golden Gate Nat'l Senior Care, LLC v. Beavens*, 123 F. Supp. 3d 619, 629 n.5 (E.D. Pa. 2015).

[12]    490 U.S. 826 (1989).

Cir. 2017) ("One such 'method of curing a jurisdictional defect [that has] long been an exception to the time-of-filing rule' is when a jurisdictional defect is 'cured by the dismissal of the party that had destroyed diversity.'" (quoting *Grupo Dataflux*, 541 U.S. at 572)).

Indeed, federal courts throughout the country agree that following *Grupo Dataflux*, parties can use Rule 41 to cure jurisdictional defects. *See, e.g.*, *Mason v. SunTrust Mortg., Inc.*, 2016 WL 9409010, at *2 (M.D. Tenn. May 6, 2016) (finding that whether dismissal of a nondiverse defendant was pursuant to Rule 21 or Rule 41 is "immaterial" (citing *AmSouth Bank v. Dale*, 386 F.3d 763, 777-78 (6th Cir. 2004))); *Hesed-El v. Bryson*, 2022 WL 4287975, at *5 (W.D.N.C. July 12, 2022), *report and recommendation adopted*, 2022 WL 3370797 (W.D.N.C. Aug. 16, 2022), *appeal dismissed*, 2023 WL 2610258 (4th Cir. Mar. 23, 2023) (collecting cases permitting plaintiffs to unilaterally dismiss nondiverse defendants to cure defects in diversity jurisdiction).

OEC Defendants' contrary arguments are unpersuasive. For starters, OEC Defendants misplace *Anderson v. Watts*,[13] a case that *Grupo Dataflux* visited before noting the longstanding "exception to the time-of-filing rule"—that a diversity-destroying party could be dismissed to cure a jurisdictional defect. *Grupo Dataflux*, 541 U.S. at 571-72. In *Anderson*, two executors of an estate, claiming to be New York citizens, brought a diversity-based suit in federal court against defendants alleged to be Florida citizens; the parties eventually learned that two defendants were New York citizens; so to save jurisdiction, the coexecutors dropped one executor and alleged that the other was actually a British citizen. *Grupo Dataflux*, 541 U.S. at 571 (discussing *Anderson*, 138 U.S. at 708). *Anderson*, according to *Grupo Dataflux*, "refused to give [diversity-perfecting] effect to the alteration of a coexecutorship into a lone executorship"—much as *Grupo Dataflux* "decline[d] to give diversity-perfecting effect to the alteration of a partnership with diversity-

---

[13]    138 U.S. 694 (1891).

destroying partners into a partnership without diversity-destroying partners." *Grupo Dataflux*, 541 U.S. at 572 n.3. But here, unlike the coexecutors in *Anderson* and the partners in *Grupo Dataflux*, the Sponsor is an "independent severable party" that Plaintiffs dismissed completely. *C.f. Grupo Dataflux*, 541 U.S. at 572 n.3. Its complete dismissal can cure a jurisdictional defect without having to change its citizenship or composition post filing.

OEC Defendants also argue that Plaintiffs' Rule 41 dismissal is null, because the Court's jurisdiction never attached, given that federal courts are "powerless to act without jurisdiction." (ECF No. 88-1 at 16.) This argument, too, is misplaced for two reasons.

First, a Rule 41 dismissal does not require court action. "Dismissals under Rule 41(a) may be effectuated by stipulation or by notice, and a proper dismissal using either method is self-executing." *Noga v. Fulton Fin. Corp. Emp. Benefit Plan*, 19 F.4th 264, 270 n.2 (3d Cir. 2021) ("[A] filing under [Rule 41(a)(1)(A)(i)] is a notice, not a motion. Its effect is automatic: the defendant does not file a response, and no order of the district court is needed to end the action." (quoting *In re Bath & Kitchen Fixtures Antitrust Litig.*, 535 F.3d 161, 165 (3d Cir. 2008) (alteration in *Noga*)). This general rule is not disputed here. (*See* ECF No. 88-1 at 21 ("[A] voluntary dismissal under Rule 41(a) is typically self-executing.").)

OEC Defendants contend that Plaintiffs' Rule 41, however, was not self-executing, because the dismissed "direct" claims were truly derivative whose dismissal required court approval under Rule 23.1(c). They argue that because "the Court must first determine a complex substantive issue of state law (i.e., whether Plaintiffs' claims against Sponsor are derivative) before determining whether" Plaintiffs can "voluntarily dismiss those claims in a self-executing manner without Court involvement," the Court first must resolve the threshold issue whether it has subject-matter jurisdiction over the case. (ECF No. 88-1 at 21-22.)

In support, OEC Defendants rely heavily on *University of South Alabama v. American Tobacco Co.*, a case whose unique posture and facts make its holding inapposite here. 168 F.3d 405 (11th Cir. 1999). (ECF No. 88-1 at 21-22.) *South Alabama* held that the district court should have addressed the University's motion to remand for lack of subject-matter jurisdiction before it addressed the validity of the nonparty Attorney General of Alabama's notice of dismissal under Rule 41(a)(1), which the Attorney General filed under an Alabama statute authorizing the Attorney General to direct and control litigation concerning the interest of the state. 168 F.3d at 407-08. For the Attorney General's Rule 41 dismissal to be effective, however, the Alabama district court had to "determine[] the scope of the Attorney General's authority under Alabama law"—that is, whether the statute authorized the Attorney General to participate in the case. *Id.* at 411. The nonparty Attorney General's invocation of that authority warranted a departure from the general rule that "[v]oluntary dismissal . . . normally may precede any analysis of subject matter jurisdiction because it is self-executing and moots all pending motions, obviating the need for the district court to exercise its jurisdiction." *Id.* at 409. (ECF No. 96 at 18.) None of the other cases that OEC Defendants rely on involves a dismissal to cure a jurisdictional defect. *See generally Certex USA, Inc. v. Vidal*, 2010 WL 2942441, at *3 n.2 (S.D. Fla. Feb. 8, 2010), and *Zavanna, LLC v. RoDa Drilling Co.*, 2009 WL 3720177, at *10 (D.N.D. Nov. 3, 2009) (both relying on *Univ. of S. Alabama*, 168 F.3d at 409, whose relevance here this Court rejected above).[14]

Second, and perhaps more important, OEC Defendants' argument disregards that federal courts can cure jurisdictional defects "at any time." *See Grupo Dataflux*, 541 U.S. at 572-73 ("By

---

[14]    Besides, OEC Defendants appear to abandon their argument by not responding to Plaintiffs' opposition on this point. (*See generally* ECF No. 94.) Defendants' "failure to respond to the pertinent opposition-brief argument acts as a concession of that argument." *Sang Geoul Lee v. Won Il Park*, 720 F. App'x 663, 666 (3d Cir. 2017) (citations omitted).

now, 'it is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time, even after judgment has been rendered.'" (quoting *Newman-Green*, 490 U.S. at 832)); *Newman-Green*, 490 U.S. at 836-37 (holding that "courts of appeals have the authority to dismiss a dispensable nondiverse party" "to correct jurisdictional defects"); *Avenatti v. Fox News Network LLC*, 41 F.4th 125, 131 (3d Cir. 2022) ("The [district] court may dismiss a nondiverse party in order to achieve diversity even after judgment has been entered." (quoting *Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1069 (3d Cir. 1979) (alteration in *Avenatti*)).   Indeed, *Newman-Green* rejected that courts should compel a plaintiff to "jump through these judicial hoops"—that is, dismiss the case only for the plaintiff to "simply refile in the District Court against the" diverse defendants and "submit the discovery materials already in hand"—"merely for the sake of hypertechnical jurisdictional purity."   490 U.S. at 837.[15]   The Court sees no reason why *Newman-Green*'s pragmatic approach to case management should not apply to Plaintiffs' Rule 41 dismissal.

OEC Defendants also misstate the ruling in *Latvala v. Amsterdam Hospitality Group LLC*.[16]  (ECF No. 94 at 8.)  In *Latvala*, the court denied the plaintiff's request to sever and dismiss three nondiverse defendants and several state-law claims to cure the jurisdictional defect—under Rule 21.  *Latvala*, 2012 WL 5512338, at *1-2.[17]  The *Latvala* plaintiffs, unlike Plaintiffs here, could not voluntarily dismiss by notice under Rule 41(a)(1)(i), because the defendants had already

---

[15]     For the same reasons, OEC Defendants' argument that Rule 82 and the Rules Enabling Act § 2072 prevent a Rule 41 dismissal from extending the Court's jurisdiction is unavailing.  (ECF No. 88-1 at 18.)

[16]     Civ. No. 11-2809, 2012 WL 5512338, at *1 (D.N.J. Nov. 14, 2012).

[17]     *See* Pl.'s Opp'n to Defs.' Mot. to Dismiss, *Latvala v. Amsterdam Hosp. Grp. LLC*, Civ. No. 11-2809 (D.N.J. May 2, 2012), ECF No. 32.

filed an answer. *Id.* at *1.[18]  But *Latvala* did not, as OEC Defendants say, reject *Publicker Industries, Inc. v. Roman Ceramics Corp.*, which held that a "court may dismiss a nondiverse party in order to achieve diversity even after judgment has been entered" if that party is not indispensable under Rule 19.  603 F.2d at 1069.  Nor could it—*Publicker Industries* was and remains controlling authority in this Circuit.  *See Avenatti*, 41 F.4th at 131 (noting that Rule 21 authorizes courts to dismiss nondiverse parties to preserve subject-matter jurisdiction (citing *Publicker Indus.*, 603 F.2d at 1069)).

In sum, Plaintiffs could cure a jurisdictional defect by voluntarily dismissing all claims against the Sponsor under Rule 41(a)(1)(A)(i).  As a result, the dismissal is effective and complete diversity exists.  The Court therefore has diversity-based subject-matter jurisdiction here.

### 2.    Necessary and Indispensable Party

To resolve all doubt, the Court on its own could dismiss the Sponsor as a party under Rule 21, because the Sponsor need not be joined under Rule 19.

Under Rule 19, a court must evaluate (1) whether the absent party should be joined under the qualifications of Rule 19(a)(1)(A) and (a)(1)(B); (2) if so, whether joinder is feasible, i.e., whether "the party be joined without depriving the court of the ability to hear the case"; and (3) if joinder is not feasible, whether the action should continue in the party's absence or be dismissed. *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, 80 F.4th 223, 232 (3d Cir. 2023).

Step one asks whether the absent party is necessary.  A party is "necessary" if either "(A) in that [party]'s absence, the court cannot accord complete relief among existing parties;" or "(B) that [party] claims an interest relating to the subject of the action and is so situated that disposing

---

[18]    *See* Answer, *Latvala v. Amsterdam Hosp. Grp. LLC*, Civ. No. 11-2809 (D.N.J. Aug. 1, 2011), ECF No. 17.

of the action in the [party]'s absence may" (i) "as a practical matter impair or impede the [party]'s ability to protect the interest;"[19] or (ii) "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1).

Defendants invoke the "complete relief" and "double, multiple, or otherwise inconsistent obligations" effects. They argue that under New Jersey's Comparative Negligence Act,[20] if the existing defendants are found to be less than 60% responsible for the total damages, those defendants will owe only the damages directly attributable to them, preventing Plaintiffs from recovering all the alleged damages. (ECF No. 85-1 at 20-24; ECF No. 88-1 at 22-24.) That recovery deficiency would not only prevent the Court from "accord[ing] complete relief among existing parties," Defendants say, but it would subject the existing defendants "to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1)(A) & (B)(ii). Defendants expect that to recover the balance, Plaintiffs would sue the Sponsor in a different jurisdiction, subjecting the existing defendants to third-party claims

---

[19]    It is noteworthy that the Sponsor does not "claim[] an interest." To be sure, "district courts possess power to protect the interests of absent parties. So when it is 'desirable to advise a person who has not been joined of the fact that the action is pending,' a 'court in its discretion may itself convey this information by directing a letter or other informal notice to the absentee.'" *Epsilon Energy*, 80 F.4th at 233 n.13 (quoting Fed. R. Civ. P. 19 advisory committee's note to 1966 amendment) (other internal citations omitted). But here, the Sponsor knows about this case—it was an original defendant. And after being dismissed from the case, the Sponsor advised the Court that it did not wish to participate: "As the Sponsor was dismissed from this action pursuant to Plaintiff's Notice of Voluntary Dismissal . . . , counsel for the Sponsor will not be attending the pre-motion conference . . . ." (ECF No. 71.)

[20]    N.J. Stat. Ann. § 2A:15-5.3. The Act "governs a broad range of civil causes of action, including statutory and common-law claims premised on intentional conduct as well as those based on negligence." *Liberty Ins. Corp. v. Techdan, LLC*, 289 A.3d 429, 441 (N.J. 2023) (citing N.J. Stat. Ann. § 2A:15-5.2(c), -5.3; *Blazovic v. Andrich*, 590 A.2d 222, 231 (N.J. 1991); *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997)).

or separate suits for contribution.  (ECF No. 88-1 at 22-24.)  That is, "expanded and duplicative litigation," "potentially contradictory rulings," and "needless multiple litigation" later.  (*Id.* at 24.)

Defendants' concern is fair but ultimately unpersuasive.  For one, this Circuit follows the longstanding rule that "a tortfeasor with the usual 'joint-and-several' liability is merely a permissive party to an action against another with like liability," and "it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit."  *Huber v. Taylor*, 532 F.3d 237, 249-50 (3d Cir. 2008); *see In re: Howmedica Osteonics Corp*, 867 F.3d 390, 408 (3d Cir. 2017) ("That the parties are allegedly joint tortfeasors or that the judgment might set 'a persuasive precedent' against the alleged required party is not sufficient" to deem that party as "required" under Rule 19 (citing *Huber*, 532 F.3d at 250)); *see also Fin. Res. Fed. Credit Union v. Alloya Corp. Fed. Credit Union*, Civ. No. 20-6180, 2021 WL 268176, at *9 (D.N.J. Jan. 27, 2021) ("Indeed, 'it is never necessary . . . to join a joint tortfeasor as a defendant in an action against other tortfeasors.'" (quoting *Rodin Properties-Shore Mall, N.V. v. Cushman & Wakefield of Pennsylvania, Inc.*, 49 F. Supp. 2d 709, 720 (D.N.J. 1999))).

For another, Defendants' argument assumes that Plaintiffs will not recover all damages from the existing defendants.  But that outcome is just one possibility based on Defendants' speculation.

In any joint-and-several liability scenario, a plaintiff who does not fully recover in one action against some joint tortfeasors might later sue for the rest from another tortfeasor.  In *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, for instance, the threat of piecemeal litigation resulting from the possibility that a nonparty co-obligor of a contract would later sue the existing defendant co-obligor for contribution or indemnification did not compel the nonparty's joinder under Rule 19.  11 F.3d 399, 410 (3d Cir. 1993) (rejecting that the present action would impair or

impede the nonparty co-obligor's interests, because the nonparty "can always bring its own action against [the existing co-obligor] for contribution or indemnification"); *see also Angst v. Royal Maccabees Life Ins. Co.*, 77 F.3d 701, 705 (3d Cir. 1996) ("The possibility that the successful party to the original litigation might have to defend against a subsequent suit by the receiver does not make the receiver a necessary party to the action." (citing *Sindia Expedition, Inc. v. Wrecked & Abandoned Vessel*, 895 F.2d 116, 122 (3d Cir. 1990))).  The *possibility* that Plaintiffs will not recover all damages from existing defendants ought not to outweigh Plaintiffs' right to choose their defendants.  *See Janney*, 11 F.3d at 412 ("Inherent in the concept of joint and several liability is the right of a plaintiff to satisfy its whole judgment by execution against any one of the multiple defendants who are liable to him, thereby forcing the debtor who has paid the whole debt to protect itself by an action for contribution against the other joint obligors.").

As Plaintiffs argue, Defendants can avoid prejudice by impleading or seeking contribution from the Sponsor.  (ECF No. 96 at 22-23, 24-25.)  Defendants counter that impleading the Sponsor would misalign the parties.  (ECF No. 94 at 14.)  Not necessarily.  Plaintiffs originally pleaded the Sponsor and the existing defendants all as direct tortfeasors, alleging that all defendants participated in the actionable events.  Plaintiffs do not allege that the existing defendants are indirect tortfeasors whose liability is predicated on the Sponsor's liability.  *Compare Janney*, 11 F.3d at 411 (rejecting Rule 19 joinder where the nonparty's liability as the defendant's co-obligor was "not a condition precedent" to the defendant's liability).  Thus, this action differs meaningfully from the cases that Defendants rely on for their misalignment argument.  *See Abuhouran v. KaiserKane, Inc.*, Civ. No. 10-6609, 2012 WL 4027416, at *7 n.15 (D.N.J. Sept. 12, 2012) (finding that without the nonparties who "actually engaged in" the actionable conduct, complete relief could not be accorded among the existing defendants (the nonparties' supervisors), whose liability

was predicated on the nonparties' liability); *Estrella v. V & G Mgmt. Corp.*, 158 F.R.D. 575, 581 (D.N.J. 1994) (finding that direct tortfeasors were necessary and indispensable parties and thus indirect tortfeasors' joining them through impleader under Rule 14 was improper).  (ECF No. 94 at 14.)

Nor does the Sponsor's absence risk the type of "needless multiple litigation" that was problematic in *Angst v. Royal Maccabees Life Insurance Co.*, as Defendants assert.  (ECF No. 88-1 at 24.)  In *Angst*, the plaintiff sued two life insurance companies in federal court, seeking the proceeds of his deceased brother's life insurance policies; around that time, a receiver for the decedent's business obtained a state-court order for one insurer to pay proceeds into escrow; then, the receiver sued the two insurers and the federal plaintiff in state court, seeking a constructive trust on the insurance policies' proceeds; finally, the receiver moved to intervene in the federal action.  77 F.3d at 703.  The federal court rejected that the action was truly a Rule 22 interpleader where the plaintiff and receiver were claimants against the insurers, found that the plaintiff and receiver were "the true opposing parties," and realigned the parties according to their interests in the litigation.  *Id.*  But the receiver was not diverse from the plaintiff, so the federal court would lack jurisdiction if the receiver was an indispensable party under Rule 19 when the complaint was filed.  *Id.* at 704.  As the *Angst* court found, the receiver was necessary because its absence could subject the existing parties to "'needless' multiple litigation": "If both actions proceed, the insurance companies could be asked to deposit the proceeds for the same insurance policies into two different escrow accounts."  *Id.* at 705-06.  And the receiver was indispensable because the plaintiff would have an adequate remedy in the state action.  *Id.* at 706.  But critical here, as mentioned above, the *Angst* court rejected that the "complete relief" effect applied, noting that "[t]he possibility that the successful party to the original litigation might have to defend against a

subsequent suit by the receiver does not make the receiver a necessary party to the action." *Id.* at 705 (citing *Sindia Expedition*, 895 F.2d at 122).

Because neither of the first-step effects invoked applies here, the Sponsor is not a necessary party under Rule 19. *See Janney*, 11 F.3d at 402 ("If [the nonparty] is not a necessary party under Rule 19(a), we need not reach the question whether it is indispensable under Rule 19(b)."). Defendants' Rule 12(b)(7) motion is therefore denied.

### 3.   Standing: Direct or Derivative Claims

Defendants argue that Plaintiffs lack standing, because their "direct" claims are truly derivative. Whether Plaintiffs' claims are direct or derivative may depend on which state's direct/derivative test applies—that of New Jersey, as Plaintiffs argue, or Delaware, as OEC Defendants argue. So the Court next resolves the parties' choice-of-law and standing disputes.[21]

A federal court sitting in diversity applies the choice-of-law rules of the state in which it is located—here, New Jersey. *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183 (3d Cir. 2017). The Court must perform a choice-of-law analysis "on an issue-by-issue basis," which means that each claim undergoes its own analysis. *Howmedica Osteonics Corp. v. Howard*, Civ. No. 19-19254, 2022 WL 16362464, at *13 n.9 (D.N.J. Oct. 28, 2022). In tort and contract matters, New Jersey applies the "most significant relationship" test set forth in the Restatement (Second) Conflict of Laws. *P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 459 (N.J. 2008); *Jackson v. Midland Funding LLC*, 468 F. App'x 123, 126 (3d Cir. 2012). The test entails two steps.

---

[21]     The law of New Jersey and Delaware both treat the decision whether a suit is direct or derivative as a threshold standing issue. *See Tully v. Mirz*, 198 A.3d 295, 301-03 (N.J. Super. Ct. App. Div. 2018) (reviewing a trial court's ruling that a plaintiff lacked standing to bring a derivative suit); *Morris v. Spectra Energy Partners (DE) GP, LP*, 246 A.3d 121, 129 (Del. 2021) ("Classifying a claim as either direct or derivative bears directly on standing and is in many ways outcome-determinative in post-merger litigation.").

First, the court determines whether an actual conflict exists. *Camp Jaycee*, 962 A.2d at 460. If no conflict exists, "there is no choice-of-law issue to be resolved and the forum state applies its own law." *Calabotta v. Phibro Animal Health Corp.*, 213 A.3d 210, 218 (N.J. Super. Ct. App. Div. 2019) (quoting *In re Accutane Litig.*, 194 A.3d 503, 517 (N.J. 2018)). But if an actual conflict exists, the Court proceeds to the second step to determine which forum has the "most significant relationship" to the claim by weighing the factors set forth in the Restatement (Second) of Conflict of Laws—for tort claims, §§ 6, 145, and 146; for contract claims, §§ 6 and 188. *Howmedica*, 2022 WL 16362464, at *14; *Calabotta*, 213 A.3d at 218-19; *Jackson*, 468 F. App'x at 126.

Minding these rules, the Court analyzes the direct/directive tests of Delaware and New Jersey.

Delaware law uses the two-question test established in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1263 (Del. 2021) (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)). A direct claimant must "demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation," i.e., "[t]he stockholder's claimed direct injury must be independent of any alleged injury to the corporation." *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 801-02 (Del. Ch. 2022) (quoting *Tooley*, 845 A.2d at 1039).

New Jersey law permits a shareholder to "maintain a direct action against a corporation or its directors if the shareholder suffers a 'special injury.'" *Tully*, 198 A.3d at 301 (quoting *Strasenburgh v. Straubmuller*, 683 A.2d 818, 830 (N.J. 1996)). "A special injury exists 'where

there is a wrong suffered by [the] plaintiff that was not suffered by all stockholders generally or where the wrong involves a contractual right of the stockholders, such as the right to vote.'" *Id.* (quoting *Strasenburgh*, 683 A.2d at 829).

Although New Jersey adopted the "special injury" test from Delaware, which has since discarded that test,[22] the current law of both states generally require a direct claim to be based on the plaintiff's own right or injury, as opposed to the company's. *See Tully*, 198 A.3d at 301 (New Jersey) ("[A] direct action is one in which liability is based upon an injury or violation of a duty owed to a particular shareholder." (citation omitted)); *Brookfield*, 261 A.3d at 1272 (Delaware) ("[A] direct, individual claim of stockholders that does not depend on harm to the corporation can also fall on all stockholders equally, without the claim thereby becoming a derivative claim." (citation omitted)).

The parties largely disagree about what law governs each claim. The parties agree that Delaware law applies to Plaintiffs' claims for breach of the Stockholders Agreement (Count I) and breach of the implied covenant of good faith and fair dealing under the Stockholders Agreement (Count III), given that agreement's Delaware choice-of-law provision. (ECF No. 96 at 28-29.) The parties dispute which state's law applies to the remaining claims for breach of the COI, which does not have a choice-of-law provision, against Pathak, C. Kurtin, and OEC (Count II);[23] tortious interference with the Stockholders Agreement against the Director Defendants, ICC, and previously the Sponsor (Count IV); tortious interference with the COI against ICC and previously

---

[22]    *See Strasenburgh*, 683 A.2d at 829 (New Jersey) (adopting the "special injury" test); *Brookfield*, 261 A.3d at 1272 (Delaware) (discussing *Tooley*'s ancestors and progeny).

[23]    Count II originally included Agrawal, though Plaintiffs now concede that Count II does not state a claim against Agrawal. (ECF No. 83 at 17 n.5.)

the Sponsor (Count V); breach of fiduciary duty against the Director Defendants (Count VI); breach of fiduciary duty against OEC (Count VII); aiding and abetting of fiduciary duty against Canaccord Inc. (Count VIII); aiding and abetting breach of fiduciary duty previously against the Sponsor (Count IX); unjust enrichment previously against the Sponsor (Count X); and unjust enrichment against J.W. Kurtin (Count XI).

Under both New Jersey and Delaware law, whether a claim is direct or derivative depends on whether the harm was to the individual shareholder or the corporation. And "[c]laims may not be dual-natured: they are either derivative or direct." *Landbridge Port Services (Hong Kong) Ltd. v. Notarc Port Investment LLC, et al.*, 2024 WL 1797115, at *3 (D. Del. Apr. 25, 2024) (citing *Brookfield*, 261 A.3d at 1266). So the Court must analyze the pleadings and determine what harm forms the basis of Plaintiffs' action. *Tully*, 198 A.3d at 301 ("To determine whether a complaint states a derivative or an individual cause of action, courts examine the nature of the wrongs alleged in the body of the complaint, not the plaintiff's designation or stated intention." (quoting *Strasenburgh*, 683 A.2d at 830)); *Hague v. Bay Landing Poa, Inc.*, 2022 WL 2541347, at *9 (Del. Ch. July 7, 2022) ("Plaintiffs' classification of the suit is not binding, and the Court looks at the nature of the wrong alleged, not merely at the form of words used in the complaint." (quoting *Tooley*, 845 A.2d at 1035; then *Blue v. Fireman*, 2022 WL 593899, at *5 (Del. Ch. Feb. 28, 2022))).

Plaintiffs allege various harms: the "loss of voting rights, equity dilution, inadequate consideration, misleading and incomplete provision of information, the misappropriation of $20 million in deal consideration, and an unfair merger process." (ECF No. 96 at 31-32.)

Some of this harm fits with direct claims. For instance, Counts I, III, and IV allege that "Plaintiffs were deprived of their contractual right to vote on the merger when the Controller Defendants unlawfully invoked the Drag-Along provision" of the Stockholders Agreement. (ECF

No. 96 at 35.)  The complete loss of voting rights provided in the parties' contract is different from, say, a fiduciary-duty claim alleging overpayment or dilution of voting power, which is "categorically derivative" because the harm flows "indirectly to [the stockholders] in proportion to, and via, their shares in" the corporate entity.  *Tornetta v. Musk*, 310 A.3d 430, 495 (Del. Ch. 2024); *Brookfield*, 261 A.3d at 1266, 1275 (Delaware).[24]  In the overpayment/dilution context, the corporate entity got the bad deal, and the shareholders suffered because of it.  *See Brookfield*, 261 A.3d at 1267 n.67 (Delaware).  By contrast, Plaintiffs focus on an individual injury: the complete loss of their voting rights under the Stockholders Agreement.  The loss of those rights allegedly also harmed the company, but those rights belonged to Plaintiffs, not the company.[25]  *See Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1139 (Del. 2016) (rejecting that "all claims, whether based on a tort, contract, or statutory cause of action . . . , [must] be brought derivatively whenever the corporation of which the plaintiff is a stockholder suffered the alleged harm" (quoting *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 180 (Del. 2015))); *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1049-50 (Del. Ch. 2015) ("Classic examples" of direct claims "included the right to vote, the right to compel payment of a contractually specified dividend, and the right to own and alienate shares").

---

[24]    To be sure, the Stockholders Agreement appears to be "part of an internal governance arrangement as opposed to an external commercial agreement."  *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 311 A.3d 809, 863 (Del. Ch. 2024).

[25]    OEC Defendants overstate *Tooley*'s impact on claims concerning voting rights.  (ECF No. 94 at 17-18 n.9.)  Contrary to OEC Defendants' suggestion, *Tooley* did not reject every aspect of every past direct/derivative ruling.  *See Allen v. Harvey*, 2023 WL 7122641, at *11 n.147 (Del. Ch. Oct. 30, 2023) (collecting post-*Tooley* cases stating that claims arising from impairments of shareholders' voting rights typically belong to the shareholders).  In fact, as *Brookfield* recognized, *Tooley* noted that "[t]he proper analysis has been and should remain" this: "a court should look to the nature of the wrong and to whom the relief should go."  *Brookfield*, 261 A.3d at 1273 (referencing pre-*Tooley* cases).  Here, the complete loss of voting rights is individual to Plaintiffs, and Plaintiffs seek money damages to remedy that injury.

For another, Plaintiffs allege injuries by "their removal as directors and the wrongful invocation of the Liquidation Preference" under the COI.  (ECF No. 96 at 43 n.10.)  They assert that the events triggering the Liquidation Preference never happened, so including the Liquidation Preference as part of the merger deal was wrong.  On the one hand, because this harm concerns contractual constraints on the Controller Defendants' authority under Onyx's governing documents, the harm lends itself to a direct claim.  *See Cmty. Corp. of High Point, Inc. v. Ponky, Inc.*, 2018 WL 4623368, at *5 (N.J. Super. Ct. App. Div. Sept. 27, 2018) ("[T]he certificate of incorporation, constitution and by-laws of the corporation constitute a contract between the corporation and its stockholders and the stockholders *inter sese*."[26] (quoting *Faunce v. Boost Co.*, 83 A.2d 649, 651 (N.J. Super. Ct. Ch. Div. 1951))); *Tully*, 198 A.3d at 302 (New Jersey) ("Plaintiff . . . is a party to the Agreement and, therefore, has standing for this claim as an interested party."); *Hague*, 2022 WL 2541347, at *9 n.129 (Delaware) ("Direct claims also include causes of action to enforce contract rights that stockholders possess under the corporation's certificate of incorporation and bylaws[.]" (quoting *In re Activision Blizzard*, 124 A.3d at 1049)).

On the other hand, Plaintiffs' allegation that the $20 million paid to OEC for the Liquidation Preference "should have been paid ratably to the common stockholders" could imply that Plaintiffs' injury is derivative.  (Compl. ¶ 155.)  If that cash was not paid to OEC, it would have "remain[ed] on the balance sheet of the post-combination company," according to the deal terms.  (*Id.* ¶ 124.)  In that light, the liquidation payment injured the company directly and Plaintiffs indirectly.  *See Tully*, 198 A.3d at 301 (New Jersey); *Brookfield*, 261 A.3d at 1272 (Delaware).

---

[26]     *Inter sese* means "between or among themselves," referring to "a right or duty owed between the parties rather than to others."  Inter se, Black's Law Dictionary (11th ed. 2019).  So taken at its plain meaning, the rule makes the COI a contract "between or among" Onyx's stockholders.

The Complaint is replete with other allegations of derivative injuries. Plaintiffs allege that they "were each diluted from 24% to 18.2% ownership of the combined company"; "Onyx suffered a total dilution of 20.8%"; and transaction-related costs left the surviving entity "with less cash than Onyx brought to the table." (Compl. ¶ 210.) Plaintiffs say their ownership stake was diluted from 48% to less than 37%, they received no cash from the merger, and they received "approximately 36% of restricted stock in PARTS iD (around 75% of their initial equity stake)." (*Id.* ¶¶ 211-213, 221-222.) On voting power dilution, the law of New Jersey and Delaware appear to conflict. *Compare Strasenburgh*, 683 A.2d at 831 (New Jersey) (implying that direct claims may arise from acts that "impair or dilute any voting rights" of minority shareholders),[27] *with Brookfield*, 261 A.3d at 1266 (Delaware) (holding that claims for voting power dilution are classically derivative).

Plaintiffs also allege that the price and terms of the merger undervalued Onyx and were deeply unfair to Plaintiffs. (Compl. ¶¶ 193-208.) The allegation implies that Onyx was harmed by Legacy's underpayment, which then harmed Plaintiffs, as shareholders, derivatively. *See Tully*, 198 A.3d at 301 (New Jersey) ("[R]egard for the corporate personality demands that suits to redress corporate injuries which secondarily harm all shareholders alike are brought only by the corporation." (citation omitted)); *Strasenburgh*, 683 A.2d at 832 (New Jersey) ("[B]ecause the nature of the injuries claimed . . . is essentially to shareholder values, the . . . claims are also

---

[27]    Considering that New Jersey's direct/derivative test came from Delaware, and that in the corporate context, New Jersey often visits decisions of Delaware courts, *see Sharma v. Gupta*, Civ. No. 20-3446, 2024 WL 86424, at *5 n.6 (D.N.J. Jan. 8, 2024) (citing *Lawson Mardon Wheaton, Inc. v. Smith*, 734 A.2d 738, 746 (N.J. 1999)), the Court estimates that if given the opportunity, New Jersey courts would follow *Brook*'s recalibration of Delaware's direct/derivative test, *but see Kostakopoulos v. Alma Bank*, 2016 WL 3563128, at *5 (N.J. Super. Ct. App. Div. July 1, 2016) ("Although we sometimes look to the decisions of the Delaware courts for guidance on corporate issues, we are not bound by those decisions.").

regarded as derivative." (citation omitted)); *Brookfield*, 261 A.3d at 1267 (Delaware) (holding that equity-dilution claims are exclusively derivative).

All told, Plaintiffs' claims all arise at least in part from harm that is direct under both New Jersey and Delaware law.  So the Court need not proceed to step two of the choice-of-law analysis or decide precisely what damages Plaintiffs can recover.  Plaintiffs have standing to pursue their direct claims.  If Plaintiffs also seek to recover derivative relief, they must comply with Rule 23.1's pleading requirements.

### C.    Personal Jurisdiction

J.W. Kurtin, Canaccord Inc., and ICC argue that this Court lacks personal jurisdiction over them.  (ECF Nos. 85-1, 87, 92.)

The United States Constitution provides two ways to establish personal jurisdiction: general (i.e., "all-purpose") and specific (i.e., "case-linked").  *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  Plaintiffs concede that these defendants are not subject to general personal jurisdiction in New Jersey.  (ECF No. 86 at 14 n.5; ECF No. 90 at 19; ECF No. 97 at 16 n.4.)

The test for specific personal jurisdiction varies depending on whether the claim is for a tort, intentional tort, or contract.  *See Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 130 (3d Cir. 2020).

Contract claims, including quasi-contract claims like unjust enrichment, undergo the traditional three-part test: *first*, the defendant "purposefully directed its activities at the forum"; *second*, the litigation "arise[s] out of or relate[s] to at least one of those activities"; and *third*, the exercise of jurisdiction "comports with fair play and substantial justice."  *O'Connor v. Sandy Lane*

*Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007); *Hepp v. Facebook*, 14 F.4th 204, 207 (3d Cir. 2021);

*D'Jamoos ex rel. Est. of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009);

*Efofex, Inc. v. Realhub Inc.*, Civ. No. 21-8454, 2023 WL 3901575, at *3-4 (D.N.J. June 8, 2023).

"The defendant need not be physically located in the state while committing the alleged acts." *Al-Ghena Int'l Corp. v. Radwan*, 957 F. Supp. 2d 511, 528 (D.N.J. 2013) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

Intentional tort claims, like tortious interference,[28] undergo the "*Calder* effects" test[29]:

> (3) The defendant committed an intentional tort;
>
> (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; [and]
>
> (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity[.]
>
> [*Christie v. Nat'l Inst. For Newman Stud.*, 258 F. Supp. 3d 494, 500 (D.N.J. 2017) (quoting *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265-66 (3d Cir. 1998)).]

### 1.    J.W. Kurtin

Plaintiffs' only claim against J.W. Kurtin is for unjust enrichment. They invoke an agency theory of personal jurisdiction, arguing that J.W. Kurtin purposefully availed himself of New Jersey "via his agents – C. Kurtin, Pathak, ICC, and OEC – whom he controlled to execute the unfair sales process for his benefit." (ECF No. 86 at 15.)

An agency theory of specific personal jurisdiction requires an agency relationship. "An agency relationship arises 'when one party consents to have another act on its behalf, with the

---

[28]    *MaxLite, Inc. v. ATG Elecs., Inc.*, 193 F. Supp. 3d 371, 388 (D.N.J. 2016).

[29]    *Calder v. Jones*, 465 U.S. 783, 788 (1984).

principal controlling and directing the acts of the agent.'" *Seltzer v. I.C. Optics, Ltd.*, 339 F. Supp. 2d 601, 609 (D.N.J. 2004) (quoting *Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 79 (N.J. 1993)). "[D]irect control of principal over agent is not absolutely necessary; a court must examine the totality of the circumstances to determine whether an agency relationship existed." *Jones v. Pi Kappa Alpha Int'l Fraternity, Inc.*, 431 F. Supp. 3d 518, 527 (D.N.J. 2019) (quoting *Rose*, 634 A.2d at 80). At this stage, a plaintiff relying on agency theory "need only make a prima facie showing of the connection between the actions of the agent and the principal." *D'Jamoos*, 566 F.3d at 108 (citation omitted).

To that effect, Plaintiffs allege the following as to J.W. Kurtin:

- J.W. Kurtin "directly advis[ed] his agents," C. Kurtin and Pathak, "to take the actions complained of in this Action" (Compl. ¶ 15);

- J.W. Kurtin "derived some pecuniary benefit from ICC as a result of the Merger" (*id.*);

- J.W. Kurtin is C. Kurtin's father and Pathak's business partner (*id.* ¶¶ 15, 41);

- J.W. Kurtin principally funded the initial $5 million investment into Onyx through ICC and owns the preferred shares in ICC through his holding company (*id.* ¶¶ 18, 32, 46, 284);

- J.W. Kurtin has the largest office at ICC's headquarters and holds himself out publicly as an ICC employee (Royzenshteyn Decl. ¶¶ 11, 24);

- During meetings with Plaintiffs in 2017, J.W. Kurtin "confirmed his influence and control over Pathak and C. Kurtin," including over Onyx's management, suggesting that he could remove Pathak as a director of Onyx and was setting aside funds to settle disputes (Compl. ¶¶ 59, 61 n.5; Royzenshteyn Decl. ¶ 26);

- Pathak and C. Kurtin implied that they were behold to J.W. Kurtin, noting that they would need to check with J.W. Kurtin before making important decisions, and often involving J.W. Kurtin in Onyx's internal disputes (Royzenshteyn Decl. ¶ 28);

- J.W. Kurtin flew Pathak and C. Kurtin into New Jersey on his private plane for Onyx board meetings, and at least once for a meeting with a potential Onyx investor (*id.* ¶ 29); and

- Based on J.W. Kurtin's interest in ICC, funding for the 2015 Transaction, and relationships with Pathak and C. Kurtin, Plaintiffs believed that J.W. Kurtin was directing ICC, Pathak, and C. Kurtin on important decisions concerning Onyx, including, "to the best of [Royzenshteyn's] belief," the 2020 merger (*id.* ¶ 30).

These allegations, accepted as true, do not plausibly imply the control necessary for the Court to infer a principal-agent relationship between J.W. Kurtin and Pathak, C. Kurtin, ICC, and OEC. Nor do they demonstrate that Plaintiffs "relied on the agent's apparent authority to act for a principal." *Rose*, 634 A.2d at 80 (citation omitted). The Court therefore rejects Plaintiffs' agency theory of specific personal jurisdiction over J.W. Kurtin.

The allegations do imply, however, that J.W. Kurtin might have directed activity at New Jersey relating to the 2020 merger. Given J.W. Kurtin's influential relationships with the Controller Defendants, involvement in OEC's initial investment in Onyx, and role in disputes between the board members, Plaintiffs theorize that he likely participated in the Controller Defendants' decisions affecting the 2020 merger. If anything, J.W. Kurtin's past dealings with the parties are circumstantial evidence leading Plaintiffs to believe that J.W. Kurtin directed ICC, Pathak, and C. Kurtin on decisions concerning the 2020 merger.

Circumstantial evidence can establish jurisdiction. *See, e.g.*, *Westpark Elecs. LLC v. EDealer LLC*, Civ. No. 22-4327, 2023 WL 5321053, at *5 (D.N.J. Aug. 17, 2023); *Batinkoff v. Church & Dwight Co.*, Civ. No. 18-16388, 2020 WL 1527957, at *13 (D.N.J. Mar. 31, 2020). And Plaintiffs enjoy all favorable inferences and a "relatively light" burden. *See Rickman v. BMW of N. Am. LLC*, 538 F. Supp. 3d 429, 438 (D.N.J. 2021) ("At this pre-discovery juncture, I construe any factual disputes in Plaintiffs' favor, and Plaintiffs' burden is relatively light." (citation omitted)). The challenge for Plaintiffs is that they only reference J.W. Kurtin's pre-merger contacts with New Jersey. *See Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 153 (3d Cir. 1996) (stating that only "dealings between the parties in regard to the

disputed contract, not dealings unrelated to the cause of action," are relevant to the minimum contacts analysis).

Plaintiffs thus ask for jurisdictional discovery.  "[A] plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery."  *Aldossari on Behalf of Aldossari v. Ripp*, 49 F.4th 236, 259 (3d Cir. 2022) (citation omitted).  Indeed, "[j]urisdictional discovery should be allowed unless the plaintiff's claim is 'clearly frivolous.'"  *Massachusetts Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997) (citation omitted). To get jurisdictional discovery, Plaintiffs need only allege facts suggesting "with reasonable particularity" that the requisite related contacts between J.W. Kurtin and New Jersey occurred. *See Malik v. Cabot Oil & Gas Corp.*, 710 F. App'x 561, 565 (3d Cir. 2017).

The Court is satisfied that Plaintiffs have so alleged here.  Plaintiffs' evidence supports that J.W. Kurtin spent time focusing on Onyx's business in New Jersey.  From that evidence, the Court can infer that J.W. Kurtin may have continued advising Pathak and C. Kurtin through the 2020 merger.   At a minimum, Plaintiffs' specific personal jurisdiction argument is not "clearly frivolous." *See Caduceus, Inc. v. Univ. Physician Grp.*, Civ. No. 23-3415, --- F.Supp.3d ----, 2024 WL 303845, at *6 (D.N.J. Jan. 26, 2024) (noting the relatively low bar for getting jurisdictional discovery "to avoid unnecessarily reaching abstract constitutional questions").

Thus, Plaintiffs and J.W. Kurtin shall engage in limited jurisdictional discovery.[30]

---

[30]    Because jurisdictional discovery is necessary, and for judicial economy, the Court denies J.W. Kurtin's Rule 12(b)(6) motion without prejudice to renew his motion to dismiss after limited discovery.  *See Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 95 (3d Cir. 2018) ("[T]hreshold disputes over venue and jurisdiction should be resolved before merits disputes.").

2.    <u>Canaccord Inc.</u>

Plaintiffs assert a claim against Canaccord Inc. for aiding and abetting the breach of a fiduciary duty.  Here, too, Plaintiffs invoke an agency theory to try to impute Canaccord LLC's acts in New Jersey to Canaccord Inc.[31]  The Complaint, however, does not mention Canaccord LLC.  Therefore, the Court dismisses Plaintiffs' claim against Canaccord Inc. without prejudice.

3.    <u>ICC</u>

Plaintiffs assert claims against ICC for tortious interference with the Stockholder Agreement and COI.  Plaintiffs argue that (1) OEC, ICC's subsidiary,[32] acted as ICC's alter ego or agent, and (2) Pathak and C. Kurtin acted as ICC's agents—such that their acts in New Jersey impute to ICC.[33]  (ECF No. 97 at 18-33.)

Generally, the "use of a subsidiary does not necessarily subject the parent corporation" or holding company "to the jurisdiction."  *In re Bulk [Extruded] Graphite Prod. Antitrust Litig.*, Civ. No. 02-6030, 2004 WL 7338471, at *5 (D.N.J. Oct. 28, 2004) (quoting *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 336 (1925)); *Carfagno v. Ace, Ltd.*, Civ. No. 04-6184, 2005 WL 1523530, at *6 (D.N.J. June 28, 2005).  But "if a subsidiary is merely the agent of a parent corporation, or if the parent corporation otherwise 'controls' the subsidiary, then personal jurisdiction exists over the parent whenever personal jurisdiction (whether general or specific)

---

[31]    (*See* ECF No. 90 at 16 (asserting that "[Canaccord LLC] acted as the United States agent of [Canaccord Inc.] with respect to the conduct at issue").)

[32]    (*See* Pathak Decl. ¶¶ 16, 20; C. Kurtin Decl. ¶¶ 16, 20 (both stating that OEC is an "independent subsidiary" of ICC).)

[33]    No party disputes that personal jurisdiction exists over OEC.

exists over the subsidiary." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 781 (3d Cir. 2018) (citations omitted).

*Alter-ego theory.* The alter-ego theory derives from New Jersey's veil-piercing doctrine,[34] requiring the jurisdiction-proponent to show the following two elements:

> (1) the subsidiary was an alter ego or the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent and (2) the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise circumvent the law.
>
> [*Bullard v. Jaguar Land Rover Auto. PLC*, Civ. No. 20-14464, 2023 WL 4841610, at *4 (D.N.J. July 28, 2023) (citation and quotation marks omitted).]

In deciding whether a subsidiary was "merely a conduit for the parent," courts consider various factors—for instance, the "failure to observe corporate formalities, gross undercapitalization, absence of corporate records, siphoning of funds of the corporation, and the corporation's existence as a facade for the operations of the dominant stockholder." *Napoli v. First Choice Loan Servs., Inc.*, Civ. No. 19-7265, 2020 WL 39148, at *5 (D.N.J. Jan. 3, 2020). Other factors include "who the subsidiary does business with other than the parent;" "the day-to-day involvement of the parent's directors, officers and personnel with the subsidiary;" and "the payment of the subsidiary's salaries and expenses by the parent." *Laverty v. Cox Enterprises, Inc.*, Civ. No. 18-1323, 2019 WL 351905, at *4 (D.N.J. Jan. 29, 2019) (quoting *Seltzer*, 339 F. Supp. 2d at 610); *see also Horowitz v. AT&T Inc.*, Civ. No. 17-4827, 2018 WL 1942525, at *8 (D.N.J. Apr. 25, 2018) (citing *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 513 (D.N.J. 2008), for

---

[34]     The parties appear to agree that the law of New Jersey governs whether to pierce OEC's corporate veil.  (*See* ECF No. 92-1 at 19-28; ECF No. 95 at 8-15; ECF No. 97 at 19, 23-27 (all relying on New Jersey law).)

additional factors). In all events, "for personal jurisdiction, the Court avoids any 'bright-line test.'" *Rickman*, 538 F. Supp. 3d at 437 (quoting *O'Connor*, 496 F.3d at 320).

For the first veil-piercing prong, Plaintiffs focus on ICC's and OEC's common ownership, OEC's financial dependency on ICC, and OEC's undercapitalization. (ECF No. 97 at 23-27.) Plaintiffs assert that Pathak and C. Kurtin are both ICC's and OEC's only owners, signaling ICC's complete domination over OEC. (ECF No. 97 at 23-24 n.7; Pathak Decl. ¶ 2; C. Kurtin Decl. ¶ 2.)[35] They also allege that OEC's $5 million investment in Onyx came from ICC, suggesting that OEC was undercapitalized at formation and financially depends on ICC. (ECF No. 97 at 24; Pathak Decl. ¶ 15 ("ICC merely funded OEC so it could buy a controlling stake in Onyx in July 2015."); C. Kurtin Decl. ¶ 15 (same).) And they assert that OEC's only business pursuit was investing in Onyx (and later PARTS iD) for ICC. (ECF No. 97 at 26; Rozyenshteyn Decl. ¶ 17.) On the last point, Rozyenshteyn's declaration states that OEC and ICC share a business address, where OEC has no signage or marketing material; Pathak and C. Kurtin used ICC email addresses and ICC letterhead for internal and external Onyx-related communications; Pathak and C. Kurtin often said that their investment in Onyx was part of ICC's "strategic plan"; and Pathak and C. Kurtin acted as if OEC and ICC "were one and the same." (Royzenshteyn Decl. ¶¶ 11-12, 15-16, 18, 21-22, 25.)

From these allegations, the Court cannot infer that OEC did not have a separate existence from ICC. For starters, common leadership is relevant but not dispositive for veil-piercing

---

[35]    *See also* PARTS iD, Schedule 13, *available at* https://www.sec.gov/Archives/edgar/data/1833076/000121390021002224/ea133379-sc13d_onyx.htm (last visited May 19, 2024) (listing Pathak and C. Kurtin as OEC's only directors). "The Court may consider documents in the public record, such as SEC filings, on a motion to dismiss without converting it into one for summary judgment." *Swift v. Pandey*, Civ. No. 13-650, 2013 WL 6054853, at *5 n.4 (D.N.J. Nov. 13, 2013) (citing *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 190 n.3 (3d Cir. 1999)).

purposes. *See High 5 Games, LLC v. Marks*, Civ. No. 13-7161, 2019 WL 3761114, at *6 (D.N.J. Aug. 9, 2019) ("'[C]ommon ownership and common management alone' are insufficient for veil-piercing purposes." (quoting *Linus Holding Corp. v. Mark Line Indus., LLC*, 376 F. Supp. 3d 417, 427 (D.N.J. 2019))); *see also Mikhail v. Amarin Corp., plc*, Civ. No. 23-01856, 2024 WL 863427, at *8 (D.N.J. Feb. 29, 2024) (noting the "well established principle of corporate law that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership" (quoting *United States v. Bestfoods*, 524 U.S. 51, 69 (1998)))).

For another, Pathak's and C. Kurtin's use of ICC's domain and brand for Onyx-related communications is not the type of conduct that typically justifies veil-piercing. *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001) ("[C]ourts have refused to pierce the veil even when subsidiary corporations use the trade name of the parent, accept administrative support from the parent, and have a significant economic relationship with the parent."); *Mills v. Ethicon, Inc.*, 406 F. Supp. 3d 363, 395 (D.N.J. 2019) ("[T]he fact that the parent and subsidiary share the same 'brand' is insufficient."); *see, e.g.*, *Westfield Ins. Co. v. Interline Brands, Inc.*, Civ. No. 12-6775, 2013 WL 6816173, at *22 (D.N.J. Dec. 20, 2013) (finding that a website referring to the entities interchangeably, common corporate officers and administrative employees, and an SEC filing's not distinguishing various entities "[a]t most" "suggest a parent-subsidiary relationship in which the lines between the distinct entities are occasionally blurred by the entities themselves or third parties"); *Horowitz*, 2018 WL 1942525, at *9 (rejecting that alter-ego status can be established by showing that the entities used the "same brand, website, and policies," without showing that "the subsidiaries ignored corporate formalities in day-to-day activities, the subsidiaries financially relied on [the holding parent], [the holding parent]'s subsidiaries were

undercapitalized, [the holding parent] paid the salaries and expenses of [its] subsidiary, and the entities shared similar employees").

Nor does ICC's formation of OEC solely to invest in Onyx justify veil-piercing. *See Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 903 A.2d 475, 499 (N.J. Super. Ct. App. Div. 2006) (noting that the "creation of a subsidiary for the sole purpose of acquiring the assets of another corporation does not establish dominance" (citing *State, Dep't of Env't Prot. v. Ventron Corp.*, 468 A.2d 150, 165 (N.J. 1983))); *Air Sea Int'l Forwarding, Inc. v. Glob. Imports & Trading, Inc.*, Civ. No. 03-268, 2008 WL 11510000, at *9 (D.N.J. Apr. 18, 2008), *report and recommendation adopted*, 2008 WL 11509999 (D.N.J. June 3, 2008) (noting that New Jersey law recognizes that "creating a corporation to limit liability is not improper"). The fact that ICC funded OEC so that OEC could buy a controlling stake in Onyx does not imply the commingling of funds or disregard of corporate formalities necessary for veil-piercing. *See Las Vegas Sands Corp. v. Ace Gaming, LLC*, 713 F. Supp. 2d 427, 446 (D.N.J. 2010) (rejecting that a subsidiary's borrowing money from its parent entity for business operations showed commingling of funds or disregard of corporate formalities (citing *Burstein*, 903 A.2d at 500)).

As for OEC's financial dependency, the Court is not convinced that OEC lacks enough capital to justify veil-piercing, based on the present record.

In short, the record does not show the factors necessary for Plaintiffs to establish an alter-ego theory of specific personal jurisdiction.[36]

---

[36]    To the extent that ICC argues that the Complaint must include a claim for piercing the corporate veil, the Court disagrees. (ECF No. 92-1 at 18-19; ECF No. 95 at 10.) *See L.E.A.D., Inc. v. Ne. Imp.-Exp., Inc.*, Civ. No. 17-4398, 2018 WL 2317535, at *3-4 (D.N.J. May 22, 2018) (finding that "New Jersey law does not recognize an independent cause of action for piercing the corporate veil"); *see also Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 469 n.10 (D. Del. 2010) ("[P]iercing the corporate veil is not itself an independent [ ] cause of action, but rather is a

*Agency theory.* Next is Plaintiffs' agency theory. To determine if a subsidiary is acting as an agent of the parent, courts consider whether (1) "the subsidiary is doing business in the forum that would otherwise be performed by the parent;"[37] (2) "there is common ownership of the parent and subsidiary;" (3) "there is financial dependency;" and (4) "the parent interferes with the subsidiary's personnel, disregards the corporate formalities, and/or controls the subsidiary's marketing and operational policies." *Mills*, 406 F. Supp. 3d at 393 (quoting *Dewey*, 558 F. Supp. 2d at 513).

ICC submits that it is merely a parent holding company of OEC. (ECF No. 92-1 at 22.) ICC says it is not an investor in Onyx and did not appoint Pathak or C. Kurtin to Onyx's board; it merely funded OEC so that OEC could buy a controlling stake in Onyx in 2015. (*Id.* at 18.)

Plaintiffs, on the other hand, assert that ICC used OEC as a shell to invest in Onyx on ICC's behalf. (ECF No. 97 at 18 (citing Compl. ¶ 46, which describes OEC's formation "to facilitate the 2015 Transaction"); Royzenshteyn Decl. ¶ 8.) Plaintiffs argue that ICC is not a true, uninvolved holding company that simply invests in different companies; rather, ICC used OEC, Pathak, and C. Kurtin to carry on ICC's business on its behalf. In support, Plaintiffs submit correspondence from Pathak and C. Kurtin using ICC domains and letterhead for Onyx-related matters, including the 2020 merger. (ECF No. 98 at 30 (citing Compl. ¶ 130); Royzenshteyn Decl. ¶¶ 9, 12, 15, 21-22, Exs. B, E, F, G.) They also submit copies of Pathak's and C. Kurtin's LinkedIn pages, which

---

means of imposing liability on an underlying cause of action." (quoting *Peacock v. Thomas*, 516 U.S. 349, 354 (1996)) (alternation in *Blair*)).

[37]    *Daimler AG v. Bauman* warned that focusing on whether an agent performs services that a parent would otherwise perform absent the agent "stacks the deck, for it will always yield a pro-jurisdiction answer" for general personal jurisdiction, not specific personal jurisdiction. 571 U.S. 117, 135-36 (2014). "Agency relationships . . . may be relevant to the existence of *specific* jurisdiction." *Id.* at 135 n.14.

list their employment with ICC and omit OEC.  (Royzenshteyn Decl. ¶ 23, Exs. H, I.)  In his declaration, Royzenshteyn states that Pathak and C. Kurtin never used an email domain associated with OEC, which does no marketing or advertising and has no company website or public-facing phone line.  (*Id.* ¶¶ 14, 18-20.)  He also states that ICC and OEC share an office address, yet only ICC has signage at the office.  (*Id.* ¶ 11.)  And again, he states that Pathak and C. Kurtin often mentioned that their investment in Onyx was part of ICC's "strategic plan."  (*Id.* ¶ 16.)

"[A]ll holding companies do," as one court put it, "is 'hold.'"  *Johnson v. SmithKline Beecham Corp.*, 853 F. Supp. 2d 487, 493 (E.D. Pa. 2012), *aff'd*, 724 F.3d 337 (3d Cir. 2013) (collecting cases observing that holding companies do not run the entities they own).  If one subsidiary disappears, a true "holding company could simply hold another type of subsidiary." *Horowitz*, 2018 WL 1942525, at *9.

But here, for purposes of jurisdiction only, Plaintiffs present enough for the Court to infer that ICC did more than just hold OEC.  Plaintiffs provide concrete examples of ICC's activity, directly or through its agents, directed toward Onyx's business in New Jersey, including the 2020 merger.  Plaintiffs' allegations and declarations, viewed in a light most favorable to Plaintiffs, plausibly imply an agency theory of specific personal jurisdiction over ICC through Pathak, C. Kurtin, OEC, or all of them.  *See Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 373 n.6 (3d Cir. 2002) (recognizing that activities of a holding company and its subsidiaries could be "so intertwined as to justify imputing the subsidiaries' conduct to [the holding company] for personal jurisdiction purposes").

Because the Court finds that Plaintiffs sufficiently establish that Pathak and C. Kurtin acted as agents in New Jersey for ICC, ICC is subject to specific personal jurisdiction here.  *See Int'l Playthings LLC v. Toy Teck Ltd., LLC*, Civ. No. 11-6832, 2013 WL 8184357, at *10 (D.N.J. July

23, 2013) (noting in the principal-agent specific personal jurisdiction context that "to the extent [the agent] is subject to personal jurisdiction in this District, so is [the principal]"); *Grand Entertainment Group v. Star Media Sales*, 988 F.2d 476, 483 (3d Cir. 1993) ("Activities of a party's agent may count toward the minimum contacts necessary to support jurisdiction.")

### D.    Quasi-Judicial Immunity

Agrawal asks the Court to extend quasi-judicial immunity to his conduct as a court-appointed provisional director and dismiss Plaintiffs' claims against him.  (ECF No. 82-1 at 16.)

Absolute quasi-judicial immunity has applied to three categories of officials whose functions are akin to those of a judge: (1) "those who make discretionary judgments 'functionally comparable' to judges, such as prosecutors and grand jurors"; (2) "those who 'perform a somewhat different function in the trial process but whose participation . . . is equally indispensable,' such as witnesses"; and (3) "those who serve as 'arms of the court,' . . . fulfilling a quasi-judicial role at the court's request, such as guardians ad litem or court-appointed doctors."  *Trinh v. Fineman*, 9 F.4th 235, 238 (3d Cir. 2021), *cert. denied*, 142 S. Ct. 1364 (2022); *Russell v. Richardson*, 905 F.3d 239, 247 (3d Cir. 2018) (cleaned up) (internal citations and some quotation marks omitted). As to the "arms of the court" category, "[q]uasi-judicial immunity extends only to the acts authorized by court order, i.e., to the execution of a court order, and not to the manner in which it is executed."  *Russell*, 905 F.3d at 250.

*Russell v. Richardson* provides a framework for "any new extension of absolute immunity."  905 F.3d at 250.  As *Russell* explains, courts take a "functional approach" to determining whether a court-appointed official fulfilled a quasi-judicial role.  *Id.* at 247, 250-51. The approach requires "examin[ing] the nature of the functions with which a particular official . . . has been lawfully entrusted, with the 'relevant decisional material' being the 'legal and structural

components of the job function.'"  *Id.* (internal citations omitted).  It then "evaluate[s] the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions."  *Id.* at 247, 251.

To illustrate, take *Trinh v. Fineman*, where the Court of Appeals extended quasi-judicial immunity to a state court-appointed receiver as an "arm of the court."  9 F.4th 235 (3d Cir. 2021).  Relevant there, the receiver "ha[d] no powers except such as are conferred upon him by the order of his appointment and the course and practice of the court"; as a legal matter, the receiver's appointment causes the subject property to "pass[ ] into the custody of the law, and thenceforward its administration [is] wholly under the control of the court by its officer or creature, the receiver"; several other courts of appeals had cloaked court-appointed receivers with quasi-judicial immunity; and Pennsylvania law defines a court-appointed receiver as a "judicial officer."  *Id.* at 238 (citations omitted).  And since the state court had approved all of the receiver's fees and expenditures, the receiver was said to have "act[ed] in all relevant respects 'at the court's request.'"  *Id.* at 239 (quoting *Russell*, 905 F.3d at 247-48).  The plaintiff's contrary arguments, the Court of Appeals found, were truly just "a disagreement with the outcome of [the receiver]'s court-ordained actions."  *Id.*

Likewise, in *Ke v. DiPasquale*, the Court of Appeals extended quasi-judicial immunity to a divorce master, whose "adjudicative tasks" were "functionally comparable to those performed by a judge."  828 F. App'x 98, 100-01 (3d Cir. 2020).  The challenged conduct was the divorce master's distribution of assets in the plaintiff's divorce case—not "conduct that was not taken in a judicial capacity or that was taken in the complete absence of jurisdiction."  *Id.* at 101 (citing *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991)).

The Court is aware of only one case that has extended quasi-judicial immunity to a provision director—*Latt v. Superior Ct.*, 212 Cal. Rptr. 380 (Ct. App. 1985). In *Latt*, the court appointed a retired judge to be a provisional director to resolve deadlocks between two 50-50 board members, Morris Latt and William Tenenblatt; eventually, the provisional director and Tenenblatt voted to remove Latt from his position as president of the company; the company later sued Latt; and Latt counterclaimed, alleging that the provisional director "had breached his fiduciary duty by not investigating or acting against Tenenblatt's alleged conflict of interest. *Id.* at 381-82. The lower court granted the provisional director quasi-judicial immunity and dismissed Latt's claim. *Id.* at 382. In so ruling, the court found that the provisional director served "as an arm of the court to resolve intra-corporate disputes in a quasi-judicial manner"; "[t]he court cannot directly supervise and rule upon the day-to-day management of corporate affairs"; and "[a]bsent a rule of immunity, there would be a chilling effect upon the ability of litigants in a case such as this to obtain the services of a qualified, impartial arbiter." *Id.* at 382.

The appellate court agreed. It noted that a provisional director "has the single function and duty to vote with one" side of the deadlocked board. *Id.* at 384. It also noted that according to the statute, the "[q]ualifications for the positions are substantially the same as those required for the exercise of judicial or quasi-judicial functions," and "[t]he limit of the appointee's power is specifically circumscribed, as is the tenure of the office." *Id.* As the appellate court observed, resolving impasses is a judicial responsibility. When a corporation will likely need tie-breaking votes regularly, the court delegates that judicial responsibility to a provisional director for efficiency. *Id.* If the board members wish to discharge the provisional director after the impasse is resolved, they can ask the court to remove him or her. But "[i]t is patently unfair to burden a

court's delegate (a provisional director) with civil liability for judicial acts performed for which a judge exercising the same functions could not be civilly liable." *Id.* at 384, 387.

Minding these principles, the Court sees no reason why quasi-judicial immunity would not extend to a court-appointed provisional director as an "arm of the court." Here, as in *Latt*, the state court appointed Agrawal as a provisional director to cast tie-breaking votes resolving deadlocks between Plaintiffs, Pathak, and C. Kurtin. In that role, Agrawal had "all the rights and powers of a duly elected director of the corporation" and could be "removed by order of the court or, unless otherwise ordered by the court, by" the voting shareholders. N.J. Stat. Ann. § 14A:12-7(3). He had to be "an impartial person" and "report from time to time to the court." N.J. Stat. Ann. § 14A:12-7(5), (6). The nature of the provisional director's role—as a tie-breaker—almost guarantees that he or she will be deeply unpopular with the losing side of the votes. Exposing a provisional director to civil liability for actions taken in that role would threaten his or her impartiality and discourage voluntary participation.

Agrawal reported to and was overseen by the state court. His impartiality was also reviewed each of the three times that Plaintiffs sought to remove him as a provisional director; the court denied the attempts. (Canning Cert. ¶¶ 2-8, ECF No. 84-1 at 2-3.) In one request, Plaintiffs submitted that "[a]s a provisional director, Mr. Agrawal is an arm and officer of the Court that was appointed subject and pursuant to N.J.S.A. 14A:12-7(5)." (ECF No. 84-1 at 33.) Indeed, Plaintiffs later wrote that "members of the judiciary — and Mr. Agrawal is an arm and officer of the judiciary — abide by Rule 3.17(B) of the Code of Judicial Conduct, which requires judges to disqualify themselves in proceedings 'in which their impartiality or the appearance of their impartiality might reasonably be questioned.'" (*Id.* at 42-43.)

Because the claims against Agrawal appear to rely only on allegations concerning Agrawal's acts as a provision director—specifically, his vote for the merger—he enjoys absolute quasi-judicial immunity.  (ECF No. 82-1 at 26-27, 29.)

That said, quasi-judicial immunity may not apply for acts "outside of his authority" or not "at the direction of the judge."  *Trinh*, 9 F.4th at 239; *Russell*, 905 F.3d at 251; *see Ke*, 828 F. App'x at 100-01 (recognizing that quasi-judicial immunity might not apply to "conduct that was not taken in a judicial capacity or that was taken in the complete absence of jurisdiction").  But the Complaint does not include such allegations.  As to Agrawal's involvement in merger negotiations, for example, the Complaint alleges only that "Agrawal was a fundamental player in negotiations"—shedding little light on his actual involvement or whether such involvement was beyond his mandate as a provision director.  (Compl. ¶ 186.)

Thus, Counts II, IV, and VI against Agrawal are dismissed without prejudice.

### E.    Prohibited Shotgun Pleadings

OEC Defendants argue that Plaintiffs engaged in prohibited shotgun pleadings.  (ECF No. 88-1 at 37.)  They argue that Plaintiffs improperly incorporated all prior allegations into each count; make hundreds of irrelevant allegations, leaving Defendants to guess which allegations form the basis of the claims against them; fail to allege which fiduciary duties Defendants allegedly violated; and improperly bracket Defendants with different roles and legal responsibilities into unitary groups.

The Court disagrees.  When it comes to "shotgun pleadings," the touchstone inquiry is whether the pleading "fail[s] to one degree or another . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."  *Bartol v. Barrowclough*, 251 F. Supp. 3d 855, 859 (E.D. Pa. 2017) (quoting *Weiland v. Palm Beach Cnty. Sheriff's Off.*,

792 F.3d 1313, 1323 (11th Cir. 2015)).  The Complaint gives Defendants more than enough notice of the factual circumstances that catalyzed the action, the fiduciary duties that OEC Defendants allegedly breached, and the roles that each defendant allegedly played in the events challenged. The Court therefore denies OEC Defendants' Rule 12(b)(6) motion.

## IV.    CONCLUSION

For the reasons set forth above, and other good cause shown, Agrawal's motion to dismiss is **GRANTED**, and Plaintiffs' claims against him (Counts II, IV, and VI) are **DISMISSED** without prejudice; J.W. Kurtin's motion to dismiss is **DENIED** so that he and Plaintiffs can conduct limited jurisdictional discovery; OEC Defendants' motion to dismiss is **DENIED**; Canaccord Inc.'s motion to dismiss is **GRANTED**, and Count VIII of the Complaint is **DISMISSED** without prejudice; and ICC's motion to dismiss is **DENIED**.  An appropriate Order follows.

Dated: May 31, 2024

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE